MELINDA BIRD (SBN: 102236)
Disability Rights California
350 S. Bixel Street, Suite 290
Los Angeles, CA 90017
Telephone: (213) 213-8000
Facsimile: (213) 213-8001
Email: melinda.bird@disabilityrightsca.org

CARLY J. MUNSON (SBN: 254598)
Disability Rights California
1831 K Street
Sacramento, CA 95811-4114
Telephone: (916) 504-5800
Facsimile: (916) 504-5801
Email: carly.munson@disabilityrightsca.org

THOMAS P. ZITO (SBN: 304629)
FREYA PITTS (SBN: 295878)
Disability Rights Advocates
2001 Center Street, Fourth Floor
Berkeley, California  94704-1204
Telephone: (510) 665-8644
Facsimile: (510) 665-8511
Email: tzito@dralegal.org
        fpitts@dralegal.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| T.G., by and through his Next Friend, TANITA J.; P.P., by and through his General Guardian, REBECCA P.; and J.A.; on behalf of themselves and all others similarly situated, Plaintiffs,<br><br>v.<br><br>KERN COUNTY; KERN COUNTY PROBATION DEPARTMENT; TR MERICKEL, in his official capacity as Chief of the Probation Department; KERN COUNTY SUPERINTENDENT OF SCHOOLS; and MARY C. BARLOW, in her official capacity as Superintendent of Schools, Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      This class action civil rights lawsuit challenges ongoing and pervasive discrimination against young people with disabilities held at Kern County's juvenile detention facilities.  Far from offering "the safe and supportive homelike environment" required under California law to promote rehabilitation, *see* Cal. Welf. & Inst. Code § 851, these facilities have the effect of punishing, isolating, and intimidating the young people in their care, while depriving them of crucial educational and rehabilitative opportunities.

2.      Staff at Kern County's James G. Bowles Juvenile Hall ("Juvenile Hall complex") and the Larry J. Rhoades Kern Crossroads Facility ("Crossroads") routinely and excessively deploy Oleoresin Capsicum spray – a stinging, burning gas known as "pepper spray"– including on youth who are nonviolent, youth who are already restrained, youth who are compliant, and youth who are unlucky enough to be in the way.  They subdue youth using excessive amounts of force and dangerous, painful prone restraint holds.  They punish youth by isolating them from their peers for extended periods of time, including for minor infractions.  Youth in these facilities navigate a climate characterized by fear, intimidation, and abuse, and are routinely unable to access the supports and opportunities they need to thrive and successfully reintegrate into their communities.

3.      This situation is all the more difficult for the many young people with mental health, behavioral, learning, intellectual, and/or developmental disabilities held at the Juvenile Hall complex or Crossroads, including the many who are survivors of significant trauma.  Staff routinely punish these young people – including through the use of isolation, restraint, and chemical force – for behavior related to their disabilities.  Because of their disabilities, these youth are uniquely vulnerable to the adverse effects of such punitive practices, which can exacerbate preexisting mental health conditions and, in a vicious cycle, increase the likelihood of further disciplinary incidents.  In addition, Defendants deny young people with disabilities appropriate psychiatric and mental health services and adequate reentry planning – supports that they need to access the rehabilitative and educational opportunities available.

4.     Compounding the harm to young people held at the Juvenile Hall complex and Crossroads, Defendants infringe upon youths' educational rights by failing to provide an adequate education and critical special education services.  Students with mental health, behavioral, learning, intellectual, and/or developmental disabilities find themselves taught by unqualified instructors, denied the accommodations to which they are entitled, and removed from the classroom without appropriate consideration of their disabilities.

5.     Plaintiffs are youth with such disabilities who are currently held in the Juvenile Hall complex or at Crossroads.  They bring suit on behalf of themselves and all other youth with mental health, behavioral, learning, intellectual, and/or developmental disabilities who are held or will be held in these facilities in order to bring an end to Defendants' ongoing and unlawful discrimination against incarcerated youth with such disabilities.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over Plaintiffs' federal claims arising under Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and the Individuals with Disabilities Education Improvement Act (the "IDEA"), 20 U.S.C. § 1400 *et seq.*, and the regulations promulgated thereunder.  Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

7.     Through the same acts and omissions that form the basis for Plaintiffs' federal claims, Defendants have also violated Plaintiffs' rights under state law.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

8.     This Court has jurisdiction over Plaintiffs' claims for declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and Federal Rules of Civil Procedure 57(d) and 65.  This Court also has authority pursuant to 42 U.S.C. § 12205 under the ADA, 29 U.S.C. § 794a(b) under Section 504, 20 U.S.C. § 1415(i)(3) under the IDEA, and California Code of Civil Procedure § 1021.5 to award Plaintiffs' reasonable attorneys' fees and costs.

9.     Venue is proper in the Eastern District of California under 28 U.S.C. § 1391(b) because Defendants are located in this District and all of the acts and/or omissions complained of

1  herein have occurred, are occurring, or will occur in this District.  Each of the Plaintiffs' claims

2  for relief arose within the District.

3  **PARTIES**

4  *Plaintiffs*

5  10.  Plaintiff T.G. is a seventeen-year-old resident of Kern County, California.  He has

6  mental health, behavioral, learning, intellectual, and/or developmental disabilities that affect his

7  daily life activities, is eligible for special education and related services, and is currently detained

8  at the Juvenile Hall complex.  Pursuant to Fed. R. Civ. P. 17, T.G.'s mother, Tanita J., brings this

9  case on his behalf as his next friend.

10  11.  Plaintiff P.P. is a fifteen-year-old resident of Kern County, California.  He has

11  mental health, behavioral, learning, intellectual, and/or developmental disabilities that affect his

12  daily life activities, is eligible for special education and related services, and is currently detained

13  at Crossroads.  Pursuant to Fed. R. Civ. P. 17, his general guardian, Rebecca P., brings this case

14  on his behalf.

15  12.  Plaintiff J.A. is an eighteen-year-old resident of Kern County, California.  He has

16  mental health, behavioral, learning, intellectual, and/or developmental disabilities that affect his

17  daily life activities, is eligible for special education and related services, and is currently detained

18  at Crossroads.

19  13.  Plaintiffs T.G., P.P., and J.A. bring this civil rights action on behalf of themselves

20  and other youth with mental health, behavioral, learning, intellectual, and/or developmental

21  disabilities who are now or will be in the future detained at the Juvenile Hall complex and/or

22  Crossroads facilities, hereinafter the "Plaintiff Class."

23  *Kern County Defendants*

24  14.  Defendant Kern County (the "County"), through its Probation Department (also

25  referred to hereinafter as "Probation") manages and controls the juvenile detention facilities in

26  which Plaintiffs and the Plaintiff Class are housed.  Cal. Welf. & Inst. Code § 852.  These

27  facilities include the Juvenile Hall complex, comprising Juvenile Hall, the Pathways Academy

28  ("Pathways"), and the Furlough Treatment and Rehabilitation Program ("FTR"), as well as the

1   separate Crossroads facility.  The Juvenile Hall complex and Crossroads facilities are hereinafter

2   referred to as the "Kern Juvenile Facilities."  On average, Crossroads and the Juvenile Hall

3   complex house more than 250 youth at any one time.

4        15.     Defendant TR Merickel is the Chief Probation Officer for Kern County and

5   oversees, manages, and directs the Kern Juvenile Facilities.  Cal. Welf. & Inst. Code § 852.

6   Upon information and belief, he is a resident of Kern County, California.  Chief Merickel is sued

7   only in his official capacity.

8        16.     Defendant County is responsible for providing oversight of its Probation

9   Department and Chief Merickel.  Defendants Kern County, the Kern County Probation

10  Department, and the Probation Chief are hereinafter collectively referred to as the "County

11  Defendants."

12       17.     The County Defendants are collectively responsible for all policies, practices, and

13  procedures at the Kern Juvenile Facilities, and for meeting minimum standards promulgated by

14  the California Board of Corrections for these facilities.  *See* Cal. Code Regs., tit. 15, § 1310.

15       18.     The County Defendants must provide "a safe and supportive homelike

16  environment" at the Kern Juvenile Facilities, and may not treat these facilities as "a penal

17  institution."  Cal. Welf. & Inst. Code § 851.

18       19.     The County Defendants are responsible for the care of the youth detained in the

19  Juvenile Hall and at Crossroads, including the provision of educational and rehabilitative

20  programs, including current and relevant social awareness programs.  Cal. Code Regs., tit. 5,

21  §§ 1370-73, 1378.  Similarly, County Defendants are responsible for providing youth with

22  "individualized guidance and treatment . . . which enables them to return to their families and

23  communities as productive and law abiding citizens."  Cal. Welf. & Inst. Code § 886.5(b)(1).

24       20.     As the custodian of detained youth with disabilities, including Plaintiffs and

25  members of the Plaintiff Class, Chief Merickel has overarching responsibilities that affect

26  Plaintiffs' access to educational and rehabilitative programming.  For example, Chief Merickel

27  must "provide for the administration and operation of juvenile court schools" at the Kern

28

1   Juvenile Facilities in conjunction with the County Board of Education.  Cal. Code Regs., tit. 15,

2   § 1370(a).

3         21.    As local government entities, the County and its Probation Department, overseen

4   by Chief Merickel, are "public entities" subject to Title II of the ADA.  42 U.S.C § 12131(1)(B).

5         22.    As public entities receiving federal funds, the County and its Probation

6   Department, overseen by Chief Merickel, are subject to Section 504 of the Rehabilitation Act.

7   29 U.S.C. § 794.

8         23.    As public entities receiving State funds, the County and its Probation Department,

9   overseen by Chief Merickel, are subject to California Government Code section 11135.

10        24.    The County and its Probation Department, overseen by Chief Merickel, are public

11  agencies subject to the IDEA because: 1) they run detention facilities "involved in the education

12  of children with disabilities," 34 C.F.R. § 300.2(b); 2) because they are educational services

13  agencies with "administrative control and direction" over school facilities at Kern Juvenile

14  Facilities, 34 C.F.R. § 300.12(b); and 3) because they are "political subdivisions of the State that

15  are responsible for providing education for children with disabilities," 34 C.F.R. § 300.33,

16  pursuant to Title 15 of the California Code of Regulations.  *See* 20 U.S.C. § 1412(a)(12)(C); Cal.

17  Code Regs., tit. 15, § 1370.  For example, the County and its Probation Department, overseen by

18  Chief Merickel, have the ability to deny students access to education services, affect the

19  continuum of placements available to students, and identify students for evaluation of their need

20  for special education and related services.

21        25.    The County and its Probation Department, overseen by Chief Merickel, are

22  "public agenc[ies]" pursuant to the California Education Code because they are responsible for

23  providing education to youth with disabilities.  34 C.F.R. § 300.33, *as incorporated into* Cal.

24  Educ. Code § 56028.5.  County Defendants are involved in decisions regarding detained

25  students.  Cal. Educ. Code § 56501(a).  For example, the County and its Probation Department,

26  overseen by Chief Merickel, have the ability to remove students from the classroom, effecting a

27  change in placement, affect the general school schedule of instructional minutes, and determine

28  whether a youth may leave his or her unit on any given day to attend an on-site school.

1    26.    The County Defendants have their principal offices in Bakersfield, California.

2                    ***Kern County Superintendent of Schools Defendants***

3    27.    Defendant Kern County Superintendent of Schools ("KCSOS") is one of the State

4    of California's county offices of education.  Under State law, county offices of education provide

5    for the administration and operation of juvenile court schools, including providing education for

6    students with disabilities.  Cal. Educ. Code §§ 48625.2 and 56150.  KCSOS operates, oversees,

7    and provides direct instruction at Central School, the on-site juvenile court school at the Juvenile

8    Hall complex, and Redwood High School, the on-site juvenile court school at the Crossroads

9    facility.  At Juvenile Hall, KCSOS is also responsible for separate classrooms for youth with a

10   high-security status, known as "Unit School."

11   28.    KCSOS is also a local education agency ("LEA"), a "public authority legally

12   constituted within a State for either administrative control or direction of, or to perform a service

13   function for, public elementary schools or secondary schools in a city, county, township, school

14   district, or other political subdivision of a State."  20 U.S.C. § 1401(19); 34 C.F.R. § 300.28(a).

15   As the LEA responsible for juvenile court schools, KCSOS must ensure that youth with

16   disabilities detained at Kern Juvenile Facilities receive a free appropriate public education within

17   the least restrictive environment pursuant to the IDEA.

18   29.    Defendant Mary C. Barlow is the Superintendent of KCSOS and oversees,

19   manages, and directs all KCSOS facilities, including the schools at the Kern Juvenile Facilities.

20   Upon information and belief, Superintendent Barlow is a resident of Kern County, California.

21   Superintendent Barlow is sued only in her official capacity.  Defendants KCSOS and

22   Superintendent Barlow are hereinafter collectively referred to as the "KCSOS Defendants."

23   30.    KCSOS Defendants are responsible for all policies, practices, and procedures at

24   the schools at the Kern Juvenile Facilities.

25   31.    Because KCSOS Defendants receive federal financial assistance under the IDEA,

26   they are responsible for providing all school-eligible persons with disabilities who reside in Kern

27   County with special education programs administered in compliance with federal and State laws

28   and regulations.  20 U.S.C. § 1413(a).

32.     KCSOS Defendants also have an independent duty to ensure that all individuals who qualify for special education services, including detained students, have access to appropriate special education programs and related services.  Cal. Educ. Code § 56140(a).

