1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| T.G., et al., | ) Case No.: 1:18-cv-0257 JLT |
| Plaintiffs, | ) ORDER GRANTING PRELIMINARY APPROVAL OF THE CLASS ACTION SETTLEMENT |
| v. | ) (Doc. 36) |
| KERN COUNTY, et al., | ) |
| Defendants. | ) |

T.G., P.P., and J.A. assert they suffered discrimination as minors with disabilities held in Kern County's juvenile detention facilities.  According to Plaintiffs, "these facilities have the effect of punishing, isolating, and intimidating the young people in their care, while depriving them of crucial educational and rehabilitative opportunities."  (Doc. 1 at 2)  Thus, Plaintiffs filed a complaint seeking declaratory and injunctive relief from Kern County; the Kern County Probation Department; and T.R. Marickel, Chief of the Probation Department; ("the Probation Defendants"), as well as Kern County Superintendent of Schools and Mary Barlow, Superintendent of Schools ("the Schools Defendants").

 T.G. and P.P. have entered into settlement agreements with the Probation Defendants and the Schools Defendants, and the parties jointly seek preliminary approval of the class action settlement.[1] (Doc. 36)  Specifically, the parties now request: (1) preliminary approval of the two class settlements,

---

[1] J.A. was not a party to the settlement because he "is over 18 years old, has completed all of his probation requirements, and has no possibility of returning to any of the Kern County Juvenile Facilities."  (Doc. 36 at 8, n.1)

(2) certification of the proposed settlement class, (3) approval of the proposed class notice and related materials, and (4) scheduling for final approval of the settlements. (*See* Doc. 36)

The Court has considered the proposed settlements between the parties, and the proposed notice and related forms. For the following reasons, the joint motion for preliminary approval of class settlement is **GRANTED**.

## BACKGROUND

Plaintiffs allege that Kern County, through its Probation Department, "manages and controls the juvenile detention facilities" in which Plaintiffs and the putative class are housed. (Doc. 1 at 4) These facilities include Juvenile Hall, Pathways Academy, Furlough Treatment and Rehabilitation Program, and a separate Crossroads facility. (*Id.* at 4-5, ¶ 14) Plaintiffs contend the Probation Defendants "must provide 'a safe and supportive homelike environment' at the Kern Juvenile Facilities and may not treat these facilities as 'a penal institution.'" (*Id.* at 5, ¶ 18, quoting Cal. Welf. & Inst. Code § 851)

On average, the Juvenile Hall complex and Crossroads "house more than 250 youth at any one time." (Doc. 1 at 4, ¶ 14) According to Plaintiffs, "at least 30 to 60 percent of the youth in the Juvenile Hall complex have a mental health, behavioral, learning, intellectual, and/or developmental disability." (*Id.* at 11, ¶ 49) In addition, Crossroads has been described as "a Juvenile Correctional Treatment Facility" by Defendants, who also "report[ed] to the Board of State and Community Corrections (BSCC) that 100 percent of the youth at Crossroads have open mental health cases." (*Id.*, ¶ 50)

TR Merickel, the Chief Probation Officer for Kern County, "oversees, manages, and directs the Kern Juvenile Facilities." (Doc. 1 at 5, ¶ 15) Plaintiffs contend, "Chief Merickel has overarching responsibilities" the affect the "access to educational and rehabilitative programming" of detained youth. (*Id.*, ¶ 20) Plaintiffs report that "Chief Merickel must 'provide for the administration and operation of juvenile court schools' at the Kern Juvenile Facilities in conjunction with the County Board of Education." (*Id.* at 5-6, ¶ 20, quoting Cal. Code Regs., tit. 15, § 1370(a)) In addition, the Probation Defendants "have the ability to remove students from the classroom, effecting a change in placement, affect the general school schedule of instructional minutes, and determine whether a youth may leave his or her unit on any given day to attend an on-site school." (*Id.* at 6, ¶ 25)

The on-site schools at the Kern Juvenile Facilities are operated and overseen by the Kern

County Superintendent of Schools ("KCSOS").  (Doc. 1 at 7, ¶ 27)  According to Plaintiffs, "[m]ost youth housed at the Juvenile Hall complex attend Central School, an on-site school operated by the KCSOS and Probation Defendants.  (*Id.* at 9, ¶ 45)  Youth housed at Crossroads attend Redwood High School, which is the on-site school for the facility.  (*Id.* at 10, ¶ 46)  However, "youth with a high-security status" are barred by Defendants from attending Central School and Redwood High School.  (*Id.* at 9-10, ¶¶ 45-46)  Instead, high-security youth at Juvenile "receive instruction in their housing unit through the Unit School," while high-security youth at Crossroads are "placed on independent study."  (*Id.* at 9-10, ¶¶ 45-46)  "Probation staff directly supervise students at all times" while they are in any classroom at Central School, Redwood High, and the Unit School.  (*Id.*)

Plaintiffs assert that because KCSOS is the "local education agency … responsible for juvenile court schools, KCSOS must insure that youth with disabilities detained at Kern Juvenile Facilities receive a free appropriate public education within the least restrictive environment" pursuant to the Individuals with Disabilities Education Act.  (Doc. 1 at 7, ¶ 28)  In addition, Plaintiffs allege that because the Schools Defendants "receive federal financial assistance under the IDEA, they are responsible for providing all school-eligible persons with disabilities who reside in Kern County with special education programs administered in compliance with federal and State laws and regulations."  (*Id.* at 7, citing 20 U.S.C. § 1413(a))  Further, Plaintiffs contend the Schools Defendants "have an independent duty to ensure that all individuals who qualify for special education services, including detained students, have access to appropriate special education programs and related services."  (*Id.* at 8, ¶ 32, citing Cal. Educ. Code § 56140(a))

At the time of the filing of the complaint, T.G. was seventeen years old and housed at the Juvenile Hall complex, where he attended the Unit School.  (Doc. 1 at 33, ¶ 182)  T.G. "first entered Kern Juvenile Facilities around the age of thirteen and "has been held at the Juvenile Hall complex and Crossroads at various points in time."  (*Id.*, ¶ 183)  T.G. has learning disabilities, and "has been diagnosed at various points in time with Posttraumatic Stress Disorder, Major Depressive Disorder with psychotic features, Bipolar Depression, and Attention Deficit Hyperactivity Disorder, as well as a mood disorder and anger problems.  (*Id.* at 33-34, ¶ 184)  According to Plaintiffs, "[t]hese impairments substantially limit one or more major life activities of T.G., qualifying him as an individual with a

disability." (*Id.* at 34, 184)  T.G. reports probation staff used pepper spray on him "on multiple occasions," including when he was "acting in a manner consistent with and on account of his disabilities." (*Id.*, at 34, ¶ 188)  T.G. also asserts that he has been subjected to physical force and placed in administrative segregation for behavior "consistent with and account of his disabilities." (*Id.*, ¶¶ 191, 193)  Furthermore, T.G. alleges he "has an individualized education plan and "has been eligible for special education and related services at all relevant times," yet has not received "appropriate special education instruction and interventions nor appropriate related services." (*Id.* at ¶¶ 182, 197)  At an unidentified time during his housing at a Kern Juvenile Facility, T.G. was placed on suicide watch. (*Id.* at 34, ¶ 187)

Plaintiff P.P. "first entered Kern Juvenile Facilities around the age of thirteen," and was detained at Crossroads when the complaint was filed.  (Doc. 1 at 36, ¶¶ 202-203)  P.P. was "diagnosed with Attention Deficit and Hyperactivity Disorder, Bipolar Affective Disorder, and anger problems," which "substantially limit one or more major life activities …, qualifying him as an individual with a disability." (*Id.*, ¶ 204) He was placed on suicide watch at an unidentified time while housed in the Kern Juvenile Facilities. (*Id.*, ¶ 205)  P.P. has been disciplined—including pepper spray, physical restraints, and placed "in solitary confinement and isolation"—and removed from class for exhibiting "behavior consistent with and on account of his disabilities." (*Id.* at 36-37, ¶¶ 206-209, ¶ 214)  P.P. reports he "spent at least fifty (50) days in isolation during his commitments to Crossroads and Juvenile Hall," and asserts the periods of isolation were "because he was unable to conform his behavior on account of his mental health disabilities, and staff did not accommodate or take into account his disabilities when deciding to discipline and punish him." (*Id.*, ¶ 210)  He asserts that he was unable to complete the program at Crossroads because he "could not obtain medication" for his mental impairments.  (*Id.*, ¶ 212) Further, P.P. alleges he has an IEP, but Defendants did not "consistently" follow it, and he did "not receive[] the accommodations, supports, and services he needs in order to access his education." (*Id.*, ¶ 213)