33.     As Superintendent, Defendant Barlow has overarching responsibilities including, *inter alia*, "visit[ing] and examin[ing] each school in . . . her county at reasonable intervals to observe its operation and to learn of its problems," including through unannounced visits, and "enforc[ing] the course of study."  Cal. Educ. Code § 1240(c)(1) and (h).

34.     As a county office, KCSOS, overseen by Superintendent Barlow, is a "public entity" as defined by the ADA.  42 U.S.C § 12131(1)(B).

35.     As a public entity receiving federal funds, KCSOS, overseen by Superintendent Barlow, is subject to Section 504 of the Rehabilitation Act.  29 U.S.C. § 794.

36.     As a public entity receiving state funds, KCSOS, overseen by Superintendent Barlow, is subject to California Government Code section 11135.

37.     KCSOS, overseen by Superintendent Barlow, is a public agency subject to the IDEA because it is a "political subdivision[] of the State that [is] responsible for providing education to children with disabilities."  34 C.F.R. § 300.33.

38.     KCSOS, overseen by Superintendent Barlow, is also "a public agency" pursuant to the California Education Code because it is a county office of education.  Cal. Educ. Code § 56028.5.  KCSOS Defendants are involved in decisions regarding detained students.  Cal. Educ. Code § 56501(a).

39.     KCSOS Defendants have their principal offices in Bakersfield, CA.

40.     KCSOS Defendants and County Defendants are collectively referred to hereafter as simply "Defendants."

## FACTUAL ALLEGATIONS

### *Kern Juvenile Facilities*

41.     Kern County operates the James G. Bowles Juvenile Hall complex in Bakersfield, California. The complex houses youth held at Juvenile Hall, which has 128 beds for detained

1   youth.  The complex also includes Pathways, a 23-bed facility for female youth who have been

2   adjudicated, and FTR, which has 30 beds.

3         42.    County Defendants initially hold all youth detained in Kern County for alleged

4   offenses at Juvenile Hall.  Generally, Juvenile Hall temporarily houses pre-adjudicated youth

5   awaiting a hearing or placement in a commitment program.  The time that youth stay at Juvenile

6   Hall depends on their individual circumstances.  Some youth remain at Juvenile Hall for a matter

7   of days or weeks, and some youth may stay longer – for example, if a youth chooses to take their

8   case to trial, if they are waiting to find out whether their case will proceed in adult or juvenile

9   court, or if the court has found them incompetent to proceed and ordered competency restoration

10  services, they will stay at Juvenile Hall for a much longer period of time.  Such detentions can

11  last for months or years.

12        43.    Pathways is a commitment program for female youth, who are required to

13  complete a twelve, eighteen, twenty-four, or thirty-six week program.  Upon the successful

14  completion of their assigned number of weeks, youth return to the community under intensive

15  supervision by Probation staff.  Failure to adhere to program and school rules extends a youth's

16  stay at Pathways.  After a youth's release, if she violates the terms of her furlough, Probation can

17  return her to Juvenile Hall.

18        44.    FTR is a short-term, in-custody program for youth who have violated the terms of

19  their furlough from another program.  Youth stay in FTR for up to 30 days before returning to

20  the community in order to complete their probation.

21        45.    Most youth housed at the Juvenile Hall complex attend Central School, an on-site

22  school operated by the KCSOS Defendants in conjunction with the County Defendants.

23  However, Defendants bar youth with a high-security status from attending Central School.

24  Instead, these students receive instruction in their housing unit through the Unit School.  KCSOS

25  also operates the Unit School in conjunction with the County Defendants.  Probation staff

26  directly supervise students at all times while they are in any classroom at the Unit or Central

27  School.

28

46.     Crossroads, also located in Bakersfield California, is a secure post-adjudication commitment facility for male youth with 80 beds.  The program contemplates that youth should spend about six months in custody at the Crossroads facility and then six months in the community on furlough.  In order to progress through the program and leave the facility, youth must comply with strict program and school rules.  Following a youth's release, violation of the terms of his furlough can result in remand to FTR or return to Crossroads.

47.     Youth at Crossroads attend Redwood High School, an on-site school operated by the KCSOS Defendants in conjunction with the County Defendants.  However, youth on high security status, known as a Safety and Security Program ("SSP"), are removed from Redwood High School and instead placed on independent study.  As at Juvenile Hall, Probation staff directly supervise students at all times while they are in their classrooms at school.

### Youth with Disabilities at Kern Juvenile Facilities

48.     Estimates vary, but according to the U.S. Department of Education, youth with disabilities make up anywhere from 30 to 85 percent of the juvenile correctional population.  *See* U.S. Dept. of Educ., *Supporting Youth with Disabilities in Juvenile Corrections*, Office of Special Educ. and Rehabilitative Services Blog (Feb. 21, 2018, 4:03 PM), https://sites.ed.gov/osers/2017/05/supporting-youth-with-disabilities-in-juvenile-corrections/. Other studies put the population at 30 to 50 percent.  Nat'l Council on Disability, *Addressing the Needs of Youth with Disabilities in the Juvenile Justice System: The Current Status of Evidence-Based Research*, Report to the U.S. President at 56-57 (May 3, 2003) (citing to Donna M. Murphy, *The Prevalence of Handicapping Conditions Among Juvenile Delinquents*, Remedial and Special Educ., May 1986, at 7, 7-17; Norman Brier, *The Relationship Between Learning Disability and Delinquency: A Reappraisal*, 22 J. of Learning Disabilities 530, 546-53 (1989); Clyde A. Winters, *Learning Disabilities, Crime, Delinquency, and Special Education Placement*, 32 ADOLESCENCE 126, 451-62 (1997); Rowand T. Robinson & Mary J. K. Rapport, *Providing Special Education in the Juvenile Justice System*, 20 Remedial and Special Educ., 1, 19-35 (1999); Nat'l Center on Educ., Disability, and Juv. Just., *Juvenile Correctional Education Programs* (2001); U.S. Dept. of Educ., *Twenty-First Annual Report to Congress on the*

1  *Implementation of the Individuals with Disabilities Education Act* (2001); Nat'l Council on

2  Disability, *The Well Being of Our Nation: An Inter-Generational Vision of Effective Mental*

3  *Health Services and Supports* (2002); Robert B. Rutherford, et al, *Youth with Disabilities in the*

4  *Correctional System: Prevalence Rates and Identification Issues*, Center for Effective

5  Collaboration and Practice, American Institutes for Research (2002)), *available at*

6  https://ncd.gov/rawmedia_repository/381fe89a_6565_446b_ba18_bad024a59476.pdf.  Another

7  study suggests that approximately 90 percent of youth in corrections meet the diagnostic criteria

8  for one or more mental health disorders.  Katherine A. Larson & K. David Turner, *Best Practices*

9  *for Serving Court Involved Youth with Learning, Attention, and Behavioral Disabilities*, Nat'l

10  Center of Educ., Disability, and Juv. Just. (2001), *available at*

11  http://www.edjj.org/Publications/ES3-10-25-99.pdf.

12       49.     On information and belief, at least 30 to 60 percent of the youth in the Juvenile

13  Hall complex have a mental health, behavioral, learning, intellectual, and/or developmental

14  disability.

15       50.     Defendants describe Crossroads as a "Juvenile Correctional Treatment Facility".

16  Moreover, Defendants report to the Board of State and Community Corrections (BSCC) that 100

17  percent of the youth at Crossroads have open mental health cases, and therefore have some kind

18  of mental health, behavioral, learning and/or developmental disability.

19       51.     Most young people in juvenile facilities have extensive histories of exposure to

20  psychological trauma.  In one study, at least 90 percent of juvenile detainees reported at least one

21  traumatic event.  Karen M. Abram, et al., *PTSD, Trauma, and Comorbid Psychiatric Disorders*

22  *in Detained Youth*, Office of Juv. Just. and Delinq. Prevention Bulletin, June 2013, *available at*

23  https://www.ojjdp.gov/pubs/239603.pdf.  Youth at Kern Juvenile Facilities may have been

24  beaten by their parents, abused physically and/or sexually, witnessed violence in the home or

25  street, or placed in foster care and forced to grieve for lost family connections.  For these youth,

26  isolation, pain, and physical touch may trigger memories of prior victimization, betrayal, or

27  abandonment.  When youth re-experience trauma in a juvenile facility, they may become hyper-

28  vigilant, or engage in self-destructive or aggressive behavior to distract, avoid, or otherwise

*T.G. et al. v. Kern County et al.*
**CLASS ACTION COMPLAINT**                                                    10

1  reduce their feelings from the trauma response.  Re-traumatizing children makes them more

2  resistant, more aggressive, and less likely to respond to rehabilitation.

3  *Use of Chemical Force*

4  52.  Probation staff at Kern Juvenile Facilities have a policy and practice of routinely

5  using pepper spray to control and subdue detained youth.  For example, during a six-month

6  period between January and June 2017, Defendants exposed at least 127 youth to pepper spray.

7  53.  Pepper spray causes intense burning in the eyes, nose, and throat, as well as

8  coughing and temporary blindness.  After exposure, pepper spray remains on a youth's skin as an

9  oily, stinging residue that youth cannot wash off with plain water.

10  54.  Staff carry either 2-ounce ("MK-3") or 4-ounce ("MK-4") canisters on their belts

11  at all times, and store a larger 16-ounce ("MK-9") canister on every housing unit.  Probation staff

12  typically use large quantities of spray – frequently emptying the can – rather than individual

13  short bursts.

14  55.  Probation staff deploy pepper spray in a cloud to fill an area, such as a housing

15  unit, dining room, or classroom, or spray it directly on a youth or youths.  Staff have sprayed

16  youth directly in their eyes, mouth, or ears.

17  56.  Probation staff use pepper spray not only to respond to fighting, but also in

18  response to non-violent acts including youth talking back, being non-compliant, banging on the

19  inside of a closed cell door, or being angry or frustrated.  Staff even use pepper spray in response

20  to incidents of self-harming behavior.

21  57.  Probation staff continue to use pepper spray even on youth who are compliant,

22  have already been subdued, or who are otherwise restrained.  Staff have punitively sprayed youth

23  who have complied with an order to drop to the ground, youth who are handcuffed or otherwise

24  under the physical control of a staff member, and youth who are confined in an individual cell

25  and are simply being disruptive, rather than posing any threat.

26  58.  Young people whom Probation staff do not specifically target still feel the effects

27  of pepper spray.  If they stand in the wrong place at the wrong time, and especially if they are

28  slower to respond to oral commands than other young people, they are hit by "overspray."  In

1    addition, large clouds of pepper spray permeating common areas such as housing units, dining

2    areas, and classrooms cause all youth in the area pain, coughing, difficulty breathing, and other

3    symptoms of exposure.

4         59.    When Probation staff deploy pepper spray during mealtimes, the spray

5    contaminates the food, and all youth in the area may miss their meals.

6         60.    When staff deploy pepper spray in common areas, Probation staff return all youth

7    in the unit to their cells.

8         61.    Following exposure to pepper spray, Probation staff provide youth chemical

9    wipes, which are often inadequate due to the large amount of pepper spray deployed.  Youth are

10   permitted to shower to remove the spray, but must sometimes wait as long as 45 minutes, and

11   Probation staff often do not permit them to use soap to remove the residue.  Hot water alone

12   simply exacerbates exposure by spreading the spray to sensitive areas.  The longer the spray

13   remains on a youth's skin, the longer he or she remains in pain.

14        62.    When a youth is sprayed while in his or her own cell, Probation staff often move

15   that youth to a safety cell for the purpose of removing and changing bedding and clothing.

16   However, the residual spray on other surfaces and materials, such as books, toiletries, and other

17   personal effects, causes ongoing re-exposure.

18        63.    Probation staff routinely threaten youth with the use of pepper spray, which

19   intimidates youth and contributes to the punitive atmosphere that pervades Kern Juvenile

20   Facilities.  Staff's widespread use of pepper spray to control and intimidate youth creates the

21   impression among youth that they are in constant danger of being sprayed at any time for reasons

22   outside their control.

23        64.    The vast majority – 90 percent – of juvenile detention facilities in the United

24   States do not use pepper spray or chemical force to control the young people in their care.

25        65.    The Juvenile Detention Alternatives Initiative (JDAI) standards require juvenile

26   justice facilities to strictly prohibit the use of chemical agents like pepper spray.  Juv. Detention

27   Alternatives Initiative, *Juvenile Detention Facility Assessment – Standards Instrument 2014*

28

1   *Update*, 104 (2014), *available at* http://www.cclp.org/wp-content/uploads/2016/06/JDAI-

2   Detention-Facility-Assessment-Standards.pdf (hereinafter JDAI Assessment Standards (2014)).

3       66.     Probation staff disproportionately use pepper spray to restrain and control youth

4   with disabilities, including in response to behavior related to their disabilities. Staff do not take

5   youths' disabilities into account before using chemical force to restrain them.

6       67.     Youth with behavioral, mental health, learning, intellectual and/or developmental

7   disabilities are more likely than youth who do not have such disabilities to engage in conduct that

8   precipitates the use of pepper spray.  Youth with disabilities are also more vulnerable to

9   overspray even when they are not the intended target because they may be slower to respond to

10   staff directives.

11      68.     Youth with disabilities, particularly youth with mental health-related disabilities

12   and a history of trauma, are particularly vulnerable to the adverse effects of the use of pepper

13   spray, which can exacerbate preexisting mental health conditions such as Posttraumatic Stress

14   Disorder.

15                          ***Use of Physical Force and Prone Restraint***

16      69.     Probation staff in Kern Juvenile Facilities routinely use physical force and

17   restraint holds to control youth under their care.