On February 21, 2018, Plaintiffs T.G., P.P., and J.A. initiated this action by filing a complaint on behalf of themselves and all other persons similarly situated, asserting the following causes of action: (1) violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; (2) violation of

the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*; (3) violation of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*; (4) violation of Cal. Gov't Code § 11135; and (5) violation of California Education Code for Students with Disabilities.[2]  (*See generally* Doc. 1 at 40-55)  Plaintiffs sought declaratory and injunctive relief including:

> a.  reasonable modification to policies practices, and procedures related to chemical and physical force, prone restraint, isolation, solitary confinement, behavior management, mental health programming, reentry, special education, and classroom management to ensure that youth do not suffer discrimination because of their mental health, behavioral, learning, intellectual, and/or developmental disabilities;
>
> b.  free appropriate public education and meaningful access to education, including compliance with all general and special education laws and regulations that protect students with disabilities; [and]
>
> c.  educational and rehabilitative services for all youth with disabilities who are isolated as a disciplinary measure for any amount of time[.]

(*Id.* at 55-56)  On March 8, 2018, the parties filed a stipulation and request to stay the proceedings, reporting they had "entered into a Structured Negotiations Agreement… to guide [their] upcoming good faith attempts at resolution."  (Doc. 10 at 2)  Thus, the Court stayed the matter.  (Doc. 11)

The parties selected the Council of Juvenile Correctional Administrators, Inc. ("CJCA") to provide expert evaluations of the facilities.  (Doc. 36 at 12)  In addition, the parties jointly selected Peter Leon, Ph.D. and Judy Elliot, Ph.D. to provide education expert opinions.  (*Id.*)  In May 2018, the "CJCA conducted on-site inspections at the facilities," while Drs. Leon and Elliot conducted their inspection in June 2018.  (*Id.*)  "The experts met with administrators, staff, and youth at the Facilities, and requested and reviewed documents and information pertaining to the Facilities, and the education provided to youth confined therein."  (*Id.*)  The parties report the "CJCA and Education Experts each provided a written report and recommendations to the Parties containing their evaluation of the issues at the Facilities… along with recommended changes to polices, practices, and procedures at the Facilities."  (*Id.*)  Following the receipt of the experts' reports, the parties "met and conferred jointly and separately by phone and in person more than twenty times … to negotiate the Settlement Agreements and strategies for implementing and monitoring these recommendations."  (*Id.* at 13)

---

[2] Rebecca P. was appointed the guardian ad litem for P.P.  (Doc. 46)  Because T.G. and J.A. are no longer minors, and T.G. has been restored to competency (Doc. 49), a guardian ad litem was not required for these plaintiffs.

On July 3, 2019, the parties reported they had "reached an agreement in principle regarding the system-wide, injunctive remedies for the putative class." (Doc. 27 at 3, ¶ 7) The parties reported Plaintiffs and the Probation Defendants "negotiated and developed a written plan, titled the 'Probation Action Plan,' that lays out the significant changes that the Probation Defendants will make in their juvenile detention facilities and the Parties' plans for implementation and monitoring." (*Id.*, ¶ 8) In addition, Plaintiffs and the Schools Defendants developed the "Court Schools Implementation Plan," which identified "significant changes that the Schools Defendants will adopt in the schools that serve students housed at the juvenile detention facilities, as well as the Parties' plans for implementation and monitoring." (*Id.*, ¶ 9) Based upon this information, the Court lifted the stay in the action. (Doc. 34)

The parties submitted a joint request for approval of the class action settlements, including the Probation Settlement (with the County of Kern, Kern County Probation Department, and Chief TR Merickel) and the Kern County Superintendent of Schools ("KCSOS") Settlement with the Kern County Superintendent of Schools and Superintendent Mary C. Barlow in her official capacity. (*See* Doc. 36, Doc. 36-2 [the Probation Settlement] and Doc. 36-3 [the KCSOS Settlement])

## THE PROPOSED SETTLEMENTS

The parties report the Probation Settlement and KCSOS Settlement are each intended to settle the claims for a class defined as follows:

> [A]ll youth with mental health, behavioral, learning, intellectual and/or developmental disabilities as defined by the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and/or Individuals with Disabilities Education Act who are currently detained, or who will be detained during the Monitoring Term (through August 31, 2022), at the Kern County Juvenile Facilities (Juvenile Hall, Crossroads, and Camp Erwin Owen).[3]

(Doc. 36 at 15)

## I.      The Probation Settlement

The settlement between Plaintiffs and Probation Defendants functions "in conjunction with the related Kern Probation Action Plan." which is incorporated into the settlement agreement. (Doc. 36-2

---

[3] The Settlement Agreements indicate the class would be certified for youth "currently detained, or who will be detained during the Monitoring Term (defined in Section 6.1.1, below)." (*See* Doc. 36-2 at 2, § 2.5; Doc. 36-3 at 2, § 2.5) Because the Monitoring Term began upon execution of the agreements on August 30, 2019, and was to run for three years, the parties modified the class definition to indicate the end of the term was August 31, 2022. (Doc. 36 at 14, n. 6)

at 2, Probation Settlement § 1.3)  Thus, the terms of both the settlement and the Action Plan are addressed by the Court.

## A.  Terms and Modification to Policies and Procedures

With the Probation Action Plan, the defendants intend "to transition from a corrections model to a treatment model, with new training for staff to reform," and provides for "special attention paid to youth with disabilities."  (Doc. 36 at 15, citing Probation Plan § 1) The Action Plan is divided into sections, which address the facilities' culture and environment; case management system programming; training; youth, family, and staff input; complaints and grievances; use of Oleoresin Capsicum ("O.C." or "pepper") spray; use of restrictive housing such as isolation, seclusion, and confinement; and re-entry.  (*See generally* Doc. 36-2 at 23-66)

The Probation Department will create an Implementation Team, which "will consist of Juvenile Corrections Officers, Deputy Probation Officers, facility managers, and executive management" to oversee the Action Plan.  (Doc. 36 at 15; Doc. 36-2 at 22)  This team will meet on a monthly basis initially, "with frequency of meetings to be determined as progress is made."  (Doc. 36-2 at 23)

### 1.  Facility Culture and Environment

In an effort to modify the culture at each of the facilities, the Probation Department will "[c]reate avenues for staff communication including regular meetings (at least quarterly) with Managers and Union shop stewards at each at each facility, open dialogue in unit meetings, managers to be available to discuss issues at meetings, through emails or in office, staff surveys will continue on a periodic basis."  (Doc. 36-2 at 23)

The Probation Defendants will create also "Re-Entry, ADA and Programming ('RAP') Units within each of the Facilities, comprising a total of 26 staff members."  (Doc. 36 at 15)  Staff for the RAP Units "will be completely separate from existing facility housing unit staffing," and "will be assigned as coordinators for Re-Entry, Program, Volunteer, School and ADA services."  (*Id.*)  The RAP Unit staff will be trained as to be part of the Crisis Awareness Response (CARE) team, which will be "designated to respond to crisis situations within each facility in an attempt to de-escalate situations before they deteriorate further."  (*Id.*)

In addition, Probation Defendants intend to coordinate culture change across Kern County

7

Juvenile Facilities through:

> (1) reading and learning more about developmentally informed juvenile justice and positive youth strategies; (2) visiting juvenile facilities that have embraced developmentally informed juvenile justice, trauma informed, therapeutic environments and positive youth development; (3) communicating with agency directors who have made a similar transition; (4) incorporating the principles of the above ideas into all training, policies and procedures and providing continuing education for staff; (5) providing strong leadership for the above ideas and reinforcing in all communication with staff; (6) consulting with experts on the above ideas for assistance in incorporating the principles into training, policies and procedures; and (7) ensuring job descriptions and hiring processes reflect the changes in [these] ideas.