18      70.     When using force to control youth, staff knock youth against a wall or to the

19   ground and impose a prone restraint hold, generally by kneeling on the youth's back or torso.

20   Typically, a second staff member then handcuffs the youth.  Youth refer to this practice as "body

21   slamming."  Staff refer to this practice as "taking youth to the ground."

22      71.     Probation staff subdue youth using physical force and prone restraint holds not

23   only in response to physical violence, but also in response to defiance, failure to follow verbal

24   commands, and other non-violent behaviors.  They lift smaller children from the ground before

25   restraining them.

26      72.     The use of prone restraint risks positional asphyxiation, i.e. the insufficient intake

27   of oxygen as a result of body position.  Inadvertently entangled or tightened clothing, covering a

28   child's face (*e.g.*, with a hand, arm, or torso), or pressure to the abdomen or chest can also

1   compromise breathing.  The risk increases when staff use both prone restraint and pepper spray,

2   as Probation staff commonly do in Kern Juvenile Facilities.

3        73.    Recognizing the unacceptable risk of using such practices on children, the JDAI

4   guidelines prohibit "restraining youth in a prone position and putting pressure on the youth's

5   back."  JDAI Assessment Standards (2014) at 174.  Similarly, the U.S. Department of Education

6   has stated that prone restraints should never be used on children and youth because they can

7   cause serious injury or death.  U.S. Dept. of Educ., *Restraint and Seclusion: Resource Document*,

8   16 (2012), *available at:* https://www2.ed.gov/policy/seclusion/restraints-and-seclusion-

9   resources.pdf.

10        74.    Probation staff disproportionately use physical force to restrain and control youth

11   with disabilities, including in response to behavior related to their disabilities. Staff do not take

12   youths' disabilities into account before using physical force to restrain them.

13        75.    Youth with behavioral, mental health, learning, intellectual, and/or developmental

14   disabilities are more likely than youth who do not have such disabilities to engage in conduct that

15   precipitates the use of physical force by Probation staff.

16        76.    Youth with disabilities, particularly youth with mental health-related disabilities

17   and a history of trauma, are particularly vulnerable to the adverse effects of the use of physical

18   force, which can exacerbate preexisting mental health conditions such as PTSD.

19                  ***Isolation and Solitary Confinement***

20        77.    In order to discipline and control youth, Probation staff routinely isolate and

21   segregate youth from their peers for extended periods of time using a variety of mechanisms.

22        78.    At the Juvenile Hall complex, Defendants may segregate a youth who has lost

23   privileges, including for offenses such as arguing, friction with a peer, or poor effort, by

24   excluding him from all social interaction time. This means that he receives meals alone in his

25   cell and spends recreation time sitting alone and silent in a chair in the hallway, forbidden from

26   making eye contact with or otherwise interacting with other youth.  Because Defendants forbid

27   youth from socializing with their peers at school, in transit around the facility, or at other times

28

1    during the day, the loss of recreation time means the loss of the rare opportunity to engage with

2    other young people.

3         79.    Similarly, at Crossroads, a youth may spend recreation time in an "Alternative

4    Program" ("AP") setting, where he must sit in silence, forbidden from interacting with his peers

5    or adults, and required to complete silent assignments.  If a youth refuses to participate in AP,

6    Probation staff return him to his individual cell.  As at Juvenile Hall, the loss of recreation time

7    amounts to the loss of the opportunity to socially engage with other youth.

8         80.    In either the Juvenile Hall complex or Crossroads, the most severe form of

9    isolation is the Safety and Security Program ("SSP").  While youth are on SSP, Defendants place

10   them in solitary confinement, i.e., Defendants confine youth to their individual rooms for up to

11   twenty-three hours a day, guaranteeing them only an hour out for their rooms for individual

12   Physical Education.  Youth on SSP take all meals alone in their cells.  They also undertake other

13   necessary activities, such as room clean up and showering, individually.  Any visits or religious

14   services may occur only in the doorway of their cell.  Defendants also restrict access to mental

15   health services depending on the youth's conduct.

16        81.    Defendants prevent youth on SSP from attending school and change their

17   educational placements to independent study.  Independent study often involves working out of a

18   sole textbook, alone in a student's cell.  None of the Plaintiffs have routinely received special

19   education services while on SSP, and Defendants did not follow their written special education

20   plans (commonly known as Individualized Education Programs or "IEPs") while they were on

21   SSP.

22        82.    Defendants have placed some youth on SSP for months at a time, locking them

23   alone in an individual cell for twenty-three hours per day, day after day, and not even permitting

24   them to look out of the window into the hallway or common spaces.  Youth who look out of their

25   windows while confined to their cells are subject to discipline by Probation staff.

26        83.    Isolating any young person for prolonged periods of time leads to stress and

27   anxiety and poses well-documented risks to the youth's mental health.  Youth at Kern Juvenile

28   Facilities are generally teenagers between the ages of fourteen and eighteen.  During this critical

1   period of development, young people need social interaction to thrive.  Left without it, they are

2   vulnerable to rapid deterioration of their mental health.  More specifically, isolation or solitary

3   confinement of youth perpetuates, worsens, or causes mental health concerns including but not

4   limited to Posttraumatic Stress Disorder, Major Depression, hyper-vigilance, agitation,

5   psychosis, anxiety disorders, agitation, lack of trust, suicidal ideation, and self-mutilation, and

6   poses unacceptable risks to youths' health and development, including the risk of self-harm and

7   suicide.  Children who experience depression and anxiety as teenagers are at a higher risk of

8   continuing to experience depression and anxiety as adults.

9          84.    Even without the danger to a young person's mental health, prolonged isolation of

10  youth compromises efforts to rehabilitate them by blocking their access to educational and

11  rehabilitative programming.  Furthermore, isolation and solitary confinement of youth can

12  undermine and break down trust with adults, resulting in paranoia, anger, and hatred.  As a

13  result, youth reintegrating from solitary confinement and/or isolation have difficulty forming the

14  therapeutic relationships necessary to address mental health concerns resulting from or

15  exacerbated by the isolation they have experienced.

16         85.    Probation staff disproportionately use isolation, segregation, and solitary

17  confinement to control youth with disabilities, including in response to behavior related to their

18  disabilities.  Staff do not effectively take youths' disabilities into account before isolating and

19  segregating them from others.

20         86.    Youth with behavioral, mental health, learning, intellectual, and/or developmental

21  disabilities are more likely than youth who do not have such disabilities to engage in conduct that

22  precipitates the use of isolation, segregation, and solitary confinement by Probation staff.

23         87.    These youth with disabilities, particularly youth with mental health-related

24  disabilities, developmental disabilities, and/or a history of trauma, are particularly vulnerable to

25  the adverse effects of the use of isolation, segregation, and solitary confinement.  Such youth

26  have weakened adaptive mechanisms, are at a higher risk of further complications to their mental

27  health, are more susceptible to significant trauma from social isolation, and are more likely to

28

1  suffer long-term consequences from the trauma of isolation than those without mental illnesses
2  or disabilities.

3       88.    The risk that isolation, segregation, and solitary confinement will exacerbate
4  existing mental health conditions makes it more likely that youth with disabilities subjected to
5  these practices will again engage in disability-related behaviors likely to lead to further isolation.

6       89.    For this reason, isolation is antithetical to the goal of maintaining security in
7  juvenile detention facilities.  When a child is experiencing anger as a symptom of mental illness,
8  the use of isolation often results in additional anger, and additional time in isolation.

9       90.    Relatedly, youth with disabilities are also more likely to compound disciplinary
10  consequences that they receive due to an inability to comply with the rigid requirements
11  associated with Defendants' isolation practices.  For example, staying silent and upright in a
12  chair and refraining from interacting with staff or youth, while listening to other youth
13  participate in recreation activities such as watching TV, playing games, and making phone calls,
14  is effectively impossible for certain youth with disabilities, such as some youth with ADHD.  For
15  this reason, youth can become stuck in a cycle of extended isolation.

16       91.    In many cases, young people with disabilities have more to lose when Defendants
17  exclude them from programming – in addition to losing access to the educational and
18  rehabilitative programming available to all young people in Kern Juvenile Facilities, they can
19  lose access to both mental health counseling and the special education services they need to
20  access the curriculum and move forward towards graduation.  The isolation of youth with
21  disabilities compromises not only their safety within the facility, but also their chance to succeed
22  in the community on release.

23       92.    A growing consensus recognizes that the isolation and solitary confinement of
24  youth is inappropriate, dangerous, and counterproductive to the goal of rehabilitating
25  incarcerated youth.  For example, the Attorney General recommended prohibiting solitary
26  confinement of juveniles in federal prisons after it found, in a 2012 report, that "[n]owhere is the
27  damaging impact of incarceration on vulnerable children more obvious than when it involves
28  solitary confinement."  *See* https://www.ncchc.org/solitary-confinement.  President Obama, in

1   January 2016, signed an order prohibiting solitary confinement in federal juvenile facilities.  *See*

2   https://www.justice.gov/archives/dag/report-and-recommendations-concerning-use-restrictive-

3   housing (last accessed Feb. 21, 2018).

4        93.     The National Commission on Correctional Health Care ("NCCHC"), a non-profit

5   organization that develops standards for health services in correctional facilities, takes the

6   position that isolation of any duration should never be used for youth.  Nat'l Commission on

7   Correctional Health Care, *Solitary Confinement (Isolation) (2016)*, *available at*

8   https://www.ncchc.org/solitary-confinement.  Similarly, the American Medical Association

9   ("AMA") and the American Academy of Child and Adolescent Psychiatry ("AACAP") both

10  oppose the use of solitary confinement for children and adolescent youth.  AMA Interim

11  Meeting, November, 2014, https://www.ama-assn.org/sites/default/files/media-

12  browser/public/hod/i14-resolutions_0.pdf; American Academy of Child & Adolescent

13  Psychiatry, April Solitary Confinement of Juvenile Offenders, American Academy of Child &

14  Adolescent Psychiatry: Policy Statements (2012), *available at*

15  http://www.aacap.org/co/root/policy_statements/solitary_confinement_of_juvenile_offenders.

16  The AMA's position is that isolation of children and adolescent youth must only occur on the

17  recommendation and under the supervision of a physician and should only be for clinical or

18  therapeutic purposes.

19        94.     The NCCHC, among other organizations, recognizes that "children are different

20  from adults, making their time spent in isolation even more difficult and the developmental,

21  psychological, and physical damage more comprehensive and lasting. They experience time

22  differently—a day for a child feels longer than a day to an adult—and have a greater need for

23  social stimulation."  AACAP similarly concluded that, "due to their 'developmental

24  vulnerability,'" adolescents are at particular danger of adverse reactions, including depression,

25  anxiety, and psychosis, when exposed to prolonged isolation and solitary confinement.  Nat'l

26  Commission on Correctional Health Care, *Solitary Confinement (Isolation) (2016)*, *available at*

27  https://www.ncchc.org/solitary-confinement.

28

*Punitive and Hostile Environment*

95.     The use of chemical and physical force and the prolonged isolation of youth, including in particular youth with disabilities, is part of the broader punitive and hostile environment that pervades Kern Juvenile Facilities.

96.     Staff verbally and physically intimidate youth and use demeaning and abusive language, including with respect to youths' disabilities.  Staff also use racial slurs and expletives when speaking to youth.

97.      Staff impose discipline arbitrarily and without known or understood cause, making the environment very unpredictable.  Minor acts that potentially subject youth to discipline, depending on the staff member and youth involved, can include looking out the window of a cell, speaking out of turn, asking to seek a doctor, lifting the eyes, and smiling at the wrong time – even if inadvertently.

98.     Often, Probation staff collectively punish youth for the acts of one or two individuals.

99.     Some staff retaliate against youth for filing grievances.

100.     Conversely, staff also award privileges arbitrarily.  Such privileges include daily points, a mechanism for youth to earn recreation time outside of their cells in the evenings, and work details, which offer youth an opportunity to leave their cells during the day in order to assist in the kitchens, on the grounds, cleaning the housing units, or elsewhere.

101.     Youth with disabilities experience these behavior management mechanisms – both the arbitrary imposition of disciplinary consequences and the arbitrary awarding of privileges – differently than their peers who do not have disabilities.  Staff disproportionately discipline youth with disabilities, including in response to behavior related to their disabilities.  Staff do not effectively take youths' disabilities into account before disciplining them, awarding points and other privileges, excluding them from work details, or otherwise monitoring and responding to their behavior.

102.     More specifically, staff penalize youth even for minor disability-related behavior over which they have no control, such as talking, failing to keep their hands behind their backs,

1  room noise, whistling, not combing their hair, banging on their doors, teasing other youth, or

2  slow compliance with an order to return to their rooms.  Each of these behaviors is a common

3  behavioral problem associated with ADHD and forms of emotional disturbances.  At Kern

4  Juvenile Facilities, these behaviors can result in lost points, alternative programming (which

5  results in social isolation), loss of work detail, or even a period of solitary confinement.

6       103.    Such behaviors can also result in a failure to progress through a youth's

7  commitment program.  Youth with disabilities often feel hopeless because staff subject them to

8  discipline for things they cannot control.  These youth are fearful that they will never be able to

9  leave the custody of the Probation Department, because their sentences will be continually

10  extended.  Some youth with disabilities have been at Kern Juvenile Facilities for several years

11  because they have repeatedly "failed the program."  Yet, they are sent back to the same program

12  again and again, often after an initial offense that was relatively minor.  Youth with mental

13  illness may initially come to Juvenile Hall for violating probation for a status offense – such as

14  disobeying one's parents – but can then remain in custody for years because they continually

15  "fail" the program at Crossroads.  This happens through no fault of their own; they are set up to

16  fail by the culture and programming.