(Doc. 36 at 15-16, citing Probation Plan § 8; *see also* Doc. 36-2 at 38-39)

Finally, the Action Plan provides that the Probation Defendants will work on changing the atmosphere of the facilities, because "[i]f the [facility] looks and feels like a prison, youth will behave like prisoners." (Doc. 36-2 at 34) The Probation Department is seeking to improve the physical look of the facilities "by creating more artwork, murals, and inspirational sayings." (Doc. 36 at 16) The parties report the "[p]ainting and homelike improvements have mostly been completed in the living units," and the anticipated completion date was three months from the Settlement Agreement. (Doc. 36-2 at 34) They also intend to offer "more books, games, and craft supplies, to assist in fostering a homelike environment." (Doc. 36 at 16, citing Probation Plan § 6)

### 2. Case Management System

Section 2 of the Probation Plan indicates that the Probation Department "will acquire a Case Management System that can provide critical measures in monthly reports to track the use of force, including O.C. spray, mutual fights, youth assaults, room confinement, youth grievances and other issues, for ease of monitoring compliance with the Probation Implementation Plan." (Doc. 36 at 16, citing Probation Plan § 2) The Probation Department restructured its budget for this purpose, and will purchase Benchmark software for tracking. (Doc. 36-2 at 25) To the extent Benchmark cannot capture relevant case management data, the Probation Department will track that information in an Excel spreadsheet. (*Id.*)

### 3. Programming

The Probation Department will "[r]each out to local resources" and "[d]evelop full schedule of structured activities for afternoons, evenings and weekends." (Doc. 36-2 at 27) The department will

"assign a volunteer coordinator to conduct outreach and manage volunteer activities" and "get input from staff, volunteers, youth and families for ideas on reducing idleness and providing more meaningful and structured activities for youth." (Doc. 36 at 16, citing Probation Plan § 3) The facilities will "[p]ost a daily schedule of activities that is reviewed by leadership," who will "ensure [the] program schedule is followed." (*Id.*; Doc. 36-2 at 27) Further, the department will perform "[p]eriodic surveys assessing the programming available and desired by youth and staff." (Doc. 36-2 at 28)

### 4.    Training and Coordination with KCSOS

The action plan provides that the Probation Department will "[a]dopt a Safe Crisis Management system focusing on de-escalation," and the department chose the Crisis Prevention Institute (CPI) as its de-escalation system. (Doc. 36-2 at 29) All probation staff will receive training in crisis intervention, trauma informed care, adolescent development and behavior, and mental health disabilities. (Doc. 36 at 17, citing Probation Plan § 4) In addition, the Probation Department will ensure that partner agencies, such as KCSOS, "are included in training opportunities to ensure continuity of services and [that a] common language is used." (Doc. 36-2 at 30) Likewise, Probation staff will "attend trainings provided by KCSOS." (Doc. 36 at 17, citing Probation Plan § 18)

The Probation Department and KCSOS will work together to integrate ADA accommodations, Individualized Education Programs (IEPs), Educationally Related Mental Health Services (ERMHS), and other services, by having RAP Unit staff attend the meetings. (Doc. 36-2 at 64) Probation will also consult with KCSOS in "(1) drafting youth handbooks at an appropriate comprehension level for special education students, (2) making accessible sensory tools for special education students, and (3) increasing the number and variety of reading materials available to youth in their housing units." (Doc. 36 at 17, citing Probation Plan § 18)

### 5.    Youth, Family, and Staff Input

The Probation Department will create and provide surveys to youth, families, and staff "to determine strengths, service gaps, and perception… regarding [the] facilities, programs and services." (Doc. 36-2 at 32; *see also* Doc. 36 at 17, citing Probation Plan § 5) In particular, the youth and family surveys will address: "[a]ctivities, [behavior management systems], sanctions, facility rules, re-entry process and services[,] medical and mental health services, staff relations, [and] safety concerns." (*Id.*)

The surveys will be available "on an on-going basis," with survey distribution and collection occurring every six months. (*Id.*) Survey data will be compiled within one month of each completed survey round, and implementation of appropriate suggestions will occur "as soon as reasonably possible," depending upon the "level of accepted suggestions and resource availability." (*Id.* at 33)

### 6. Complaints and Grievances

The Probation Department will "[d]evelop a robust review process for staff and youth grievances to ensure facility leadership is aware of and addresses such concerns." (Doc. 36 at 17, citing Probation Plan § 7) This will involve using Excel spreadsheets to track the "number of youth grievances and categories (types of grievances) consistently across all facilities." (Doc. 36-2 at 36) Clerical staff at the facilities will report the youth grievance statistics on a monthly basis to Facility Managers, who then will report the statistics during Executive Review Committee Meetings. (*Id.*)

### 7. Pepper Spray and Uses of Force

"Probation Defendants will incorporate strategies to mitigate the need for use of force, including reducing the use of O.C. spray." (Doc. 36 at 17, citing Probation Plan § 9) The Plan provides that the "spray should be used only when [there is a] clear and present threat of safety." (Doc. 36-2 at 41) As part of this effect, the Probation Department will use the CARE team to de-escalate situations, "[p]rovide training to all facility staff to include de-escalation via CPI," receive training from Dr. Tasha Arneson on "trauma informed care and mental health," and conduct "in-house Reality Based Training." (*Id.*; *see also* Doc. 36 at 17)

### 8. Isolation, Seclusion, and Confinement

The Probation Defendants will also work to "gradually reduce the length of time youth spend in isolation." (Doc. 36 at 18, citing Probation Plan § 10) The parties report:

> Probation Defendants will: (1) eliminate the "program restriction" sanctions that require youth to sit in a chair outside of their rooms; (2) create CARE teams to resolve and de-escalate situations without the use of isolation; (3) limit the amount of time a youth spends in separation following a safety and security incident; (4) change policy and procedures to reduce time youth spend in separation for investigations or pending disciplinary hearings; and (5) consult with youth and staff to develop and implement a more robust behavior management and incentive system.

(*Id.* citing Probation Plan § 9) The Probation Defendants "[w]ill track number and types of room separations at Juvenile Hall and Crossroads consistently." (Doc. 36-2 at 58)

In addition, the defendants will also "[c]arefully look at [the] practice of voluntary room confinement," while acknowledging this "is difficult to manage and can lead to youth not engaging in programming." (Doc. 36-2 at 58) Currently, "Mental Health Consultation Slips are required after 24 hours of self- separation and a running log is started after 4 hours of self-separation." (*Id.*) The policy is now being changed "to require Mental Health Consultation Slips after 4 hours of self-separation instead of after 24 hours of separation." (*Id.*) Under the amended policy, staff will also be directed "to consider Mental Health Consultation Slips for youth who self- separate less than 4 hours, but who do so frequently." (*Id.*)

### 9. Special Cases Meetings

The RAP Units will "include additional specialized staffing, which will allow for increased case planning in terms of both ADA accommodations and Re-entry." (Doc. 36-2 at 52) These new RAP Units at each facility "will oversee Special Cases Meetings, where the RAP Unit staff and other staff will discuss youth on the Special Cases List, e.g., youth with security, mental health, ADA, education, behavioral, and/or medical issues." (Doc. 36 at 18, citing Probation Plan § 13)

### 10. Individualized Safety and Security Program

The Probation Department will revise the manual for its Individualized Safety and Security Program ("ISSP") "to ensure that behavioral health professionals have experience with youth with disabilities, trauma informed care, delinquency variables, and have training in leading a team." (Doc. 36 at 18, citing Probation Plan § 14) An ADA section will be added to the ISSP manual "to acknowledge youth's disabilities," and direct that "youth will not 'unfairly or disproportionately' be affected due to ADA considerations." (Doc. 36-2 at 54)

ISSP plans will clearly identify: "(1) why the plan would not unfairly or disproportionately deprive youth of programs, services or increase his time in custody; (2) how the plan relates to other special education, behavioral, mental health, or medical plans; (3) the youths' progress on the ISSP; (4) why any modifications or revisions are made; and (5) when reviews occur (no less than weekly)." (Doc. 36-2 at 54, citing Probation Plan § 14) Youth and their parents (or guardians) will be informed of the ISSP plan, how to participate in the process, and recourses available if they disagree with the ISSP plan. (*Id.*)