17       104.    Even for youth not subject to discipline, youth with disabilities are often unable to

18  earn their way out of their cells and into social time by earning "points" or being assigned to a

19  work detail.  Consequently, they spend more time isolated than other youth, compromising their

20  rehabilitation.

21          ***Inadequate Mental Health, Rehabilitative, and Reentry Supports and Services***

22       105.    Different agencies provide mental health care for youth at each of the Kern

23  Juvenile Facilities.  At the Juvenile Hall complex, Juvenile Probation Psychiatric Services (JPPS)

24  provides mental health care.  JPPS is a part of the Children's System of Care, Kern County

25  Behavioral Health and Recovery Agency.  At Crossroads, the County Defendants contract with

26  an outside agency called Phoenix House to provide mental health care.

27       106.    Mental health care coordination at the Kern Juvenile Facilities is confusing and

28  disorganized.

107.    Coordination between and among mental health providers and the County Defendants is informal and depends on phone consultation, unscheduled meetings, and paper "consult slips" exchanged between and among the agencies.  Upon information and belief, coordination and communication is minimal and similarly informal between and among mental health providers and the KCSOS Defendants.

108.    In addition, because Phoenix House and JPPS use different electronic systems, neither entity can access the electronic records of the other.  Consequently, youths' records are not transferred and care between the Juvenile Hall complex and Crossroads lacks consistency and continuity.

109.    The availability of mental health support is insufficient to meet the needs of youth with disabilities housed at Kern Juvenile Facilities.  For example, even though all youth at Crossroads have open mental health cases, most may only obtain an individual appointment with a counselor once every two weeks.  Furthermore, Crossroads does not have a licensed psychiatrist or medical doctor on site as part of its contract with Phoenix House.

110.    At Crossroads, Defendants do not consistently identify and treat youth in need of psychotropic medication.

111.    Without adequate mental health services, youth with disabilities are unable to access the rehabilitative, educational, vocational, and other services they need to succeed following their release.

112.    Group rehabilitative programming, including relevant social awareness programming to promote pro-social behavior and avoid maladaptive behaviors such as gang involvement, is limited in breadth, depth, and number of programs.  Defendants offer the few available programs, such as Aggression Replacement Training ("ART"), in a repetitive fashion.  Such limited programming is insufficient to meet youths' needs, especially the needs of youth who stay at Kern Juvenile Facilities for longer periods of time.

113.    Without adequate rehabilitative programming, youth with disabilities similarly are unable to access the educational, vocational, and other services they need to succeed following their release.

1    114.    Defendants also fail to provide adequate reentry services to help youth with

2    disabilities plan for and succeed after their release, and to avoid returning to Kern Juvenile

3    Facilities.

4    115.    Defendants do not provide youth with supports and services to identify where

5    they will live post-release, so they may remain uncertain of housing until the day of their release.

6    This exacerbates preexisting anxiety and makes effective planning impossible.

7    116.    Defendants do not provide youth with independent living skills or key job skills,

8    to enable them to obtain employment or succeed in the community.

9    117.    Upon release to the community on probation, the juvenile court often orders youth

10   to attend one school – Blanton Academy – but Defendants do not offer youth transportation to

11   this school, even if it is a long distance away from a student's home.  Some students are unable

12   to travel the distance to Blanton, including special education students who are entitled to

13   transportation as a related service.  If students fail to attend because of lack of transportation,

14   Defendants consider them in violation of the conditions of their probation.

15   118.    Without adequate reentry services and assistance with planning their transition

16   back to the community, youth with disabilities are unable to fully benefit from Defendants'

17   rehabilitative, educational, and other services.

18               ***Responsibility to Provide Education and Special Education Services***

19   119.    Federal and State laws provide that Defendants must actively seek out, identify,

20   locate, and evaluate students who are suspected of having disabilities.  Youth with disabilities

21   that affect their ability to access their education are then eligible for and entitled to receive

22   special education services.

23   120.    Under the IDEA, students who are eligible to receive special education services,

24   including those in the juvenile justice system, have a right to a free and appropriate public

25   education or "FAPE."  A FAPE consists of specially designed instruction, more commonly

26   known as "specialized academic instruction" or "SAI," and related services, at no cost to the

27   parents or adult student.  Related services include, but are not limited to, speech and language

28   therapy, counseling and guidance services, including rehabilitation counseling, psychological

1    services, social worker services, and specially designed vocational education and career

2    development.

3        121.    Special education services must be designed to meet the unique needs of the

4    individual with a disability, be consistent with curriculum standards set by the State of

5    California, and conform to the student's written IEP.

6        122.    Students who are or will soon be sixteen years of age are also entitled to receive

7    transition planning and transition services to assist them in preparing for an independent,

8    productive, civically engaged life after high school.

9        123.    Youths' SAI and related services must be provided in the least restrictive

10   environment or "LRE."  The least restrictive environment requirement means that youth must be

11   placed where they will receive educational benefit and make progress, but also be as integrated

12   with typically developing peers as possible.  LRE exists on a continuum of placements, ranging

13   from fully integrated to fully segregated academic and social experiences.  A youth's placement

14   must be documented on his or her IEP, including reasons for selecting that placement as the

15   LRE.

16       124.    Federal special education law also requires specific procedural safeguards

17   designed to protect students from being denied their lawful special education planning, supports,

18   and services and to ensure that parents and students nearing and over the age 16 are involved in

19   developing their IEPs.  These procedural safeguards include requirements to ensure parents and

20   students are meaningfully informed, to obtain parental consent before implementing or changing

21   special education services, and to systematically seek out, identify, locate, and evaluate all

22   students who are suspected of having a disability.

23       125.    County Defendants and KCSOS Defendants are jointly responsible for ensuring

24   that youth detained at Kern Juvenile Facilities receive legally mandated education services.

25       126.    Together, Defendants must "develop and implement written policy and

26   procedures to ensure communication and coordination between educators and probation staff,"

27   and to ensure that all detained students have access to education.  Cal. Code Regs., tit. 15, §

28   1370(a).

127.    Defendants may not take disciplinary actions at the Kern Juvenile Facilities that deprive students of education.  Cal. Code Regs., tit. 15, § 1390.

128.    Further, the Defendants shall provide "a *quality* educational program that includes instructional strategies designed to respond to the different learning styles and abilities of students."  Cal. Code Regs., tit. 15, § 1370(b) (emphasis added).  This means that "education instruction shall be provided to minors restricted to high security or other special units" and that "state and federal laws shall be observed for individuals with special education needs."  Cal. Code Regs., tit. 15, § 1370(d).  Moreover, "expulsion/suspension from school shall follow the appropriate due process safeguards including the rights of students with special needs."  Cal. Code Regs., tit. 15, § 1370(c)(3).

129.    In addition, the Defendants are jointly responsible for ensuring that schools in juvenile facilities such as Juvenile Hall and Crossroads provide – in practice, rather than simply on paper – detained youth a course of study that complies with the State Education Code.

130.    Students at the Juvenile Hall complex and Crossroads must receive, at minimum, 240 minutes per day of instruction; accordingly, Defendants must jointly ensure that schedules, polices, practices, and procedures at the Kern Juvenile Facilities do not interfere with these minimum school instructional time.  Cal. Educ. Code § 48645.3; Cal. Code Regs., tit. 15, § 1370(b)(4).  Only specific youth who attend school and also an approved vocational education program, specific prescribed work program, or work experience program, may receive a reduced number of daily instructional minutes (180 minutes instead of 240 minutes).  Cal. Educ. Code § 48645.3.

131.    In other words, the Defendants must ensure that youth detained at the Kern Juvenile Facilities have access to legally adequate and appropriate educational services, currently provided directly by KCSOS, during their term of detention.  They must also ensure that youth with disabilities do not experience discrimination on the basis of their disabilities.  And, as the caretaker charged with detained youths' wellbeing and rehabilitation, the County Defendants are also responsible for designing and implementing treatment plans designed to assist youth in their successful transition back into the community.

***Defendants' Failures to Identify and Evaluate Students with Disabilities***

132.     As far as Plaintiffs are aware, Defendants are not seeking out, evaluating, or otherwise attempting to locate and identify any children with disabilities.  The threshold for suspecting a disability is quite low.

133.     County and KCSOS Defendants do not effectively communicate with one another about information that would create a suspicion of possible disability.  Accordingly, many youth at Kern Juvenile Facilities are going without evaluations and subsequent school-based services.

134.     Although County Defendants report that 100 percent of the youth at Crossroads have mental health conditions and require mental health treatment, as far as Plaintiffs are aware, the KCSOS Defendants do not evaluate any youth who did not have an IEP prior to his detention to evaluate his suspected disabilities.

135.     As far as Plaintiffs are aware, KCSOS Defendants have failed to evaluate youth who are at the Juvenile Hall complex awaiting disposition despite those youth with disabilities requesting evaluations from the County Defendants.

136.     During evaluations performed by the KCSOS Defendants, they have not assessed any of the Plaintiffs in all areas of suspected disability.  Upon information and belief, Defendants routinely fail to evaluate detained youth with disabilities in all areas of suspected disability.

137.     KCSOS Defendants do not regularly provide assessments in the areas of behavioral and mental health, even to youth who have diagnosed and documented conditions. KCSOS Defendants have not evaluated youth for IEPs, even when they have documented needs for IEPs.

***Defendants' Failure to Provide Adequate Education, Special Education, and Related Services***

138.     Many students in the Defendants' facilities do not receive sufficient and/or appropriate SAI and related services while detained.

139.     Plaintiffs, youth with significant mental health, behavioral, intellectual, and/or developmental disabilities, have not received appropriate SAI and general education instruction from properly credentialed teachers.   Plaintiffs have not met their goals and do not have SAI, goals, or related services designed to remedy their significant deficits in all areas of disability.

1       140.    At Crossroads, Defendants maintain a systemic, facility-wide schedule that allots

2 only 180 minutes per day (900 minutes per week), maximum, to educational instruction for each

3 youth. Because the California-mandated minimum school day is 240 minutes of instruction per

4 day (1,200 minutes per week), any and all youth who do not regularly participate in qualified

5 vocational education and work programs are being denied 300 minutes or five hours of

6 instruction per week.

7       141.    At Crossroads, Defendants routinely deny youth with disabilities access to and

8 participation in qualified vocational education and work programs run by the County.

9 Accordingly, these youth do not qualify for the reduced minimum school day and are denied 300

10 minutes of instruction per week. The systemic, facility-wide practice of allocating only 180

11 minutes, maximum, for school instruction *per se* denies these youth substantive educational

12 opportunities and instruction. It also ensures that youth with disabilities do not receive

13 corresponding minutes of SAI as specified in their IEPs.

14       142.    Upon information and belief, youth at both Crossroads and the Juvenile Hall

15 complex who are on SSP or other Administrative Restriction, and youth in high-security units

16 also do not receive the minimum 240 minutes of instruction. These youth also do not regularly

17 receive their required SAI and related services.

18       143.    In addition, at all Kern Juvenile Facilities, Defendants routinely place youth in

19 courses that are not tailored to their grade level or actual education level. For example,

20 classrooms routinely include students in four or five different grade levels.

21       144.    Similarly, Defendants do not regularly group special education students according

22 to their instructional needs.

23       145.    KCSOS Defendants do not employ a sufficient number of credentialed special

24 education teachers to serve the population of the Kern Juvenile Facilities. County Defendants do

25 not ensure that KCSOS Defendants employ a sufficient number of credentialed teachers.

26       146.    KCSOS teachers and staff (credentialed and un-credentialed) who serve special

27 education students at the Kern Juvenile Facilities rotate so quickly through the facilities that

28 some are only present for one or two weeks at a time. The constant turnover prevents teachers

1    and staff from being sufficiently familiar with each youth's IEP and special education needs to

2    provide that student with a FAPE.

3         147.   Defendants also fail to provide a curriculum of grade-level instruction that is

4    aligned to the state curriculum content standards.  Youth attend school in multi-grade classrooms

5    in which content is not differentiated.  Transcripts indicate that youth within the same class are

6    taking different courses during the same instructional period, again with no differentiation of

7    material or approach.  KCSOS Defendants award academic credit for required diploma courses

8    although the classes actually taken are generic science or history classes.

9         148.   Defendants routinely provide only limited generic access to high school classes

10   that do not prepare students for reentry into the community and a return to schools in the

11   community, or for further educational advancement.  Although KCSOS Defendants have other

12   substantive courses available through a computer program, Defendants do not routinely provide

13   youth with disabilities access to these courses.

14        149.   Defendants do not provide many youth with disabilities access to computers,

15   technology, or assistive technology (such as text-to-speech software) at all.  Some of the youth

16   who have been denied access, including Plaintiffs, even have IEP goals that state they will use

17   computers to learn certain skills or do certain tasks, such as research colleges and careers.

18        150.   Even if youth have IEPs that list specific accommodations for and/or

19   modifications to instruction because of their disabilities, Defendants do not consistently and

20   uniformly allow these youth with disabilities to use the accommodations listed in their IEPs that

21   are necessary for them to access instruction.  Whether or not a student receives an

22   accommodation in an IEP varies highly from teacher to teacher.  For example, Defendants deny

23   breaks to youth whose IEPs entitle them to breaks in order to avoid frustration or escalation

24   because Defendants' policies require all youth to remain seated at all times.  As a result, youth

25   have emotional outbursts or lose control, which then precipitates discipline by Defendants,

26   including chemical and/or physical force and isolation and/or solitary confinement.