### 11. Suicide Prevention

The Probation Department will change the language in its suicide prevention policy to: "be more in line with the Massachusetts Youth Screening Instrument ("MAYSI")." (Doc. 36 at 19, citing Probation Plan § 15) This will enable the department "to identify the potential mental health needs of adolescents involved in the juvenile justice system and … more accurately reflect risk-level identification and awareness." (*Id.*)

### 12. Re-Entry

The RAP Unit at each facility "will include staff dedicated to re-entry case planning." (Doc. 36-2 at 61) The re-entry staff will outline and discuss plans and goals during meetings that occur at least bi-monthly, including the following topics: living environment, education, vocation, medical, and mental health. (*Id.*) The re-entry staff at Juvenile Hall shall "identify long term youth on the detention side to provide case planning meetings to identify and address service needs, both in and out of custody." (*Id.*) Further, the Probation Department will continue to offer work-related experience in areas such as construction, food services, and agriculture. (*Id.* at 62)

### B. Monitoring and Expiration of the Settlement

The parties selected the Council of Juvenile Correctional Administrators ("CJCA") "to act as the Monitoring Expert to monitor compliance with the Probation Plan for the term of the Probation Settlement." (Doc. 36 at 19; *see also* Doc. 36-2 at 6, § 6.1.3) As the Monitoring Expert, CJCA will "have complete access to staff and youth records," as well as any information "necessary to assist in conducting the review of the Action Plan and monitoring Probation Defendants' progress in implementing that Action Plan." (Doc. 36-2 at 67, §§ 6.1.2, 6.2.1) "The Monitoring Expert will prepare a written report for review and comment by the Parties on a quarterly basis for the first year of the Monitoring Term and on a semiannual basis thereafter." (Doc. 36 at 19, citing Doc. 36-2 § 6.2.2) Each monitoring report will be reviewed by Plaintiffs' counsel, which will provide written feedback, if any, to the Monitoring Expert and counsel for the Probation Defendants. (*Id.*)

The parties also agreed the Probation Settlement would be "in effect from the Execution Date until the completion of the Monitoring Term and issuance of the final monitoring report." (Doc. 36-2 at 9, Probation Settlement § 8) As noted above, the Monitoring Term ends "three years after the

Execution Date of the Probation Settlement," which will be August 31, 2022. (*See* Doc. 36 at 14, n. 6)

### C. Releases

The Probation Settlement provides the Plaintiffs and Class Members, "[i]n exchange for the injunctive relief proposed," release the Probation Defendants from claims arising from February 21, 2016, though the term of the agreement. (Doc. 36 at 20) Specifically, the agreement provides:

> The "Released Injunctive Claims" are any and all claims, rights, demands, charges, complaints, actions, suits, and causes of action, for injunctive or declaratory relief, that have been brought in the Lawsuit under the ADA, Rehabilitation Act, IDEA, and/or state laws arising from February 21, 2016, through the Term of the Agreement brought against Probation Defendants. The Released Injunctive Claims do not include any claims for compensatory education or individual due process claims arising under the IDEA or Section 504, any claims for reasonable accommodations related to physical access, communication access, and/or accommodations otherwise relating to hearing, vision and/or mobility disabilities arising under the ADA or Section 504, or any monetary claims that may exist under any relevant laws. Released Injunctive Claims do not include any claim to enforce the terms of this Agreement. Released Injunctive Claims do not include claims against Schools Defendants.

(Doc. 36-2 at 12-13, § 11.2)

### D. Attorneys' Fees, Costs, and Expenses

The Probation Defendants have agreed Plaintiffs' Counsel shall be awarded attorneys fees and costs, subject to the Court granting final approval of the class action settlement. (Doc. 36 at 21; Doc. 36-2 at 13, § 12) Under the terms of the agreement, within thirty days of preliminary approval of the agreement and certification of the settlement class, "Plaintiffs' Counsel shall provide counsel for Probation Defendants complete billing records that Plaintiffs' Counsel would submit to the Court pursuant to a motion for approval." (Doc. 36-2 at 13, § 12.1.4)

The parties have agreed that "Plaintiffs will move for approval by the Court of the reasonable attorneys' fees, expenses, and costs incurred by Plaintiffs' Counsel, pursuant to Rule 23(h) of the Federal Rules of Civil Procedure," in the amount of $900,000. (Doc. 36-2 at 13, § 12.2) The amount shall be paid by the Probation Defendants within sixty days of final approval of the settlement. (*Id.*, §12.1.2) Of this total, Plaintiffs Counsel anticipates setting aside $25,000 "for fees, expenses, and costs incurred in monitoring … implementation of [the] Agreement." (*Id.* § 12.1.3)

### II. The KCSOS Settlement

This agreement between Plaintiffs and Schools Defendants functions "in conjunction with the

related Kern Court Schools Implementation Plan," which is incorporated into their settlement agreement.  (Doc. 36-3 at 2, KCSOS Settlement § 1.3)

A.    **Modifications to Policies and Procedures**

The Schools Defendants "agreed to make most of the changes recommended by the Education Experts in their Report."  (Doc. 36-3 at 5, § 5.1) Thus, the Schools Defendants will take a number of steps to improve education programs at each of the facilities.  (Doc. 36 at 21)

1.    Access to Adequate Education, Special Education, and Related Services for Youth with Disabilities

KCSOS will develop an intake classroom at Juvenile Hall's Central School, which will be used to assess all new students "during their initial detention."  (Doc. 36-3 at 20, Schools Plan § 1.1) KCSOS will:

> (1) assess students' needs, including the need for Education Related Mental Health Services ("ERMHS"); (2) provide basic instruction in literacy, numeracy, and current events; (3) determine students' prior school history and special education eligibility; (4) identify English learners; and (5) determine students' instructional needs.

(Doc. 36 at 21, citing Schools Plan §§ 1.1 and 2.10)  In addition, the youth will be placed in classes by their grade level and grouped by ability level, if necessary, "to ensure they are receiving grade appropriate content and coursework."  (*Id.*, citing Schools Plan § 1.2)  Students who have satisfied graduation requirements will be provided with vocational learning and post-secondary college opportunities.  (*Id.*)

KCSOS also intends to hire additional staff to provide services, implement new technology, and provide training to educational staff.  (Doc. 36 at 21-22, citing Schools Plan §§ 1.6, 1.7, 1.10, 1.11)  For example, KCSOS will hire additional librarians and school counselors, and "provide professional learning opportunities for educational staff to reinforce and further develop the delivery of robust and engaging instruction."  (*Id.* at 22)  Special education staff will use a co-teaching model, and the schedule will be modified "from half day of student contact to full day with push in services and/or student group… work within [the] general education setting."  (Doc. 36-3 at 35)

///

///

### 2. Behavioral Interventions and Supports, Mental Health Care, Educationally Related Mental Health Services, and Transition Planning

KCSOS will provide "[s]ensory break tools… for all students during educational programming" at Central School Camp Owen, and Redwood. (Doc. 36-3 at 37) In addition, "KCSOS will designate a variety of 'chill out' options to meet the individual needs of students," with breaks provided per students' IEPs, or as otherwise appropriate. (*Id.*)

Incidents where youth are removed from school will be tracked by KCSOS, which will gather data related to "youth, date, reason, number of minutes, personnel requesting removal." (Doc. 36-3 at 39) The collected information will be reviewed on a weekly basis at the Special Cases Meetings in collaboration with Mental Health, Probation, and school staff. (*Id.*) Further, a monthly report of this information will be reviewed at the CASE meeting and by KCSOS administration. (*Id.* at 40; *see also* Doc. 36 at 22, citing Schools Plan § 2.4)

KCSOS will also work with the Educationally Related Mental Health Services (ERMHS) providers and clinicians. (Doc. 36 at 22) Specifically, the parties agreed KCSOS will:

> (1) create a system to ensure all service providers, including ERMHS clinicians, are made aware of pending release dates of students so that planning and transition services can be coordinated (Schools Plan § 2.6); (2) invite designated mental health clinicians, in addition to ERMHS providers, to IEP meetings of youth on their caseloads and participate in the development of the goals and objectives for mental health and related services on youths' [IEPs] (Schools Plan § 2.8); (3) ensure that ERMHS providers communicate with mental health providers to promote therapeutic delivery of mental health services for youth with IEPs (Schools Plan § 2.13); and (4) provide regular orientation and training for Probation staff on mental health diagnoses and the impact on youth behavior (Schools Plan § 2.12).