27        151.   Defendants unlawfully provide "independent study" to youth with disabilities

28   who are in isolation and not attending school in a regular classroom, and to youth who need to

1    take specific courses for graduation that KCSOS Defendants do not offer in their classrooms.

2    While assigned to independent study, youth must study from textbooks on their own with

3    minimal adult assistance.  Defendants do not provide youth on independent study with sufficient

4    minutes of direct instruction; independent study is not substantially equivalent to classroom

5    instruction.  Upon information and belief, youth on "independent study" do not regularly receive

6    any direct SAI, let alone the full minutes of SAI specified in their IEPs, from credentialed special

7    education teachers.

8        152.    Plaintiffs have not regularly received a full day of instruction or all of the SAI

9    specified in their IEPs while on independent study.

10       153.    Defendants do not assess youth for necessary related services and

11   accommodations.  Nor do Defendants routinely offer or provide necessary and sufficient related

12   services or accommodations to youth who cannot learn in environments that are overly chaotic

13   and stimulating.

14       154.    KCSOS Defendants fail to provide necessary and sufficient mental and behavioral

15   health services to youth when students need them to benefit from their education.  KCSOS

16   Defendants instead rely on the County Defendants to provide general services outside of school

17   hours.  But, County Defendants, too, fail to provide adequate, necessary, and sufficient mental

18   and behavioral health services designed to meet youths' educational needs (often referred to as

19   educationally related mental health services or "ERMHS").  For example, County Defendants do

20   not routinely assess, plan for, or incorporate youths' school-related needs when arranging for

21   general, custody-based mental health services through Phoenix House or JPPS, described above.

22   ***Defendants' Failure to Provide a Continuum of Special Education Placements for LRE***

23       155.    Defendants fail to provide a continuum of special education placements so that

24   students detained at Kern Juvenile Facilities learn in the least restrictive environment that is

25   appropriate to their needs.  For example, Defendants do not offer or provide self-contained, small

26   group special education classes, with whole-class lessons and instruction, commonly known as

27   Special Day Classes, at the Kern Juvenile Facilities.

28

1      156.    For detained youth with special education needs, the only placement available

2 outside of general education classes is the "Learning Center."

3      157.    Upon information and belief, County Defendants do not make physical facilities

4 available to KCSOS Defendants to provide a continuum of special education placements.

5      158.    Similarly, as discussed above, Defendants collectively do not ensure that KCSOS

6 Defendants employ sufficient special education teachers and staff to ensure that a continuum of

7 placements can be provided.

8      159.    The Learning Center approach does not provide students with access to

9 appropriate instruction, class sizes, and teachers credentialed to serve their disabilities and needs.

10 No Kern Juvenile Facilities have specially designed class placement options for youth with

11 significant mental health or behavioral needs, such as a specific mental health or trauma-

12 informed special day class placement.

13      160.    The Learning Center approach similarly does not allow special education students

14 to be grouped by instructional needs as required by law.

15      161.    Nevertheless, Defendants place youth whose IEPs provide or previously provided

16 for Special Day Classes in these Learning Centers.

17      162.    Upon information and belief, the Juvenile Hall complex has three Learning

18 Centers and Crossroads has one Learning Center.

19      163.    Some of the Learning Centers have high teacher turnover, practically ensuring

20 that youth do not have regular access to a special education teacher who is familiar with his or

21 her needs and IEP.

22      164.    At least one Learning Center – the one that serves the Unit School at Juvenile

23 Hall – routinely does not have a credentialed teacher (special education or otherwise).

24 Defendants instead staff this class with KCSOS "Extra Help" employees.  Upon information and

25 belief, these staff are akin to paraprofessionals or classroom aides.  Further, Defendants offer this

26 Learning Center in a Probation Staging Area off of the 200 Unit, which is not conducive to

27 education.  Youth sit facing the walls while groups of Probation staff gather and talk.

28

1

*Defendants' Failure to Provide Lawful Individualized Transition Planning and Services*

2      165.    Defendants generally fail to have a system, including adequate staff, materials,

3  courses, policies, and procedures, in place to ensure that youth with disabilities receive lawful

4  individualized transition planning and services through their IEPs.

5      166.    Defendants regularly fail to timely and adequately assess youths' needs regarding

6  postsecondary transition planning and services in order to develop adequate postsecondary

7  transition goals and services for youth with disabilities.  Assessments should include a youth's

8  status in areas such as training, education, employment, and independent living skills, and should

9  evaluate transition services needed to grow in these areas.

10     167.    Defendants regularly fail to offer or otherwise provide in IEPs for appropriate,

11  measurable postsecondary transition goals based on appropriate assessments.

12     168.    Defendants regularly fail to identify in youths' IEP transition plans the frequency,

13  location, and duration of transition services, as well as adequate school staff responsible for

14  providing transition services.

15     169.    Defendants regularly fail to provide adequate transition services based on youths'

16  needs, taking into account youths' strengths, preferences, and interests.  Transition services

17  include, but are not limited to, vocational education and training, work programs, remedial

18  academic instruction, postsecondary counseling and guidance, preparation for college

19  applications and attendance, and instruction in social, communication, and independent living

20  skills.

21
22
*Defendants' Unlawful Responses to Classroom Behavior, Including Use of Restraints and Lack of Due Process*

23     170.    Defendants have failed and continue to fail to adopt a school-wide positive

24  behavior intervention system at Kern Juvenile Facilities, and have failed and continue to fail to

25  provide behavior-related services to individual youth as appropriate through their IEPs.

26     171.    KCSOS Defendants rely on the County Defendants to manage classroom

27  behavior.  As a result, County Defendants have and, upon information and belief, continue to

28

1   pepper spray, physically restrain, take to the ground, and handcuff youth in KCSOS Defendants'

2   classrooms and within KCSOS Defendants' designated school facilities.

3       172.    Despite youth having a right to their education, County Defendants have also and,

4   upon information and belief, continue to remove youth from and exclude youth from

5   participating in school.  KCSOS Defendants retain no record of these *de facto* suspensions or

6   expulsions from school.

7       173.    Despite the fact that youth with disabilities have a heightened interest in their

8   education and are entitled to legal protections to ensure that they are not removed from school

9   for behaviors that are manifestations of their respective disabilities, Defendants have and, upon

10  information and belief, continue to remove these youth from their classrooms because of

11  behaviors that are manifestations of their respective disabilities.

12      174.    Because KCSOS Defendants do not track or otherwise address school removals,

13  Defendants also fail to hold legally required meetings with parents to determine whether a

14  youth's behavior that results in removal is a manifestation of his or her disability.

15      175.    In addition, because KCSOS Defendants do not track a student's removals from

16  class, Defendants cannot ascertain when 10 days have passed for the purposes of convening an

17  IEP meeting prior to changing the student's placement.  Changing a youth's educational

18  placement without parental consent and without following appropriate safeguards again violates

19  youth's due process rights under special education laws.

20          ***Defendants' Failure to Follow Procedural Safeguards to Ensure Due Process***

21      176.    Defendants have prevented youth from attending and refused to transport youth to

22  attend scheduled IEP meetings.

23      177.    Defendants have failed to appoint educational surrogate parents for youth who do

24  not have a parent, guardian, or any other legal holder of their educational rights.  Without an

25  education rights holder, these youth with disabilities have no adult responsible for making

26  decisions regarding their education, such as providing informed consent for special education

27  assessments and services.  Absent lawful education rights holders, Defendants cannot lawfully

28  discharge their duty to provide FAPE to these youth with disabilities.

1        178.    Defendants fail to convene IEP meetings when youth fail to make progress or

2  obtain education benefit, or when youth have been removed from school for more than 10 days

3  in a school year, constituting a change of placement.

4        179.    Defendants fail to implement youths' last agreed-to and operative IEPs whenever

5  youth enter Defendants' facilities.  Instead, upon information and belief, KCSOS Defendants

6  unilaterally create "Interim Placements" for youth outside of IEP meetings and without input

7  from or the consent of youths' parents.  Because Defendants offer only one special education

8  placement – the Learning Center – these Interim Placements routinely change youths'

9  placements to full or partial-day placement in the Learning Center regardless of the placement

10  specified on the youths' operative IEPs.

11        180.    KCSOS Defendants fail to obtain complete education records for detained youth,

12  leading to incomplete and mis-information about youths' disabilities and needs.  And, as a result,

13  KCSOS Defendants fail to transfer youths' high school credits from outside schools, depriving

14  them of credits toward graduation with a high school diploma.

15        181.    KCSOS Defendants fail to provide receiving community school districts with

16  complete copies of youths' education records following their release from Kern Juvenile

17  Facilities and/or KCSOS Defendants' schools.

18                           ***Individual Facts of Plaintiff T.G.***

19        182.    T.G. is seventeen years old and is currently detained at the Juvenile Hall complex;

20  he is therefore qualified to participate in the programs, services, and activities offered at the

21  Juvenile Hall complex.  T.G. attends the Unit School and has an IEP.  He has been eligible for

22  special education and related services at all times relevant to allegations raised in this Complaint.

23        183.    T.G. first entered Kern Juvenile Facilities around the age of 13.  He has been held

24  at the Juvenile Hall complex and Crossroads at various points in time.  He has failed the

25  Crossroads program at least once.

26        184.    T.G. has identified learning disabilities and possible developmental and/or

27  intellectual disabilities.  He has been diagnosed at various points in time with Posttraumatic

28  Stress Disorder, Major Depressive Disorder with psychotic features, Bipolar Depression, and

Attention Deficit Hyperactivity Disorder, as well as a mood disorder and anger problems. These impairments substantially limit one or more major life activities of T.G., qualifying him as an individual with a disability. In addition, T.G. suffered a serious head injury and seizures as a child. Because T.G. has not been properly assessed, the full impact of this injury is unknown.

185.     T.G. has difficulty regulating his emotions and reactions.

186.     In 2017, the Kern County Juvenile Court found T.G. incompetent under California Welfare and Institutions Code section 709.

187.     Defendants have placed T.G. on suicide watch.

188.     Probation staff have pepper sprayed T.G. on multiple occasions. Staff have sprayed T.G. while he was in his cell. Staff have sprayed T.G. in his face and in his eyes. Staff have sprayed T.G. when he was not presenting any threat, including when staff had handcuffed him. Staff have sprayed T.G. because he was acting in manner consistent with and on account of his disabilities. T.G. has also been exposed to pepper spray in school when County Defendants sprayed other youth.

189.     On one occasion, after T.G. was pepper sprayed, County Defendants confiscated his glasses because they were covered in pepper spray. County Defendants did not return T.G.'s glasses, even though they were aware he needed glasses, he had been prescribed glasses, and the glasses remained in his personal possessions. County Defendants did not return T.G.'s glasses for several months, and when they did return them the glasses were still covered in pepper spray, which leaves a particular orange residue.

190.     On another occasion, Defendants failed to allow T.G. to wash the pepper spray off for approximately two to three days.

191.     Probation staff have physically restrained T.G. on multiple occasions. When Probation staff have restrained T.G.., they have kneed his head and back and punched his body. On one occasion, Probation staff took T.G. to the ground so forcefully that it caused bleeding from his head. Probation staff have restrained T.G. and subjected him to physical force because he was acting in a manner consistent with and on account of his disabilities.

1    192.   T.G. has been traumatized by the experience of staff taking him to the ground,

2  beating him, and spraying him.

3    193.   County Defendants have placed T.G. in solitary confinement and isolation on

4  many occasions, including placing him in administrative segregation and SSP.  Defendants have

5  often isolated T.G. for behavior consistent with and on account of his disabilities.

6    194.   Staff have called T.G. names and spoken to him aggressively.  T.G. believes that

7  staff administer discipline and reward systems unfairly, including work detail, and that he loses

8  points and privileges because of behaviors related to his disabilities.

9    195.   While detained, T.G. has not consistently been able to access mental health

10  services, including medication management with a psychiatrist.

11    196.   While detained, T.G. has not received support with reentry planning.  In addition,

12  KCSOS Defendants have failed to obtain or forward complete copies of his education records or

13  properly transfer his credits.

14    197.   While detained, T.G. has not received the accommodations, supports, and services

15  he needs in order to access his education.  Although T.G. has an IEP, Defendants have not

16  consistently followed his IEP or involved his parent in IEP meetings.  T.G. has received neither

17  appropriate special education instruction and interventions nor appropriate related services, such

18  as ERMHS and behavioral supports and services.

19    198.   The Unit School's Learning Center, where T.G. currently attended classes, lacks a

20  full-time, credentialed special education instructor and is located in a noisy staging area.  T.G.

21  generally works independently from books and worksheets, without any group instruction,

22  lessons, or projects.  T.G. does not have access to a computer in the Unit School's Learning

23  Center, even though his IEP provides that he will complete certain work on a computer each

24  week.

25    199.   While detained, T.G. has not consistently received the minimum state-required

26  minutes of instruction.  While in class, he has not received the rigorous, grade-level instruction

27  he needs to prepare for the workforce.

28

1    200.    Although T.G. is seventeen, Defendants have not provided appropriate transition

2    planning and services to prepare him to live independently.

3    201.    When Defendants placed T.G. on SSP, they unilaterally changed his education

4    placement to independent study and did not provide appropriate special education services.