(Doc. 36 at 22)

### 3. Reasonable Accommodations

The Educational Experts recommended KCSOS "[d]evelop or adopt a screening instrument as part of an intake assessment process to identify youth with disabilities …." (Doc. 36-3 at 48) Thus, the Schools Plan provides that KCSOS will hold "[a] meeting with mental health clinicians, ERMHS providers and other appropriate personnel to develop a screening instrument that is used upon intake that identifies youth with disabilities under ADA and IDEA who are entitled to accommodations, support and protection while in custody." (*Id.*) This will be implemented in the Intake Classroom for

Central School, Camp Owen, and Redwood.  (*Id.*)  In addition, KCSOS intends to "work with the county ADA coordinator at Central (and Redwood and Camp Owen when hired) and other appropriate staff to … regularly monitor [the] provision of accommodations, protections and support of youth under ADA and IDEA." (Doc. 36-3 at 50)

### 4. Training and Coordination with Probation

Education staff will receive training "on the use of data to drive instructional decision making, including training on a suite of data reports that are used by administration and education staff to manage, coordinate services and monitor performance for all students including students with disabilities." (Doc. 36 at 23, citing Schools Plan §§ 4.1, 4.2)  This data will be regularly reviewed "at administrative and staff meetings to monitor youth performance across multiple measures." (*Id.*, citing Schools Plan § 4.3)  KCSOS will also create an electronic log for data that "documents the process and outcome of youth referred to the Student Support Team." (*Id.* citing Schools Plan § 4.5)

In addition, professional learning opportunities will be established for education and Probation staff addressing "mental health diagnoses and behavior, identification of youth with disabilities, de-escalation strategies, restorative practices, Behavior Intervention Plans, [the] ADA…, Individualized Education Plans…, ERMHS and other related services, and the behavior management system." (Doc. 36 at 23, Schools Plan §§ 4.10-4.13) KCSOS will also schedule meetings with Probation and education staff related to "critical incident and ADA protocol reviews, new or revised policies and practices, and to problem solve areas of need." (*Id.*, citing Schools Plan §§ 4.14- 4.17)

## B. Monitoring and Expiration of the Settlement

Plaintiffs and the Schools Defendants selected Judy Elliot, Ph.D. to act as the Monitoring Expert to "monitor KCSOS's compliance with the Court Schools Implementation Plan for the Term of the KCSOS Settlement." (Doc. 36 at 24; *see also* Doc. 36-3 at 6, §6.1)  As their Monitoring Expert, Dr. Elliot will "have complete access to staff and youth records (except any individual student's counseling, therapy, or psychological service notes that are not part of the student's education record)," as well as "any and all information she deems necessary to assist in conducting the review of the Implementation Plan and monitoring Schools Defendants' progress." (Doc. 36-3 at 6-7, §§ 6.1.2, 6.2.1)  "The Monitoring Expert will prepare a written report for review and comment by the Parties on

a quarterly basis for the first year of the Monitoring Term and on a semiannual basis thereafter."

(Doc. 36-3 at 24, citing KCSOS Settlement § 6.2.2.3) Each monitoring report will be reviewed by

Plaintiffs' counsel, which will provide written feedback, if any, to the Monitoring Expert and counsel

for KCSOS.  (*Id.*)

The parties also agreed the KCSOS Settlement would "remain in effect from the Execution

Date until the completion of the Monitoring Term and issuance of the final monitoring report."  (Doc.

36-3 at 9, KCSOS Settlement § 8)  As noted above, the Monitoring Term ends "three years after the

Execution Date of the Probation Settlement," which will be August 31, 2022.  (*See* Doc. 36 at 14, n. 6)

### C.      Releases

The KCSOS settlement provides the Plaintiffs and Class Members, "[i]n exchange for the

injunctive relief proposed," release the KCSOS Defendants from claims arising from February 21, 2016,

though the term of the agreement.  (Doc. 36 at 25, citing KCSOS Settlement § 11)  Specifically, the

agreement provides:

> The "Released Injunctive Claims" are any and all claims, rights, demands, charges,
> complaints, actions, suits, and causes of action, for injunctive or declaratory relief, that
> have been brought in the Lawsuit under the ADA, Rehabilitation Act, IDEA, and/or
> state laws arising from February 21, 2016, through the Term of the Agreement brought
> against Schools Defendants. The Released Injunctive Claims do not include any claims
> for compensatory education or individual due process claims arising under the IDEA or
> Section 504, any claims for reasonable accommodations related to physical access,
> communication access, and/or accommodations otherwise relating to hearing, vision
> and/or mobility disabilities arising under the ADA or Section 504, or any monetary
> claims that may exist under any relevant laws. Released Injunctive Claims do not
> include any claim to enforce the terms of this Agreement. Released Injunctive Claims
> do not include claims against Probation Defendants.

(Doc. 36-2 at 12-13, § 11.2)

### D.      Attorneys' Fees, Costs and Expenses

Plaintiffs and the Schools Defendants agree Plaintiffs have "the right to seek and recover

reasonable attorneys fees," but have not reached an agreement regarding the amount to be awarded.

(Doc. 36 at 25)  Therefore, the parties agreed Plaintiffs will file a motion for approval of any amount

of fees to be awarded.  (*Id.*, citing KCSOS Settlement § 13)

### III.      Objections Procedure

The proposed settlements do not set forth procedures for Class Members to object to the terms.

(*See generally* Doc. 36-2, Doc. 36-3)  However, the parties agree the proposed notice should include information on "how and where any objections should be submitted." (Doc. 36 at 39)  The parties propose the deadline for any objections to be made be set for 30 days before the Final Approval Hearing.  (*Id.* at 42)  The Proposed Notice informs Class Members of they right to raise "concerns with the Court," and will identify the deadline for submitting objections to the Court. (*See* Doc. 36-4 at 7)

### PRELIMINARY APPROVAL OF A CLASS SETTLEMENT

When parties settle the action prior to class certification, the Court has an obligation to "peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Preliminary approval of a class settlement is generally a two-step process.  First, the Court must assess whether a class exists.  *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). Second, the Court must "determine whether the proposed settlement is fundamentally fair, adequate, and reasonable." *Id.* (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)).  The decision to approve or reject a settlement is within the Court's discretion.  *Hanlon*, 150 F.3d at 1026.

### I.      Conditional Class Certification

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all."  Fed. R. Civ. P. 23(a).  Under the terms of the Settlements, the proposed Settlement Class is comprised of:

> [A]ll youth with mental health, behavioral, learning, intellectual and/or developmental disabilities as defined by the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and/or Individuals with Disabilities Education Act who are currently detained, or who will be detained during the Monitoring Term (through August 31, 2022), at the Kern County Juvenile Facilities (Juvenile Hall, Crossroads, and Camp Erwin Owen).

(Doc. 36 at 15)  Plaintiffs seek conditional approval of the class for settlement pursuant to Rule 23, under which the Court may "make a conditional determination of whether an action should be maintained as a class action, subject to final approval at a later date."  *See Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461, 466 (E.D. Pa. 2000)).

Parties seeking class certification bear the burden of demonstrating the elements of Rule 23(a)

are satisfied, and "must affirmatively demonstrate . . . compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304, 1308 (9th Cir. 1977). If an action meets the prerequisites of Rule 23(a), the Court must consider whether the class is maintainable under one or more of the three alternatives set forth in Rule 23(b). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

### A.    Rule 23(a) Requirements

The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147, 155-56 (1982). Certification of a class is proper if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy of representation. *Falcon*, 457 U.S. at 156.