5    ***Individual Facts of Plaintiff P.P.***

6    202.    P.P. is fifteen years old and is currently detained at Crossroads; he is therefore

7    qualified to participate in the programs, services, and activities offered at Crossroads.  He attends

8    Redwood High School and has an IEP.  He has been eligible for special education and related

9    services at all times relevant to allegations raised in this Complaint.

10    203.    P.P. first entered Kern Juvenile Facilities around the age of thirteen.  He has been

11    held at the Juvenile Hall complex has been committed to Crossroads on three separate occasions.

12    He has failed Crossroads once.

13    204.    P.P. has been diagnosed with Attention Deficit and Hyperactivity Disorder,

14    Bipolar Affective Disorder, and anger problems.  These impairments substantially limit one or

15    more major life activities of P.P, qualifying him as an individual with a disability.

16    205.    Defendants have placed P.P. on suicide watch.

17    206.    Probation staff have pepper sprayed P.P. on several occasions.  Staff have sprayed

18    P.P. while he was in his cell.  Staff have sprayed P.P. in his face, in his eyes, and in his ears.

19    Staff have sprayed P.P. when he was not presenting any threat because staff had physically

20    restrained him in handcuffs.  Staff have sprayed P.P. because he was acting in a manner

21    consistent with and on account of his disabilities.

22    207.    On one occasion, when staff sprayed P.P. in his cell, he had to wait for

23    approximately 45 minutes to shower.  When the single wipe staff gave him to remove the spray

24    was not enough and he requested more, staff refused to give him a second wipe.

25    208.    Probation staff have physically restrained P.P. on multiple occasions.  When

26    Probation staff have restrained P.P., they have taken him to the ground forcefully and an adult

27    probation officer has placed his knee and full weight on P.P.'s back causing him pain.  When

28    restraining P.P., Probation officers have forcefully pulled on P.P.'s arm, also causing him pain.

1  On one occasion, officers restraining P.P. kicked and hit him, including hitting his head with a

2  pepper spray canister.  Probation staff have restrained P.P. and subjected him to physical force

3  because he was acting in a manner consistent with and on account of his disabilities.

4      209.    Defendants have placed P.P. in solitary confinement and isolation on many

5  occasions, including placing him in administrative segregation and SSP.  Defendants have often

6  isolated P.P. for behavior consistent with and on account of his disabilities.

7      210.    Between April 2, 2017 and the end of July, 2017, he spent more than thirty-six

8  (36) days in isolation.  Three of those confinements were for six (6) consecutive days (144

9  hours) and one was for five (5) consecutive days (120 hours).  Up through July 2017, P.P. spent

10 at least fifty (50) days in isolation during his commitments to Crossroads and Juvenile Hall.

11 These longer periods of isolation were in large part because he was unable to conform his

12 behavior on account of his mental health disabilities, and staff did not accommodate or take into

13 account his disabilities when deciding to discipline and punish him.

14     211.    Staff have called P.P. names and spoken to him aggressively, including calling

15 him a "bitch."  P.P. believes that staff administer discipline and reward systems, including work

16 details, unfairly, and that he loses points and privileges because of behaviors related to his

17 disabilities.

18     212.    While detained, P.P. has not consistently been able to access mental health

19 services, including medication management.  At Crossroads, P.P. could not obtain medication

20 and consequently failed the program largely because of behavior related to his disabilities.

21 When he returned to Juvenile Hall and saw a JPPS psychiatrist in person, he obtained the

22 medication he needed and he is now better able to meet program requirements.

23     213.    While detained, P.P. has not received the accommodations, supports, and services

24 he needs in order to access his education.  Although P.P. has an IEP, Defendants have not

25 consistently followed it.  P.P. has received neither appropriate special education instruction and

26 interventions nor appropriate related services, such as ERMHS and behavioral supports and

27 services.

28

1     214.    While detained, P.P. has not consistently received the minimum state-required

2     minutes of instruction.  While in class, he has not received the rigorous, grade-level instruction

3     he needs to prepare for college and the workforce.  He often repeats the same work he has seen

4     before.

5     215.    Defendants have disciplined and removed P.P. from class for behaviors related to

6     his disabilities without due process, including placing him on SSP.  While P.P. is on SSP,

7     Defendants have unilaterally changed his educational placement to independent study and have

8     not provided appropriate special education services.

9                          ***Individual Facts of Plaintiff J.A.***

10    216.    J.A. is eighteen years old and is currently detained at Crossroads; he is therefore

11    qualified to participate in the programs, services, and activities offered at Crossroads.  He attends

12    Redwood High School and has an IEP.  He has been eligible for special education and related

13    services at all times relevant to allegations raised in this Complaint.

14    217.    J.A. first entered Kern Juvenile Facilities as early as the age of 10.  He has

15    previously been held at the Juvenile Hall complex, Crossroads, and Camp Erwin Owen.  He has

16    failed Crossroads twice.

17    218.    J.A. has been diagnosed with Attention Deficit Hyperactivity Disorder,

18    Posttraumatic Stress Disorder, and Depression.  These impairments substantially limit one or

19    more major life activities of J.A., qualifying him as an individual with a disability.

20    219.    J.A. gets overstimulated very easily by other youth, by noises, and by other

21    stimuli.  He has suffered significant emotional and physical trauma from an early age and

22    throughout his life.

23    220.    Defendants have placed J.A. on suicide watch.

24    221.    Probation staff have pepper sprayed J.A. on multiple occasions.  Staff have

25    sprayed J.A. while he was in his cell and while he was in school.  Staff have sprayed J.A. in his

26    face and in his eyes.  Staff have sprayed J.A. when he was not presenting any threat, including

27    when staff had physically restrained him and when staff had handcuffed him.  Staff have sprayed

28    J.A. because he was acting in manner consistent with and on account of his disabilities.

222.    Staff have pepper sprayed J.A. so many times that he is traumatized by the use of pepper spray.  He always looks at staff members' belts to see who is carrying pepper spray, and even the sound made by the pepper spray canister makes J.A. tense up and cringe.  J.A. is so traumatized by the use of pepper spray that he says that he would prefer to be physically assaulted or body slammed than pepper sprayed.

223.    On one occasion, after staff had pepper sprayed J.A., he was in his cell and hitting the sink and walls because the burning gas was causing him pain, and staff opened his cell door and sprayed him again for making noise.  J.A. felt like he was dying in his room with all of the pepper spray, trying to breathe through the burning.

224.    J.A. has waited for hours to shower after being pepper sprayed.  The first time staff sprayed him, they gave him a wipe to remove the spray, but he didn't know how to use it because no one told him how.

225.    Probation staff have physically restrained J.A. on multiple occasions.  When Probation staff have restrained J.A, one staff member placed a knee on his back and a second staff member restrained his legs.  The restraints have hurt his arms and back because of the amount of force staff have used.   Staff have restrained J.A. and subjected him to physical force because he was acting in a manner consistent with and on account of his disabilities.

226.    Defendants have placed J.A. in solitary confinement and isolation on many occasions, including placing him in administrative segregation and SSP.  Sometimes Defendants have placed J.A. in solitary confinement or isolation for weeks at a time.  Defendants often isolate J.A. for extended periods of time for behavior consistent with and on account of his disabilities.

227.    Staff routinely call J.A. names and speak to him aggressively.  J.A. believes that staff administer points and privileges unfairly, especially work details.  J.A. regularly loses points and privileges for behaviors related to his disabilities.

228.    J.A. does not have a guardian or family who will house him in on release.  Instead of assisting J.A. in planning for his future by providing vocational training, counseling, or other reentry services, Defendants have told J.A. that they intend to release him to a homeless shelter.

1    229.    While detained, J.A. has not received the accommodations, supports, and services

2    he needs in order to access his education.  Although J.A. has an IEP, Defendants have not

3    consistently followed it.  J.A. has received neither appropriate special education instruction and

4    interventions nor appropriate related services, such as behavioral supports and services and

5    vocational education.

6    230.    While detained, J.A. has not consistently received the minimum state-required

7    minutes of instruction.  While in class, he has not received the rigorous, grade-level instruction

8    he needs to prepare for college and the workforce.  To complete the coursework he needs to

9    graduate, J.A. works alone out of textbooks without classroom instruction or teacher assistance.

10   231.    Although J.A. is eighteen and approaching graduation, Defendants have not

11   provided appropriate transition planning and services to prepare him to live independently.

12   232.    Defendants have disciplined and removed J.A. from class for behaviors related to

13   his disabilities without due process, including placing him on SSP.  While J.A. is on SSP,

14   Defendants have unilaterally changed his educational placement to independent study and have

15   not provided appropriate special education services.

16   **CLASS ALLEGATIONS**

17   233.    Plaintiffs bring this action on behalf of themselves and all other persons similarly

18   situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

19   234.    The class consists of all youth with mental health, behavioral, learning,

20   intellectual and/or developmental disabilities, as defined by the Americans with Disabilities Act

21   and Section 504 of the Rehabilitation Act, who are currently detained or who will be detained by

22   the Kern County Probation Department at the Juvenile Hall complex, comprising Juvenile Hall,

23   Pathways, and FTR, and/or at Crossroads.

24   235.    Class action status for this litigation is proper because:

25        a.    The class of youth is so numerous that joinder of all members is impractical.

26        Plaintiffs maintain that the class of persons includes hundreds of youth with

27        identified mental health, behavioral, learning, and/or developmental disabilities.

28        The class also includes the many detained youth who have a disability but are not

1      identified as such because of Defendants' failure to fulfill their obligations under

2      federal and state laws to locate, identify, and assess youth suspected of having a

3      disability.

4     b.   There are questions of law and fact common to the class.

5     c.   Plaintiffs' claims are typical of the claims of the class.  Plaintiffs have been and

6      are being denied their rights to be free from discrimination because of their

7      disabilities; to receive reasonable modifications to Defendants' policies and

8      practices to avoid discrimination on the basis of their disabilities; and to access a

9      free appropriate public education.

10     d.   Plaintiffs will fairly and adequately protect the interests of the class as there is no

11      conflict between Plaintiffs and the other class members and Plaintiffs have

12      retained counsel experienced in class action litigation relating to the civil rights of

13      persons with disabilities, including their education and special education rights.

14     e.   Defendants have acted and/or refused to act on grounds generally applicable to

15      the class, thereby making appropriate final declaratory and injunctive relief with

16      respect to the class as a whole.

17

**CLAIMS FOR RELIEF**

18

**FIRST CAUSE OF ACTION**
**Violation of Americans with Disabilities Act**
**Against All Defendants**
**(42 U.S.C. § 12101, et. seq.)**

19

20

21     236.   Plaintiffs incorporate by reference each and every allegation contained in the

22  foregoing paragraphs as if specifically alleged herein.

23     237.   Title II of the ADA states, in pertinent part:

24      [N]o qualified individual with a disability shall, by reason of such

25      disability, be excluded from participation in or be denied the
        benefits of the services, programs, or activities of a public entity, or
        be subjected to discrimination by any such entity.

26

27  42 U.S.C. § 12132.

28

238.    Plaintiffs and the members of the Plaintiff Class were at all times relevant to this action, and are currently, qualified individuals with disabilities within the meaning of Title II of the ADA.  They all have impairments that substantially limit a major life activity, and they all are, and/or will be residents of Kern Juvenile Facilities qualified to participate in the programs, services, and activities of Kern Juvenile Facilities.

239.    Defendants the County and its Probation Department, overseen by Chief Merickel, and KCSOS, overseen by Superintendent Barlow, were at all times relevant to this action, and are currently, "public entities" within the meaning of Title II of the ADA and provided and provide "services, programs, or activities," including educational and rehabilitative programs, services and activities in Kern Juvenile Facilities.

240.    Defendants have violated and continue to violate the rights of Plaintiffs and members of the Plaintiff Class secured by Title II of the ADA and its implementing regulations through their policies, practices, and procedures with respect to chemical and physical force, prone restraint, isolation, solitary confinement, and behavior management; their policies, practices, and procedures with respect to mental health programming and reentry services; and their policies, practices, and procedures with respect to special education and classroom management.

241.    Defendants deny Plaintiffs and members of the Plaintiff Class the opportunity to participate in and benefit from the aids, benefits, and services offered by Defendants; afford them an opportunity to participate in and benefit from those aids, benefits, and services that is not equal to that afforded others; provide them aids, benefits, and services that are not as effective in affording equal opportunity as those provided to others; and otherwise limit them in the enjoyment of rights, privileges, advantages, and opportunities enjoyed by others.  28 C.F.R. § 35.130(b)(1)(i), (ii), (iii), and (vii).

242.    Defendants disproportionately use chemical and physical force, prone restraint, isolation, solitary confinement, and disciplinary sanctions on Plaintiffs and the members of the Plaintiff Class, and withhold privileges from them, including because of behavior related to their disabilities and without appropriately taking disability into account.  Youth with disabilities are

1    more vulnerable to the adverse effects of such practices, which can exacerbate their disabilities

2    and lead to additional force, isolation, and sanctions and therefore compound Defendants' denial

3    of access to their educational and rehabilitative programs, services, and activities.

4           243.    In addition, because Plaintiffs and members of the Plaintiff Class require adequate

5    mental health programming and reentry services in order to access Defendants educational and

6    rehabilitative programs, services, and activities, Defendants' failure to provide such services

7    further blocks equal access.

8           244.    By failing to identify and evaluate youth with disabilities, failing to provide

9    adequate special education and related services, and failing to properly respond to classroom

10   behavior, Defendants deny Plaintiffs and members of the Plaintiff class meaningful access to

11   education in Kern Juvenile Facilities.