#### 1.    Numerosity

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requires the Court to consider "specific facts of each case and imposes no absolute limitations." *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980). Although there is not a specific numerical threshold, "[c]ourts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members." *Collins v. Cargill Meat Solutions Corp.*, 274 F.R.D. 294, 300 (E.D. Cal. 2011) (citing *Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998)); *see also Romero v. Producers Dairy Foods, Inc.,* 235 F.R.D. 474, 485 (E.D. Cal. 2006) ("courts have held that classes as small as 40 satisfy the numerosity demand"); *Patel v. Trans Union, LLC*, 308 F.R.D. 292, 304 (N.D. Cal. 2015) ("courts have held that classes as small as 40 satisfy the numerosity demand");

The parties note "the population of detained youth changes from month to month, and even day to day, as youth enter and leave each of the Facilities." (Doc. 36 at 27)  However, Probation Defendants report that the class included "at least 54 youth across the Facilities who were detained and known to

have disabilities as of July 2019."  (*Id.*)  Further, the proposed class includes "every unknown future youth with disabilities in the Facilities thru the end of the Agreement (August 31, 2022)."  (*Id.*)  Therefore, the numerosity requirement is satisfied by the Settlement Class.

### 2.      Commonality

Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Commonality "does not mean merely that [class members] have all suffered a violation of the same pro-vision of law."  *Wal-Mart Stores*, 564 U.S. at 350.  The requirement is satisfied where there is a "common contention" that is "of such a nature that it is capable of classwide resolution."  *Id.*

"Plaintiffs contend, and Defendants do not contest for settlement purposes, that the commonality requirement is satisfied because Defendants have system-wide policies and practices that apply to all Class members."  (Doc. 36 at 28)  In addition, the parties report "[a]ny injunctive or declaratory remedy would apply to the entire Class because the changes Plaintiffs seek are to Defendants' system-wide policies and practices."  (*Id.* at 28-29)  Indeed, the Action Plan and Schools Plan demonstrate the youth at each of the Juvenile Facilities are subject to similar—if not the same— policies and procedures.  Accordingly, the Court finds the commonality requirement is satisfied for purposes of settlement.

### 3.      Typicality

This requirement requires a finding that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  A claim is not required to be identical, but rather "reasonably coextensive" with those of the absent class members.  *Hanlon*, 150 F.3d at 1020.  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks and citation omitted); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (the typicality requirement is satisfied when the named plaintiffs have the same claims as other members of the class and are not subject to unique defenses).

Plaintiffs T.G. and P.P. are currently held in the Kern County juvenile detention facilities.  (*See* Doc. 1 at 3-4, ¶¶ 5, 10-11)  In addition, Plaintiffs "are students with mental health, behavioral,

learning, intellectual, and/or developmental disabilities that affect their daily life activities who, at the time of the filing the Complaint, were eligible for special education and related services." (Doc. 36 at 30) The parties report Plaintiffs also were "subject to the same or similar use of force and conditions of confinement, as well as the same educational, behavioral, and reentry planning services" as the Settlement Class members. (*Id.*) Thus, the Court finds the typicality requirement is satisfied.

### 4. Fair and Adequate Representation

Absentee class members must be adequately represented for judgment to be binding upon them. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940). This prerequisite is satisfied if the representative parties "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[R]esolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020).

#### a. Proposed class representative

T.G. and P.P. seek appointment as the class representatives, asserting "that no conflicts exist between named Plaintiffs, Class Counsel, and the settlement Class with respect to the negotiation and consummation of the terms of this settlement." (Doc. 36 at 31) In addition, Plaintiffs note they "seek the same relief … for themselves as they are seeking for the Class: declaratory and injunctive relief compelling Defendants to change their policies and practices with respect to students with disabilities detained within the Facilities." (*Id.*) Thus, it appears Plaintiffs will fairly and adequately represent the interests of the class.

#### b. Proposed class counsel

To determine the adequacy of class counsel, the Court must evaluate "whether the attorneys who seek to represent the class are competent to do the job." *Gomez v. J. Jacobo Farm Labor Contractor, Inc.*, 2019 WL 5787805 at *12 (E.D. Cal. Nov. 6, 2019) (quoting Newberg on Class Actions § 3:54 (5th ed.). Rule 23(g) directs the Court to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's

knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Disability Rights Advocates and Disability Rights California seek appointment as Class Counsel. (Doc. 36 at 32) Thomas Zito, a supervising attorney at Disability Rights Advocates ("DRA"), reports that DRA "is a 501(c)(3) non-profit public interest organization exclusively dedicated to advancing the civil rights of people with disabilities." (Doc. 36-1 at 2, Zito Decl. ¶¶ 1, 5) Mr. Zito also reports DRA "has served as lead counsel in over 100 disability civil rights class actions across the Country and has specialized expertise in class action litigation concerning persons with disabilities in incarcerated settings." (*Id.* at 2-3, ¶ 5) According to Mr. Zito, "DRA has no conflicts of interest that would prevent the firm from providing zealous representation of the Named Plaintiffs and the Class." (*Id.* at 6, ¶ 13) Further, Mr. Zito reports that he has "been actively involved in all aspects of this case from its inception," and "took a lead role in all aspects of this case including the negotiations with Defendants and finalizing the Settlement Agreements along with [his] co-counsel at Disability Rights California, Carly Munson." (*Id.* at 3, ¶ 8)

Carly Munson reports she is "Litigation Counsel at Disability Rights California," which is "the State's designated protection and advocacy system." (Doc. 36-5 at 2, Munson Decl. ¶¶ 1, 4) She reports that "[i]n 2017, Disability Rights California, along with Disability Rights Advocates as its authorized agent, opened a monitoring investigation into conditions of confinement and education practices affecting youth with disabilities who were detained in the County of Kern," which included conducting on-site inspections at Juvenile Hall, Crossroads, and Camp Erwin Owen. (*Id.*, ¶ 4) In addition, Ms. Munson reports:

> As part of this investigation, Plaintiffs' counsel conducted confidential interviews with more than 50 youth, including the named Plaintiffs, who were or recently had been detained in the Facilities. We also interviewed parents and guardians of detained youth, represented individual detained youth in special education meetings at the Facilities, and reviewed more than 10,000 pages of documents including policies, incident reports, logs of pepper spray use and room confinement, and medical and education records. The materials corroborated information provided by youth and their families.

> Plaintiffs' counsel also met with the heads and representatives of the Kern County Superintendent of Schools and Kern County Probation Department, and their counsel, on several occasions throughout the investigation to discuss concerns and learn more about programs and operations.

(Doc. 36-5 at 2-3, ¶¶ 5-6)  Ms. Munson also reports that Plaintiff's counsel "performed extensive legal research about potential claims and relief available."  (*Id.*, ¶ 10)

Defendants do not oppose the requested appointments or assert Plaintiffs' counsel are inadequate to represent the interest of the class.  Based upon the information provided regarding the experience of counsel, actions taken to represent the class, and resources expended to investigate the claims and obtain expert opinions, the Court finds proposed class counsel satisfy the adequacy requirement.

### B.        Certification of a Class under Rule 23(b)

As noted above, once the requirements of Rule 23(a) are satisfied, a class may only be certified if it is maintainable under one of the three grounds identified under Rule 23(b).  Fed. R. Civ. P. 23(b); *see also Narouz*, 591 F.3d at 1266.

Under Rule 23(b)(1), a class is maintainable if there is a risk of inconsistent or varying adjudications from "prosecuting separate actions by or against individual class members." Fed. R. Civ. P. 23(b)(1).  A class is maintainable under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate responding the class as a whole." Fed. R. Civ. P. 23(b)(2).  Finally, a class is maintainable under Rule 23(b)(3) where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and where "a class action is superior to other available methods for fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

The parties report the Settlement Class satisfies the requirements of Rule 23(b)(2). (Doc. 36 at 33-34)  The Supreme Court explained, "The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Wal-Mart Stores*, 564 U.S. at 360. (citation omitted)  Thus, the provision "applies only when a single injunction or declaratory judgment would provide relief to each member of the class."  *Id.*

As the parties observe, the Ninth Circuit also noted the "primary role" of Rule 23(b)(2) "has always been the certification of civil rights class actions."  (Doc. 36 at 33) (quoting *Parsons v. Ryan*,

754 F.3d 657, 686 (9th Cir. 2014).  Thus, in *Parsons*, the Ninth Circuit found the district court did not

err in certifying a class of prisoners under Rule 23(b)(2), observing "the plaintiffs' claims 'for

injunctive relief stemming from allegedly unconstitutional conditions of confinement are the

quintessential type of claims that Rule 23(b)(2) was meant to address.'"  *Id.*, 754 F.3d at 687.