12          245.    Defendants' policies, practices, and procedures disproportionately burden

13   Plaintiffs and members of the Plaintiff Class.  Because of their disabilities, Plaintiffs and

14   members of the Plaintiff Class are more likely to engage in conduct that precipitates the use of

15   chemical and physical force, prone restraint, isolation, solitary confinement, and disciplinary

16   sanctions, including classroom discipline and removal, and more likely to experience adverse

17   effects as a result, including trauma-related responses.  Relatedly, because of their disabilities,

18   Plaintiffs and members of the Plaintiff Class are unique in their need for mental health

19   programming and reentry services and special education and related services.

20          246.    Defendants fail to make reasonable modifications in policies, practices, and

21   procedures that are necessary to avoid discrimination on the basis of disability.  28 C.F.R.

22   § 35.130(b)(7)(i).  Specifically, Defendants, *inter alia*, fail to identify and track Plaintiffs and

23   members of the Plaintiff Class who require reasonable accommodations; fail to inquire into

24   whether behaviors of Plaintiffs and members of the Plaintiff class leading to chemical and

25   physical force, prone restraint, isolation, solitary confinement, and disciplinary sanctions are

26   disability-related; and fail to modify policies and practices related to chemical and physical

27   force, prone restraint, isolation, solitary confinement, behavior management, mental health

28

1  programming, reentry, special education, and classroom management to account for the

2  disabilities of Plaintiffs and the Plaintiff Class.

3      247.   Defendants impose and apply eligibility criteria that screen out or tend to screen

4  out Plaintiffs and members of the Plaintiff Class from fully and equally enjoying their services,

5  programs, or activities.  28 C.F.R. § 35.130(b)(8).  Specifically, Defendants' behavioral

6  expectations for youth, including, for example, eligibility criteria for time to socialize with other

7  youth and for privileges such as work details, do not account for the disabilities of Plaintiffs and

8  thereby exclude them from fully and equally participating in Defendants' rehabilitative and

9  educational programs, services, and activities.

10     248.   In addition, by using chemical and physical force, prone restraint, isolation,

11  solitary confinement, and disciplinary sanctions as described herein, failing to meet the unique

12  needs of Plaintiffs and members of the Plaintiff Class for adequate mental health and reentry

13  programming, failing to provide adequate special education and related services, and failing to

14  account for disability in managing classroom behavior, Defendants use methods of

15  administration that have the effect of subjecting Plaintiffs and members of the Plaintiff Class to

16  discrimination on the basis of their disabilities and have the purpose and/or effect of defeating or

17  substantially impairing accomplishment of the objectives of Defendants' educational and

18  rehabilitative programs, services, and activities with respect to Plaintiffs and members of the

19  Plaintiff Class.  28 C.F.R. § 35.130(b)(3)(ii).

20     249.   Defendants aid and perpetuate discrimination against persons with disabilities in

21  the programs, services, or activities they provide, 28 C.F.R. § 35.130(b)(1)(v), by, *inter alia*,

22  maintaining policies, practices, and procedures that allow for ongoing discrimination by each co-

23  Defendant.

24     250.   Because Defendants' discriminatory and wrongful conduct is ongoing,

25  declaratory and injunctive relief are appropriate remedies. Further, as a direct result of

26  Defendants' actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm,

27  including lost education opportunities. Therefore, speedy and immediate relief is appropriate.

28

1    251.    Pursuant to 42 U.S.C. § 12133, Plaintiffs are entitled to declaratory and injunctive

2    relief as well as reasonable attorneys' fees and costs incurred in bringing this action under 42

3    U.S.C. § 12205.

4                            **SECOND CAUSE OF ACTION**

5                    **Violation of Section 504 of the Rehabilitation Act**
                                    **Against All Defendants**
6                                    *(29 U.S.C. § 794)*

7    252.    Plaintiffs incorporate by reference each and every allegation contained in the

8    foregoing paragraphs as if specifically alleged herein.

9    253.    Section 504 provides, in pertinent part:

10           No otherwise qualified individual with a disability in the United
             States . . . shall, solely by reason of his or her disability, be excluded
11           from the participation in, be denied the benefits of, or be subjected
             to discrimination under any program or activity receiving Federal
12           financial assistance[.]

13   29 U.S.C. § 794(a).

14   254.    Plaintiffs and the members of the Plaintiff Class were at all times relevant to this

15   action, and are currently, "otherwise qualified individual[s] with [] disabilit[ies]" within the

16   meaning of Section 504.  They all have impairments that substantially limit a major life activity,

17   and they are and/or will be residents of Kern Juvenile Facilities qualified to participate in the

18   programs and activities of Kern Juvenile Facilities.

19   255.    Defendants the County and its Probation Department, overseen by Chief

20   Merickel, and KCSOS, overseen by Superintendent Barlow, were at all times relevant to this

21   action, and are currently, recipients of federal financial assistance within the meaning of Section

22   504 of the Rehabilitation Act and provided and provide a "program or activity," which is defined

23   to include "all the operations of" the recipient.  29 U.S.C. § 794(b).  Defendants' operations

24   include the educational and rehabilitative programs and activities in Kern Juvenile Facilities.  29

25   U.S.C. § 794(b).

26   256.    Defendants have violated and continue to violate the rights of Plaintiffs and

27   members of the Plaintiff Class secured by Section 504 and its implementing regulations through

28   their policies, practices, and procedures with respect to chemical and physical force, prone

1  restraint, isolation, solitary confinement, and behavior management; their policies, practices, and

2  procedures with respect to mental health programming and reentry services; and their policies,

3  practices, and procedures with respect to special education and classroom management.

4       257.  Defendants deny Plaintiffs and the members of the Plaintiff Class the opportunity

5  to participate in and benefit from Defendants' programs and activities; deny them the equal

6  opportunity to achieve the same benefits others achieve in Defendants' programs and activities;

7  deny them the equal opportunity to participate in Defendants' programs and activities; and

8  otherwise subject Plaintiffs and the members of the Plaintiff Class to discrimination.  28 C.F.R.

9  § 42.503(a), (b).

10       258.  Defendants disproportionately use chemical and physical force, prone restraint,

11  isolation, solitary confinement, and disciplinary sanctions on Plaintiffs and the members of the

12  Plaintiff Class, and withhold privileges from them, including because of behavior related to their

13  disabilities and without appropriately taking disability into account.  Youth with disabilities are

14  more vulnerable to the adverse effects of such practices, which can exacerbate their disabilities

15  and lead to additional force, isolation, and sanctions and therefore compound Defendants' denial

16  of participation in their educational and rehabilitative programs and activities.

17       259.  In addition, because Plaintiffs and members of the Plaintiff Class require adequate

18  mental health programming and reentry services in order to access Defendants educational and

19  rehabilitative programs and activities, Defendants' failure to provide such services further blocks

20  equal access.

21       260.  By failing to identify and evaluate youth with disabilities, failing to provide

22  adequate special education and related services, and failing to properly respond to classroom

23  behavior, Defendants deny Plaintiffs and members of the Plaintiff class meaningful access to

24  education in Kern Juvenile Facilities.

25       261.  Defendants' policies, practices, and procedures disproportionately burden

26  Plaintiffs and members of the Plaintiff Class.  Because of their disabilities, Plaintiffs and

27  members of the Plaintiff Class are more likely to engage in conduct that precipitates the use of

28  chemical and physical force, prone restraint, isolation, solitary confinement, and disciplinary

1    sanctions, including classroom discipline and removal, and more likely to experience adverse

2    effects as a result, including trauma-related responses.  Relatedly, because of their disabilities,

3    Plaintiffs and members of the Plaintiff Class are unique in their need for mental health

4    programming and reentry services and special education and related services.

5         262.    Defendants fail to make reasonable accommodations in policies, practices, and

6    procedures that are necessary to avoid discrimination on the basis of disability. 28 C.F.R.

7    § 42.511.  Specifically, Defendants, *inter alia*, fail to identify and track Plaintiffs and members

8    of the Plaintiff Class who require reasonable accommodations; fail to inquire into whether

9    behaviors of Plaintiffs and members of the Plaintiff class leading to chemical and physical force,

10   prone restraint, isolation, solitary confinement, and disciplinary sanctions are disability-related;

11   and fail to modify policies and practices related to chemical and physical force, prone restraint,

12   isolation, solitary confinement, behavior management, mental health programming, reentry,

13   special education, and classroom management to account for the disabilities of Plaintiffs and the

14   Plaintiff Class.

15        263.    By using chemical and physical force, prone restraint, isolation, solitary

16   confinement, and disciplinary sanctions as described herein, failing to meet the unique needs of

17   Plaintiffs and members of the Plaintiff Class for adequate mental health and reentry

18   programming, failing to provide adequate special education and related services, and failing to

19   account for disability in managing classroom behavior, Defendants utilize criteria and/or

20   methods of administration that either purposely or in effect discriminate against Plaintiffs and

21   members of the Plaintiff Class on the basis of their disabilities and defeat or substantially impair

22   accomplishment of the objectives of the Defendants' educational and rehabilitative programs or

23   activities with respect to Plaintiffs and members of the Plaintiff Class.  28 C.F.R. § 42.503(b)(3).

24        264.    Defendants further fail to provide a free appropriate public education to each

25   qualified student in Defendants' jurisdiction, 34 C.F.R. § 104.33(a), and fail to provide special

26   education and related aids and services that are designed to meet the individual educational needs

27   of students with disabilities as adequately as the needs of students without disabilities are met, 34

28   C.F.R. § 104.33(b)(1).  Because Defendants' discriminatory conduct is ongoing, declaratory

1   relief and injunctive relief are appropriate remedies.  Further, as a direct result of Defendants'

2   actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm, including

3   lost educational opportunities. Therefore, speedy and immediate relief is appropriate.

4        265.   Pursuant to 29 U.S.C. § 794a, Plaintiffs are entitled to declaratory and injunctive

5   relief and to recover from Defendants the reasonable attorneys' fees and costs incurred in

6   bringing this action.

7   **THIRD CAUSE OF ACTION**

8   **Violation of Individuals with Disabilities Education Improvement Act**
**Against All Defendants**

9   ***(20 U.S.C. § 1400 et. seq.)***

10        266.   Plaintiffs incorporate by reference each and every allegation contained in the

11   foregoing paragraphs as if specifically alleged herein.

12        267.   Under the federal Individuals with Disabilities Education Act (IDEA), students

13   who are eligible to receive special education services, including those in the juvenile justice

14   system, have a right to a free and appropriate public education, or "FAPE."  20 U.S.C.

15   § 1412(a)(1)(A); 34 C.F.R. § 300.101.  A FAPE consists of specially designed instruction and

16   related services, at no cost to the parents or adult student, that are designed to meet the unique

17   needs of the individual with a disability, are consistent with curriculum standards set by the State

18   of California, and conform to the student's IEP.  20 U.S.C. § 1401(9) and (29).  Special

19   education services must provide a meaningful educational benefit toward the goal of self-

20   sufficiency, and allow youth to make appropriate holistic progress in areas such academics,

21   behavioral functioning, and social and emotional well-being.

22        268.   The IDEA defines a child with a disability as a child "with intellectual disabilities,

23   hearing impairments (including deafness), speech or language impairments, visual impairments

24   (including blindness), serious emotional disturbance . . ., orthopedic impairments, autism,

25   traumatic brain injury, other health impairments, or specific learning disabilities" "who, by

26   reason thereof, needs special education and related services."  20 U.S.C. § 1401(3).

27        269.   Plaintiffs and the members of the Plaintiff Class are all youth with disabilities as

28   defined by the ADA and Section 504.  Plaintiffs are all currently eligible for special education

1  and related services under the IDEA.  And all of the youth in the Plaintiff Class either are

2  currently eligible or should be eligible for special education and related services under IDEA.

3  Therefore, Plaintiffs and the members of the Plaintiff Class qualify as children with disabilities

4  for the purposes of IDEA.

5  270.   As discussed above, Defendant KCSOS, overseen by Superintendent Barlow, is

6  the county office of education and LEA responsible for establishing and providing education

7  programs to youth in Kern Juvenile Facilities.  It is also a public agency because it is a "political

8  subdivision[] of the State that [is] responsible for providing education to children with

9  disabilities," 34 C.F.R. § 300.33, and because it is a local education agency ("LEA"), which is

10  defined as a "public authority legally constituted within a State for either administrative control

11  or direction of, or to perform a service function for, public elementary schools or secondary

12  schools in a city, county, township, school district, or other political subdivision of a State."  20

13  U.S.C. § 1401(19); 34 C.F.R. § 300.28(a).

14  271.   As a result, KCSOS Defendants have the duty to provide a FAPE to all students

15  with disabilities, including those who have been suspended or expelled from school.  20 U.S.C.

16  §§ 1412(a)(1), 1413(a).  This duty extends to school-eligible persons with disabilities who are

17  incarcerated in juvenile and adult correctional facilities.  34 C.F.R. § 300.2(b)(iv).

18  272.   As discussed above, the County and its Probation Department, overseen by Chief

19  Merickel, are public agencies because they run a correctional facility "involved in the education

20  of children with disabilities."  34 C.F.R. § 300.2(b).  The Probation Department, and thus, the

21  County, is an educational services agency with "administrative control and direction" over Kern

22  Juvenile Facilities schools, 34 C.F.R. § 300.12(b), and it is a "political subdivision[] of the State

23  that [is] responsible for providing education to children with disabilities," 34 C.F.R. § 300.33.