Similarly, the primary relief sought by Plaintiffs in the complaint was the modification of

policies and procedures at the Kern County Juvenile Detention Facilities and their schools.  (*See*

*generally* Doc. 1)  In addition, the proposed settlements address "system-wide improvements in the

Facilities' use of force, conditions of confinement, education, and services."  (Doc. 36 at 34)  Injunctive

relief will provide relief to each member of the Settlement Class.  Consequently, the Court finds

certification under Rule 23(b)(2) is appropriate.

## II.      Evaluation of the Settlements' Terms

Settlement of a class action requires approval of the Court, which may be granted "only after a

hearing and on finding that [the settlement] is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

Approval is required to ensure the proposed settlement is consistent with Plaintiffs' fiduciary

obligations to the class.  *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985).  The

Ninth Circuit identified several factors for the Court to evaluate whether a settlement agreement meets

these standards, including:

> the strength of plaintiff's case; the risk, expense, complexity, and likely duration of
> further litigation; the risk of maintaining class action status throughout the trial; the
> amount offered in settlement; the extent of discovery completed, and the stage of the
> proceedings; the experience and views of counsel; the presence of a governmental
> participant; and the reaction of the class members to the proposed settlement.

*Staton*, 327 F.3d at 959 (citation omitted).  Further, a court should consider whether settlement is "the

product of collusion among the negotiating parties."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 458

(citing *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992)).  Reviewing the settlement

terms, "[t]he court need not reach any ultimate conclusions on the contested issues of fact and law

which underlie the merits of the dispute."  *Class Plaintiffs*, 955 F.2d at 1291(internal quotation marks

and citation omitted).

### A.      Strength of Plaintiffs' Case

In this action, Plaintiffs identified four causes of action that the fact-finder would be required

24

to evaluate on the merits, including: (1) violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; (2) violation of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*; (3) violation of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*; (4) violation of Cal. Gov't Code § 11135; and (5) violation of California Education Code for Students with Disabilities. (*See generally* Doc. 1 at 40-55)  The proposed settlements were reached following on-site inspections and discovery, which allowed the parties to assess the strengths and weaknesses of the claims presented. Accordingly, this factor weighs in favor of preliminary approval of the Settlement.

## B.      Risks, Expenses, Complexity, and Likely Duration of Further Litigation

Approval of settlement is "preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  If the proposed settlements are not approved, the parties would have to engage in further litigation, and " "the Parties agree that the litigation risks presented by this case are significant." (Doc. 36 at 38)

According to the parties, "[t]he extensive factual issues and novel legal issues in the case would involve extensive resources at trial, including the use of expert." (Doc. 36 at 38)  They report the factual and legal issues include:

> (1) the constantly changing populations of youth in the Facilities and the resulting probability that current Class members will age out of the Facilities before getting any relief; (2) ongoing policy revisions by Defendants which could create different factual issues; (3) the expense of hiring experts for all Parties; (4) legal resolution of any conflicts between federal and state laws and regulations; and (5) the novelty of Plaintiffs' claims, many of which – like the challenge to pepper spray use – have never been challenged under the ADA in California.

(*Id.* at 38)  As the parties observe, continued litigation would delay relief to the putative class members, and some may age-out of the system before similar injunctive relief is provided.  On the other hand, the Settlement Agreements provide relief immediately to the Class Members.  Due to the risk of the claims of class members, this factor weighs in favor of preliminary approval of the Settlements.

## C.      Amount Offered in Settlement

The Ninth Circuit observed "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Justice v. Civil Serv. Commission*, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).  Thus, when analyzing the amount offered in settlement, the Court should examine "the complete package taken as a whole," and the amount is "not

to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Id.*, 688 F.2d at 625, 628.

A monetary award is not in issue. Nevertheless, as the parties note, the proposed "Settlement Agreements will result in substantial benefits to the class," with improvements to housing conditions and education services. (Doc. 38 at 37, emphasis omitted). Under the two settlement agreements and their respective plans, "Defendants will modify their policies, practices, and procedures to ensure that members of the Class are identified and tracked, housed in a safe and supportive homelike environment, provided reasonable accommodations, and given equal access to educational and rehabilitative programs and services." (*Id.*) Staff will be hired by the defendants to increase rehabilitative programing and enhance the educational services—including special education services—for the detained youth. (*Id.*) In addition, the transition of "the facility culture from a corrections model to a treatment model" will benefit all the detained youth, not just class members. Further, the relief obtained is Consequently, the Court finds the terms of the offered settlements support preliminary approval of the Settlement.

### D. Extent of Discovery Completed and Stage of the Proceedings

The proposed settlements were reached following on-site inspections at the facilities by experts from the Council of Correctional Administrators, Dr. Peter Leon, and Dr. Judy Elliot; meetings with administrators, staff, and detained youth; review of more than 10,000 page of documents including policies, incident reports, logs of pepper spray use and confinement, medical records, and education records. (Doc. 36 at 12; Doc. 36-5 at 2, ¶5) Due to the extent of the investigation and discovery completed, the parties were able to make informed decisions regarding the claims presented and use the recommendations of the experts to frame the Probation Action Plan, Court Schools Implementation Plan, and settlement agreements. Thus, this factor supports preliminary approval of the Settlement.

### E. Views of Counsel

In general, "[g]reat weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *See Nat'l Rural Telecomms.*, 221 F.R.D. at 528. The parties report that "[c]ounsel on both sides view the Settlement Agreements as a successful compromise that will resolve Class members' claims in a fair and efficient manner." (Doc. 36 at 36)

Accordingly, the views of both Class Counsel and Defendants' counsel support preliminary approval of the Settlement.

### F. Reaction of Class Members to the Proposed Settlement

T.G. and P.P., by and through his guardian ad litem Rebecca P., agreed to the terms and executed the Settlement Agreements. (Doc. 36-2 at 16 [Probation Settlement]; Doc. 36-3 at 17 [KCSOS Settlement]) However, the Settlement Class members have not yet received notice regarding the settlement terms. Therefore, this factor shall be revisited prior to final approval of the Settlement.

### G. Collusion between Negotiating Parties

The inquiry of collusion addresses the possibility that the settlement agreement is the result of either "overt misconduct by the negotiators" or improper incentives of class members at the expense of others. *Staton*, 327 F.3d at 960. The parties report, "Plaintiffs and Probation Defendants reached the Probation Settlement Agreement after more than ten (10) in-person and telephonic negotiations between counsel," and use of the report prepared by CJCA. (Doc. 36 at 36; *see also id.* at 12) Similarly, the KCSOS Settlement was reached "after more than ten (10) in person and telephonic negotiations between counsel," with the assistance of Dr. Elliot acting as a neutral expert. (*Id.* at 36) Thus, it appears the agreements are the product of non-collusive conduct, and this factor weighs in favor of preliminary approval of the Settlements.

### H. Attorneys' Fees

As set forth above, pursuant to the settlement agreements, Class counsel may request attorneys' fees and costs. (Doc. 36-2 at 13, § 12.2; Doc. 36-3 at 13-14, § 13) In general, the party seeking fees bears the burden of establishing that the fees and costs were reasonably necessary to achieve the results obtained. *See Fischer v. SJB-P.D., Inc.,* 214 F.3d 1115, 1119 (9th 2000). Therefore, in seeking a fee award, an applicant **must provide time records documenting the tasks completed and the amount of time spent on the action**. *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins. Co*., 480 F.3d 942, 945-46 (9th Cir. 2007).