24  273.   Through the acts and omissions alleged herein, Defendants have denied and

25  continue to deny Plaintiffs and the members of the Plaintiff Class their rights to a free

26  appropriate public education in the least restrictive environment guaranteed under the IDEA and

27  the regulations promulgated thereunder.  20 U.S.C. § 1400, et seq.; 34 C.F.R. § 300, *et seq*.

28  Specifically, Defendants have failed to identify and evaluate students with disabilities; failed to

1  provide adequate education, special education, and related services to students with disabilities;

2  failed to provide a continuum of special education placements for students with disabilities;

3  failed to provide lawful individualized transition planning and services for students with

4  disabilities; responded unlawfully to the classroom behavior of students with disabilities; and

5  failed to follow procedural safeguards to ensure due process for students with disabilities.

6      274.  Because Defendants' discriminatory and wrongful conduct is ongoing,

7  declaratory and injunctive relief are appropriate remedies.  Further, as a direct result of

8  Defendants' actions, Plaintiffs and members of the Class are suffering irreparable harm,

9  including lost education opportunities.  Therefore, speedy and immediate relief is appropriate.

10      275.  Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable

11  attorneys' fees and costs incurred in bringing this action under 20 U.S.C. § 1415(i)(3).

12  **FOURTH CAUSE OF ACTION**

13  **Violation of California Government Code § 11135**
**Against All Defendants**

14  ***(Cal. Gov't Code § 11135)***

15      276.  Plaintiffs incorporate by reference each and every allegation contained in the

16  foregoing paragraphs as if specifically alleged herein.

17      277.  California Government Code section 11135 sets forth a nondiscrimination policy

18  for state programs. It provides, in pertinent part, that:

19  
20  
21  
22        [n]o person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, genetic information or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state. Cal. Gov't Code § 11135(a).

23      278.  Plaintiffs and the members of the Plaintiff Class were at all times relevant to this

24  action, and are currently, "persons in the State of California" within the meaning of California

25  Government Code section 11135.  Plaintiffs and the members of the Plaintiff Class all have

26  disabilities as defined by California Government Code section 12926, and they all are and/or will

27  

28

1  be residents of Kern Juvenile Facilities qualified to participate in the programs and activities of

2  Kern Juvenile Facilities.

3        279.    Defendants were at all times relevant to this action, and are currently, operating or

4  administering a program or activity that receives state financial assistance within the meaning of

5  California Government Code section 11135, including the educational and rehabilitative

6  programs and activities in the Kern Juvenile Facilities.

7        280.    Defendants have violated and continue to violate the rights of Plaintiffs and

8  members of the Plaintiff Class secured by California Government Code section 11135 and the

9  regulations promulgated thereunder, Cal. Code Regs., tit. 4.1, § 11153, *et seq.*, through their

10  policies, practices, and procedures with respect to chemical and physical force, prone restraint,

11  isolation, solitary confinement, and behavior management; their policies, practices, and

12  procedures with respect to mental health programming and reentry services; and their policies,

13  practices, and procedures with respect to special education and classroom management.

14        281.    Defendants deny Plaintiffs and members of the Plaintiff Class the opportunity to

15  participate in and benefit from the aids, benefits, and services offered by Defendants; afford them

16  an opportunity to participate in and benefit from those aids, benefits, and services that is not

17  equal to that afforded others; provide them with aids, benefits, and services that are not as

18  effective in affording equal opportunity as those provided to others; and otherwise limit them in

19  the enjoyment of rights, privileges, advantages, and opportunities enjoyed by others.  Cal. Code

20  Regs., tit. 2, § 11154 (a), (b), (c), (g).

21        282.    Defendants disproportionately use chemical and physical force, prone restraint,

22  isolation, solitary confinement, and disciplinary sanctions on Plaintiffs and the members of the

23  Plaintiff Class, and withhold privileges from them, including because of behavior related to their

24  disabilities and without appropriately taking disability into account.  Youth with disabilities are

25  more vulnerable to the adverse effects of such practices, which can exacerbate their disabilities

26  and lead to additional force, isolation, and sanctions and therefore compound Defendants' denial

27  of access to their educational and rehabilitative programs and activities.

28

283.    In addition, because Plaintiffs and members of the Plaintiff Class require adequate mental health programming and reentry services in order to access Defendants educational and rehabilitative programs and activities, Defendants' failure to provide such services further blocks equal access.

284.    By failing to identify and evaluate youth with disabilities, failing to provide adequate special education and related services, and failing to properly respond to classroom behavior, Defendants deny Plaintiffs and members of the Plaintiff class meaningful access to education in Kern Juvenile Facilities.

285.    Defendants' policies, practices, and procedures disproportionately burden Plaintiffs and members of the Plaintiff Class.  Because of their disabilities, Plaintiffs and members of the Plaintiff Class are more likely to engage in conduct that precipitates the use of chemical and physical force, prone restraint, isolation, solitary confinement, and disciplinary sanctions, including classroom discipline and removal, and more likely to experience adverse effects as a result, including trauma-related responses.  Relatedly, because of their disabilities, Plaintiffs and members of the Plaintiff Class are unique in their need for mental health programming and reentry services and special education and related services.

286.    By using chemical and physical force, prone restraint, isolation, solitary confinement, and disciplinary sanctions as described herein, failing to meet the unique needs of Plaintiffs and members of the Plaintiff Class for adequate mental health and reentry programming, failing to provide adequate special education and related services, and failing to account for disability in managing classroom behavior, Defendants use criteria and/or methods of administration that have the purpose or effect of subjecting Plaintiffs and members of the Plaintiff Class to discrimination on the basis of their disabilities and have the purpose and/or effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' educational and rehabilitative programs and activities with respect to Plaintiffs and members of the Plaintiff Class.  Cal. Code Regs., tit. 2, § 11140.

287.    California Government Code section 11135 further requires that programs and activities that receive financial assistance from the state "shall meet the protections and

1  prohibitions contained in Section 202 of the federal Americans with Disabilities Act . . . except

2  that if the laws of this state prescribe stronger protections and prohibitions, the programs and

3  activities subject to subdivision (a) shall be subject to the stronger protections and prohibitions."

4  Cal. Gov't Code § 11135(b).  Here, because Defendants are violating Title II of the ADA, they

5  also are violating California Government Code section 11135.

6      288.    Because Defendants' discriminatory and wrongful conduct is ongoing,

7  declaratory and injunctive relief are appropriate remedies. Further, as a direct result of

8  Defendants' actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm,

9  including lost education opportunities. Therefore, speedy and immediate relief is appropriate.

10     289.    Pursuant to California Code of Civil Procedure sections 526(a) and 1021.5,

11 Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and

12 costs incurred in bringing this action.

13                          **FIFTH CAUSE OF ACTION**

14  **Violation of California Education Code for Students with Disabilities**
    **Against All Defendants**
15  **(Cal. Educ. Code §§ 48645, et seq., 48900, et seq., and 56000, et seq.)**

16     290.    Plaintiffs incorporate by reference each and every allegation contained in the

17 foregoing paragraphs as if specifically alleged herein.

18     291.    Individuals with exceptional needs are entitled to receive a free appropriate public

19 education in accordance with IDEA and its implementing regulations, including a full day of

20 school instruction.  Cal. Educ. Code §§ 48645.3, 56040.

21     292.    A student may qualify as an individual with exceptional needs if he or she has any

22 of the following as defined by the California Code of Regulations: autism, emotional

23 disturbance, intellectual disabilities, multiple disabilities, learning disabilities, language or

24 speech disorders, or traumatic brain injury.  Cal Code Regs., tit. 5, § 3030.  Plaintiffs and the

25 members of the Plaintiff Class all have one or more of these conditions.  As alleged above,

26 Plaintiffs and the members of the Plaintiff Class are all youth with disabilities as defined by the

27 ADA and Section 504 and are currently eligible for or should be eligible for special education

28

1  and related services under the IDEA.  Therefore, Plaintiffs and the members of the Plaintiff Class

2  qualify as individuals with exceptional needs under California's Education Code.

3         293.  The County and its Probation Department, overseen by Chief Merickel, are

4  "public agenc[ies]" pursuant to the California Education Code because they are responsible for

5  providing education to youth with disabilities.  34 C.F.R. § 300.33, *as incorporated into* Cal.

6  Educ. Code § 56028.5.  County Defendants are involved in "decisions regarding a pupil."  Cal.

7  Educ. Code § 56501(a).  The County and its Probation Department, overseen by Chief Merickel,

8  also qualify as public agencies pursuant to the IDEA, as previously alleged.

9         294.  KCSOS, overseen by Superintendent Barlow, is a "public agency" pursuant to the

10  California Education Code because it is a county office of education.  Cal. Educ. Code

11  § 56028.5.  KCSOS Defendants are involved in any "decisions regarding a pupil."  Cal. Educ.

12  Code § 56501(a).  KCSOS, overseen by Superintendent Barlow, also qualifies as a public agency

13  pursuant to IDEA, as previously alleged.

14         295.  Through the acts and omissions alleged herein, Defendants have denied Plaintiffs

15  and the members of the Plaintiff Class their rights to a free and appropriate public education in

16  the least restrictive environment with proper due process, as guaranteed under the California

17  Education Code and the regulations promulgated thereunder.  Cal. Educ. Code §§ 48900, *et seq.*

18  and 56000, *et seq.*; Cal. Code Regs., tit. 5, § 3000, *et seq.*  Specifically, Defendants have failed to

19  identify and evaluate students with disabilities; failed to provide adequate education, special

20  education, and related services to students with disabilities; failed to provide a continuum of

21  special education placements for students with disabilities; failed to provide lawful

22  individualized transition planning and services for students with disabilities; responded

23  unlawfully to the classroom behavior of students with disabilities; and failed to follow

24  procedural safeguards to ensure due process for students with disabilities.

25         296.  Because Defendants' discriminatory and wrongful conduct is ongoing,

26  declaratory and injunctive relief are appropriate remedies.  Further, as a direct result of

27  Defendants' actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm,

28  including lost education opportunities. Therefore, speedy and immediate relief is appropriate.

1    297.    Pursuant to California Code of Civil Procedure sections 526(a) and 1021.5,

2    Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and

3    costs incurred in bringing this action.

4                                    **REQUEST FOR RELIEF**

5        WHEREFORE, Plaintiffs pray that the Court grant the following relief:

6        1.    Order that Plaintiffs may maintain this action as a class action pursuant to Rule

7    23(b)(2) of the Federal Rules of Civil Procedure;

8        2.    Order and declare that Defendants' conduct as alleged herein has violated, and

9    continues to violate, the ADA, 42 U.S.C. § 12101, *et seq.*, and accompanying regulations;

10   Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and accompanying regulations; the

11   IDEA, 20 U.S.C. § 1400, *et seq.*, and accompanying regulations; California Government Code

12   section 11135, and accompanying regulations; and California Education Code sections 48645, *et*

13   *seq.*, 48900, *et seq.*, and 56000, *et seq.*, and accompanying regulations;

14       3.    Preliminarily and permanently enjoin Defendants from violating the ADA, 42

15   U.S.C. § 12101, *et seq.*, and accompanying regulations; Section 504 of the Rehabilitation Act, 29

16   U.S.C. § 794, and accompanying regulations; the IDEA, 20 U.S.C. § 1400, *et seq.*, and

17   accompanying regulations; California Government Code section 11135, and accompanying

18   regulations; and California Education Code sections 48645, *et seq.*, 48900, *et seq.*, and 56000, *et*

19   *seq.*, and accompanying regulations;

20       4.    Order Defendants to provide Plaintiffs and the members of the Plaintiff Class:

21           a.   reasonable modifications to policies, practices, and procedures related to chemical

22               and physical force, prone restraint, isolation, solitary confinement, behavior

23               management, mental health programming, reentry, special education, and

24               classroom management to ensure that youth do not suffer discrimination because

25               of their mental health, behavioral, learning, intellectual, and/or developmental

26               disabilities;

27           b.   a free appropriate public education and meaningful access to education, including

28               compliance with all general and special education laws and regulations that

1    protect students with disabilities;

2         c.   educational and rehabilitative services for all youth with disabilities who are

3              isolated as a disciplinary measure for any amount of time;

4    5.    Appoint a special master to oversee the implementation of the above-listed

5    systems, processes, and mechanisms, and grant the special master legal authority to administer

6    specific programs and activities of Defendants as may be necessary to prevent discrimination and

7    to ensure the provision of educational and rehabilitative services to Plaintiffs and members of the

8    Plaintiff Class;

9    6.    Retain jurisdiction over this case until Defendants have complied with the orders

10   of this Court, and there is a reasonable assurance that Defendants will continue to comply in the

11   future, absent continuing jurisdiction;

12   7.    Award Plaintiffs' attorneys' fees and costs, as provided by statute and law; and

13   8.    Any other such relief as the Court finds just and proper.

14   DATED:  February 21, 2018              Respectfully submitted,

15

16                                          MELINDA BIRD
                                            CARLY J. MUNSON
17
                                            DISABILITY RIGHTS CALIFORNIA
18

19                                           /s/ Carly J. Munson
                                            (as authorized on February 21, 2018)
20
                                            Carly J. Munson
21                                          Attorneys for Plaintiffs

22
                                            THOMAS P. ZITO
23                                          FREYA PITTS

24                                          DISABILITY RIGHTS ADVOCATES

25

26

27                                          _____
                                            Freya Pitts
28                                          Attorneys for Plaintiffs