### APPROVAL OF CLASS NOTICE

A class notice must satisfy the requirements of the Federal Rules of Civil Procedure, which provides the notice "must clearly and concisely state in plain, easily understood language" the

following information:

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). A class notice must be "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

**I.      Content of the Notice**

Plaintiffs have submitted the proposed "Notice of Proposed Settlement of Class Action Litigation" ("the Notice") to be distributed to the class members. (Doc. 36-4)  The parties report this was "drafted to be readable at a Ninth-Grade reading level."  (Doc. 36 at 40)

Upon review of the terms in the Notice, the Court finds the content is adequate.  Plaintiffs provide information regarding the background of the action and claims asserted.  (Doc. 36-4 at 3-4)  The Notice explains the terms and provisions of the Settlements, including the changes to programs, services, and resources.  (*See generally id.* at 4-5)  In addition, the Notice explains the rights and procedures to object to the Settlement or elect not to participate in the Settlement and will include the applicable deadlines.  (*Id*. at 6-7)  Finally, the Notice explains the effect of the entry of judgment and settlement, including the release of claims.  (*Id.* at 6)

**II.      Method and Administration of Notice**

The parties propose that "[w]ithin thirty days of the date of service of this Order, Probation and Schools Defendants shall distribute the Notice to all youth currently at the Juvenile Hall, Crossroads, or Camp Erwin Owen." (*See* Doc. 37 at 3)  Probation and Schools Defendants will "ensure that the Notice is posted in each classroom at each of the Facility Schools, in the visitor areas, the entrance lobby of Juvenile Hall, Crossroads, and Camp Erwin Owen, as well as in a prominent place on each active housing unit within the Facilities."  (Doc. 36 at 40)  Plaintiff's counsel, the Probation Department, and KCSOS will each post the Notice and proposed settlement agreements on their respective websites. (*Id.*) The Notices will remain posted at the facilities and online until the deadline for submitting objections has passed.  (*Id.*)

In addition, within thirty days, Probation and Schools Defendants will "mail a copy to those youth's respective parents and/or guardians of record." (*See* Doc. 37 at 3)  The parties also agree that "[t]he outside front of the envelope or mailing surface shall clearly be printed with the phrase 'IMPORTANT SETTLEMENT DOCUMENTS ENCLOSED' in both English and Spanish."  (Doc. 36 at 44) Defendants are responsible for bearing the expense of mailing and may use a third-party vendor that specializes in the serving class action notices to serve "the parents of all youth in custody as well as any Class members not currently in custody."  (*Id.*; *see also* Doc. 37 at 4)  Defendants will also " mail a copy of the Notice to the Kern County Juvenile Court Judges, the Kern County Public Defender's Office, the Kern County Behavioral Health and Recovery Services, the Kern County Indigent Criminal Defense Panel, the Kern County Department of Human Services – Child Welfare Division, and the Kern County District Attorney's Office."  (*Id.*) Prior to the hearing for final approval, Plaintiffs' Counsel and Defendants file declarations reporting their dissemination of the Notice.  The declaration shall identify the locations the Notice was posted and the number of the guardians to whom the Notices were mailed.

Class members who "disagree with any part of [the] settlement" may make written objections.  (Doc. 36-4 at 7)  Any objections to the settlement must be received by the Court no later than thirty days before the Final Approval and Fairness Hearing, or no later than March 16, 2020. (*See id.*)  The written objections must include the case name; case number; the objecting party's name, address, and signature; and rounds for the objection.  (*Id.*)

**III.    Required Revisions to the Notice Packet**

The Notice must be modified to include information in this Order, including the date and location of the hearing for Final Approval of Class Settlement, and deadlines related to objecting to the Settlements.  Likewise, the document should be modified to clarify that Class Members will not be permitted to make objections at the Final Approval and Fairness Hearing unless they have submitted a timely written objection, which includes notice of intention to appear.

Finally, because Plaintiffs intend to issue a Spanish language translation of the Notice, they are reminded that this Court requires translation by a certified court interpreter.  Plaintiffs shall file a declaration that the Notice was translated by a certified court interpreter asserting the translation is an

accurate translation of the Court-approved English version of the Notice.

## CONCLUSION AND ORDER

Based upon the foregoing, the Court finds the proposed class settlements are fair, adequate, and reasonable. The factors set forth by the Ninth Circuit weigh in favor of preliminary approval of the settlement agreements. Moreover, preliminary approval of a settlement and notice to the proposed class is appropriate "if [1] the proposed settlement appears to be the product of serious, informed, noncollusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or segments of the class, and [4] falls within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F.Supp.2d 1078, 1079 (N.D. Cal. 2007) (quoting *Manual for Complex Litigation*, Second § 30.44 (1985)). Here, the proposed settlement agreements satisfy this test.

Accordingly, the Court **ORDERS**:

1. Plaintiffs' request for conditional certification of the Settlement Class is **GRANTED**, and the class is defined follows:

> [A]ll youth with mental health, behavioral, learning, intellectual and/or developmental disabilities as defined by the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and/or Individuals with Disabilities Education Act who are currently detained, or who will be detained during the Monitoring Term (through August 31, 2022), at the Kern County Juvenile Facilities (Juvenile Hall, Crossroads, and Camp Erwin Owen.

2. Preliminary approval of the parties' proposed settlements is **GRANTED**;

3. The proposed notice plan, as set forth above, is **APPROVED**;

4. T.G. and P.P. are **APPOINTED** the Class Representatives;

5. Disability Rights Advocates and Disability Rights California are **APPOINTED** Class Counsel;

6. Within thirty days of this date of service of this order, Class Counsel **SHALL** provide counsel for Probation Defendants complete billing records that Plaintiffs' Counsel would submit to the Court pursuant to a motion for approval;

7. The proposed Notice is preliminarily **APPROVED**, and the parties **SHALL** file a finalized Notice with the required revisions for the Court's approval no later than

30

**December 13, 2019**;

8.  No later than **January 6, 2020**, Probation Defendants and Schools Defendants **SHALL:**

    a.      Distribute the Notice to all youth currently at the Juvenile Hall, Crossroads, or Camp Erwin Owen and mail a copy to those youth's respective parents and/or guardians of record, and the outside front of the envelope or mailing surface shall clearly be printed with the phrase "IMPORTANT SETTLEMENT DOCUMENTS ENCLOSED" in both English and Spanish;

    b.      Ensure the Notice is posted in each classroom at each of the Facility Schools; the visitor areas; the entrance lobby of Juvenile Hall, Crossroads, and Camp Erwin Owen; and in a prominent place on each active housing unit within the Facilities; and

    c.      Mail a copy of the Notice to the Kern County Juvenile Court Judges, the Kern County Public Defender's Office, the Kern County Behavioral Health and Recovery Services, the Kern County Indigent Criminal Defense Panel, the Kern County Department of Human Services – Child Welfare Division, and the Kern County District Attorney's Office;

9.  No later than **January 6, 2020**, Plaintiffs' Counsel, the Probation Department and KCSOS **SHALL** each post on the front page of their respective websites a copy of the Notice of Proposed Settlement of Class Action Lawsuit and the proposed Settlement Agreements, to remain until the deadline for submitting objections has passed;

10. Class Counsel and Defendants' Counsel **SHALL** provide declarations to the Court attesting they each disseminated the Notice in compliance with this Order no later than **April 1, 2020**;

11. Any objections to or comments on the Settlement Agreement must be filed with the Court no later than **March 16, 2020**.

12. Class Counsel and/or Defendants' Counsel SHALL respond to any objections and file a joint motion for final approval of the settlements no later than **March 18, 2020**;

13. Class Counsel SHALL file any motion for approval/award of attorneys' fees and costs no later than **March 18, 2020**;

14. Plaintiff P.P. SHALL file a motion for approval of minor's compromise for any settlement related to his individual claims no later than **March 18, 2020**;

15. A Final Approval and Fairness Hearing is SET for **April 15, 2020**, at 10:00 a.m., before Magistrate Judge Jennifer L. Thurston. The hearing will be located at the United States Courthouse at 510 19th Street, Bakersfield, California. At this hearing, the Court shall determine whether the Settlements should be granted final approval as fair, reasonable, and adequate as to the class members. The Court shall hear all evidence and argument necessary to evaluate the Settlement Agreements and other motions and requests, including the class representative enhancement request and motion for attorneys' fees and costs;

16. Class Members may appear at the hearing on **April 15, 2020**, in person or through his or her own attorney, to show cause why this Court should not approve the Settlement Agreements. For comments or objections to be considered at the hearing, the Class Member must file comments with the Clerk of this Court indicating briefly the nature of the Class Member's comments, support, or objection.

17. The Court reserves the right to vacate the Final Approval and Fairness Hearing if no comments or objections are filed with this Court on or before **March 16, 2020**;

18. The Court reserves the right to continue the date of the Final Approval and Fairness Hearing without further notice to class members; and

19. The Court retains jurisdiction to consider all further applications arising from or related to the Settlement Agreement.

IT IS SO ORDERED.

Dated:   **December 4, 2019**          **/s/ Jennifer L. Thurston**
                                        UNITED STATES MAGISTRATE JUDGE