1  CARLY J. MUNSON (SBN: 254598)
2  NEERAJ KUMAR (SBN: 317765)
   MELINDA BIRD (SBN: 102236)
3  Disability Rights California
   350 S. Bixel Street, Suite 290
4  Los Angeles, California 90017
   Telephone: (213) 213-8000
5  Facsimile:  (213) 213-8001
6  Email: carly.munson@disabilityrightsca.org
           neeraj.kumar@disabilityrightsca.org
7          melinda.bird@disabilityrightsca.org

8  THOMAS P. ZITO (SBN: 304629)
   MICHELLE IORIO (SBN: 298252)
9  Disability Rights Advocates
   2001 Center Street, Fourth Floor
10 Berkeley, California 94704-1204
   Telephone: (510) 665-8644
11 Facsimile:  (510) 665-8511
   Email: tzito@dralegal.org
12        miorio@dralegal.org

13 *Attorneys for Plaintiffs*

14 ADDITIONAL ATTORNEYS ON FINAL PAGE

15          **UNITED STATES DISTRICT COURT**

16          **EASTERN DISTRICT OF CALIFORNIA**

17

18 | T.G., by and through his Next Friend, | Case No.  **1:18-cv-00257-JLT** |
   | TANITA J.; P.P., by and through his General |  |
19 | Guardian, REBECCA P.; and J.A.; on behalf | **JOINT NOTICE OF MOTION AND** |
   | of themselves and all others similarly situated, | **MOTION FOR FINAL APPROVAL OF** |
20 |  | **CLASS SETTLEMENT AGREEMENTS** |

21          Plaintiffs,

22 v.

23 KERN COUNTY; KERN COUNTY          Judge: Hon. Jennifer L. Thurston
   PROBATION DEPARTMENT; TR          Date: June 8, 2020
24 MERICKEL, in his official capacity as Chief   Time: 9:00 a.m.
   of the Probation Department; KERN          Crtrm: 510 19th Street, Bakersfield, CA 93301
25 COUNTY SUPERINTENDENT OF
   SCHOOLS; and MARY C. BARLOW, in her   Trial Date: None Set
26 official capacity as Superintendent of Schools,
                                  Complaint filed: Feb. 21, 2018
27          Defendants.

28

1

# TABLE OF CONTENTS

2  TABLE OF AUTHORITIES ........................................................**Error! Bookmark not defined.**

3  NOTICE OF MOTION AND MOTION ................................................................. 1

4  MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

5  I.    INTRODUCTION ................................................................................ 1

6  II.   PROCEDURAL HISTORY AND SETTLEMENT
       NEGOTIATIONS ................................................................................ 3

7  III.  SUMMARY OF THE SETTLEMENT AGREEMENTS ...................................... 6

8       A.   The Probation Settlement.......................................................... 7

9            1.   Modifications to Policies and Procedures....................................... 7

10                a.   Facility Culture and Environment........................................ 7

11                b.   Case Management System. ................................................. 8

12                c.   Programming.................................................................. 8

13                d.   Training and Coordination with KCSOS............................... 9

14                e.   Youth, Family and Staff Input. .......................................... 9

15                f.   Complaints and Grievances. .............................................. 9

16                g.   Pepper Spray, Isolation, Seclusion, and
                     Confinement................................................................. 9

17                h.   Special Cases Meetings, Individualized
18                     Safety and Security Program, and Suicide
19                     Prevention. ................................................................ 10

20                i.   Re-Entry. ................................................................... 11

21           2.   Term of Probation Settlement. ......................................... 11

22           3.   Monitoring. ................................................................ 11

23           4.   Dispute Resolution and Reservation of Jurisdiction
24                and Enforcement. ......................................................... 12

25           5.   The Release of Claims and Dismissal of Actions.................... 12

26           6.   Attorneys' Fees, Costs, and Expenses. ............................... 13

27       B.   The KCSOS Settlement and Addendum.................................. 13

28           1.   Modifications to Policies and Procedures.............................. 14

a.    Access to Adequate Education, Special Education, and Related Services for Youth with Disabilities. ............................................. 14

b.    Behavioral Interventions and Supports, Mental Health Care, Educationally Related Mental Health Services, and Transition Planning. ............................................... 15

c.    Reasonable Accommodations. .......................................... 16

d.    Training and Coordination with Probation. ...................... 16

2.    Term of KCSOS Settlement. ..................................................... 16

3.    Monitoring. ................................................................................ 18

4.    Dispute Resolution and Reservation of Jurisdiction and Enforcement. ........................................................................... 18

5.    The Release of Claims and Dismissal of Actions. ....................... 19

6.    Attorneys' Fees, Costs, and Expenses. ......................................... 19

IV.    NOTICE HAS BEEN PROVIDED TO THE CLASS AND NO OBJECTIONS HAVE BEEN FILED. .................................................. 20

V.    THE SETTLEMENT AGREEMENTS SHOULD BE APPROVED. ........................................................................................ 21

A.    Legal Standards for Approval of Class Action Settlement. .................... 21

B.    The Settlement Agreements Are Fair, Adequate, and Reasonable. ................................................................................... 22

1.    The Strength of Plaintiffs' Case and Risk and Expense of Continued Litigation. ................................................ 22

2.    The Settlement Agreements are Fair, Adequate, and Reasonable in Light of the Discovery Completed and the Stage of the Proceedings. .................................................. 24

3.    No Class Member Objected to the Settlement Agreements. ............................................................................... 25

4.    The Settlement Agreements Are the Product of Arms-Length Negotiations by Experienced Class Counsel. .................................................................................... 25

VI.    CONCLUSION ................................................................................. 26

1

# TABLE OF AUTHORITIES

2

**Cases**                                                                                                     **Page(s)**

3

*Chun-Hoon v. McKee Foods Corp.*,

4
    716 F. Supp. 2d 848 (N.D. Cal. 2010) ....................................................................24

5

*Class Plaintiffs v. City of Seattle*,
    955 F.2d 1268, 1276 (9th Cir. 1992) .....................................................................20

6

7

*Fernandez v. Victoria Secret Stores, LLC*,
    No. CV 06-04149 MMM, 2008 WL 8150856 (C.D. Cal. July 21, 2008) ...............24

8

*Garner v. State Farm Mutual Automobile Ins. Co.*,

9
    No. CV 08-1365 CW, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010)....................21

10

*Hall v. Cty. of Fresno*,
    No. 1:11-CV-02047-LJO-BAM, 2015 WL 5916741 (E.D. Cal. Oct. 7, 2015) .....................24

11

12

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .........................................................................20, 21

13

14

*Harris v. Vector Mktg. Corp.*,
    No. C-08–5198 EMC, 2011 WL 1627973 (N.D. Cal. Apr. 29, 2011)....................21

15

*In re Heritage Bond Litig.*,
    No. 02-ML-1475 DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ....................22

16

17

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ...............................................................................21

18

19

*Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004) ............................................................22, 23, 24

20

*Officers for Justice v. Civil Serv. Comm'n*,
    688 F.2d 615 (9th Cir. 1982) ..........................................................................20, 21

21

22

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................................................24

23

24

*In re Oracle Sec. Litig.*,
    829 F. Supp.1176 (N.D. Cal. 1993) .....................................................................21

25

*In re Syncor ERISA Litig.*,
    516 F.3d 1095 (9th Cir. 2008) ...............................................................................20

26

**Statutes**

27

20 U.S.C. § 1400 *et. seq.*................................................................................ *passim*

28

29 U.S.C. § 794 et seq.................................................................................... *passim*

42 U.S.C. § 12101 et seq.................................................................................................... *passim*

Calif. Govt. Code § 11135 ...............................................................................................3

**Rules and Regulations**

Fed. R. Civ. P. 23(e) .........................................................................................................1

Fed. R. Civ. P. 23(e)(2).....................................................................................................20

**Other Authorities**

*Manual for Complex* Litigation, Second § 30.44 (1985) ...........................................2, 3

1

**NOTICE OF MOTION AND MOTION**

2    PLEASE TAKE NOTICE THAT on June 8, 2020, at 9:00 a.m. or as soon thereafter as

3    the matter may be heard, Plaintiffs T.G. and P.P. ("Plaintiffs")[1], Defendants Kern County[2], Kern

4    County Probation Department, and Probation Chief TR Merickel (collectively "Probation" or

5    "Probation Defendants"), and Defendants Kern County Superintendent of Schools and

6    Superintendent Mary C. Barlow (collectively "KCSOS" or "Schools Defendants") (altogether,

7    "the Parties") will and hereby do jointly move the Court pursuant to Rule 23(e) of the Federal

8    Rules of Civil Procedure for an Order granting final approval of the settlement agreements

9    entered into by the Parties (collectively, "the Settlements Agreements" individually, the

10   "Probation Settlement" and "KCSOS Settlement," respectively).

11   This Joint Motion for Final Approval of Class Settlement Agreements ("Motion for Final

12   Approval") is made on the grounds that the Settlement Agreements are fair, reasonable, and

13   adequate.  This Motion for Final Approval is based upon this Notice of Motion and Motion; the

14   accompanying Memorandum of Points and Authorities; the concurrently filed declarations and

15   exhibits; all pleadings and papers on file in this action; and any oral argument this Court permits.

16   As no comments or objections have been filed and consistent with the Court's December

17   4, 2019, Order Granting Preliminary Approval of the Class Action Settlement ("Preliminary

18   Approval Order") (ECF No. 50), the Parties agree to forgo a hearing unless the Court concludes

19   that a hearing is necessary.

20

**MEMORANDUM OF POINTS AND AUTHORITIES**

21   I.    **INTRODUCTION**

22   As detailed in the Parties' Joint Motion for Preliminary Approval of Class Settlement and

23   Related Motions ("Preliminary Approval Motion") (ECF No. 36), the Parties have reached a

24   proposed resolution of the issues raised in Plaintiffs' Complaint and the report published by

25

26   ---

[1] As noted in the Joint Motion for Preliminary Approval of Class Settlement and Related
Motions (ECF No. 36) Plaintiff J.A. has not participated in this settlement. J.A. is over 18 years

27   old, has completed all of his probation requirements, and has no possibility of returning to any of
the Kern County Juvenile Facilities.  Munson Decl. ¶ 84.  Therefore, he cannot adequately

28   represent the Class because he no longer has any standing to do so.

[2] The County of Kern was named as "Kern County" in the complaint.  County of Kern is
Defendant Kern County's official name.

1   Disability Rights California and Disability Rights Advocates ("Plaintiffs' Counsel" or "Class

2   Counsel") concerning alleged discrimination against youth with disabilities detained at the Kern

3   County Juvenile Facilities (Juvenile Hall, Crossroads, and Camp Erwin Owen) (collectively, "the

4   Facilities").

5           The resulting Settlement Agreements, presented for this Court's initial approval in

6   August 2019, achieve substantial and lasting benefits for youth with disabilities detained in the

7   Facilities.  These benefits include: (1) comprehensive injunctive relief, including modification of

8   policies, practices, and procedures to ensure that youth with disabilities are identified and

9   tracked, housed in a safe and supportive homelike environment, provided reasonable

10  accommodations, and given equal access to educational and rehabilitative programs and services;

11  (2) increased staffing to enhance the rehabilitative and educational programming, decrease use of

12  force, and generally shift the culture from a corrections model to a treatment model; and (3)

13  comprehensive reporting and monitoring by independent experts for a three-year monitoring

14  term.  In addition, the Settlement Agreements provide for continuing jurisdiction by the Court to

15  oversee enforcement of their terms for the duration of the respective monitoring periods, and a

16  dispute resolution process.

17          On December 4, 2019, this Court certified the settlement class ("Class"), preliminarily

18  approved the Settlement Agreements, and directed notice to the Class.  Preliminary Approval

19  Order at 30.  In doing so, the Court found that "the proposed class settlements are fair, adequate,

20  and reasonable."  *Id*.  The Court noted that preliminary approval is appropriate when "[1] the

21  proposed settlement appears to be the product of serious, informed, noncollusive negotiations,

22  [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class

23  representatives or segments of the class, and [4] falls within the range of possible approval" and

24  found that the Settlement Agreements satisfied this test.  *Id*., *citing In re Tableware Antitrust*

25  *Litig.*, 484 F.Supp.2d 1078, 1079 (N.D. Cal. 2007) (quoting *Manual for Complex* Litigation,

26  Second § 30.44 (1985)).  As addressed below, the Court's preliminary findings remain true

27  today.

28          In December 2019, Defendants posted the class notice throughout the Facilities and

1  distributed individual notices to approximately 279 class members in accordance with the

2  Court's order.  To date, not a single member of the Class has filed objections or comments to the

3  Settlement Agreements.

4      As addressed below (*supra* at 6, 13-14), in May 2020, the Plaintiffs and KCSOS

5  Defendants executed an Addendum to the KCSOS Settlement ("Addendum") to address the

6  briefly delayed start of monitoring and the COVID-19 pandemic's unforeseen effects on

7  monitoring in light of physical school closures.  Declaration of Carly J. Munson in Support of

8  Final Approval and Fees ("Munson Decl.") ¶¶ 26-28 and Exhibit (Ex.) A at ¶¶ 1-2.  This

9  Addendum, hereinafter incorporated by reference into the KCSOS Settlement unless specifically

10  noted, preserves the original terms and intent of the KCSOS Settlement and protects the Class's

11  interests by ensuring monitoring will occur for the full three-year Monitoring Term.  Addendum

12  ¶¶ 3-4.  The substance of the relief, including the Court Schools Implementation Plan, has not

13  been changed by the Addendum.  *Id.*  The Parties' continued steps to implement the KCSOS

14  Settlement in the interests of the Class further support this Court's final approval.

15      In light of these facts and as discussed below, the Parties respectfully request that the

16  Court find the Settlement Agreements to be fair, adequate, and reasonable, and grant final

17  approval of the Settlement Agreements.

18  **II.    PROCEDURAL HISTORY AND SETTLEMENT NEGOTIATIONS**

19      Plaintiffs, on behalf of themselves and a Class of all others similarly situated, filed this

20  action on February 21, 2018, alleging claims for injunctive and declaratory relief under the

21  Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA"), Section 504 of the

22  Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("Rehabilitation Act"), the Individuals with

23  Disabilities Education Improvement Act of 2004, 20 U.S.C. § 1400 *et. seq*. ("IDEA"), California

24  Government Code Section 11135 and the California Education Code.  In summary, Plaintiffs

25  alleged that the Probation Defendants and the Schools Defendants routinely punish, isolate, and

26  intimidate youth in their care while depriving them of crucial educational and rehabilitative

27  services.  Plaintiffs further alleged that such policies and practices have an exceptionally adverse

28  impact on youth with mental health, behavioral, learning, intellectual, and/or developmental

1    disabilities.

2        Prior to filing the Complaint (ECF No. 1), Plaintiffs' Counsel had conducted an

3    investigation into the conditions of confinement and education practices in the Facilities through

4    Disability Rights California's role and authority as the protection and advocacy system for the

5    State of California.  Following this investigation, the Parties entered into a Structured

6    Negotiations Agreement.  The findings of this investigation were included in the Complaint and

7    in a simultaneously released public report ("the Report") (ECF No. 36-6).

8        The Parties began negotiations in early 2018, and on March 8, 2018, the Parties stipulated

9    to request that the Court stay the lawsuit while the Parties engaged in structured negotiations,

10   which the Court granted.  Pursuant to the Structured Negotiations Agreement, Probation

11   Defendants agreed to retain experts in: (a) the ADA and the Rehabilitation Act; (b) California

12   state law requirements pertaining to persons with disabilities; and (c) the operation of juvenile

13   halls.  Similarly, Schools Defendants agreed to retain experts in: (a) the IDEA, ADA and the

14   Rehabilitation Act; (b) California state education law requirements pertaining to persons with

15   disabilities; and (c) the operation of schools inside of juvenile halls.  The retained experts were

16   tasked with evaluating the claims in Plaintiffs' Complaint and Report.  After several sessions of

17   arms-length negotiations, Plaintiffs and Probation Defendants jointly selected the Council of

18   Juvenile Justice Administrators, Inc. ("CJJA")[3] as the evaluating experts; Plaintiffs and Schools

19   Defendants jointly selected Peter Leone, Ph.D., and Judy Elliott, Ph.D. ("Education Experts") as

20   the evaluating experts.

21       From May 21 through 25, 2018, CJJA conducted on-site inspections at the Facilities;

22   Education Experts conducted their on-site inspection on June 11, 12, 25, and 26, 2018.  Among

23   other things, the experts met with administrators, staff, and youth at the Facilities, and requested

24   and reviewed documents and information pertaining to the Facilities, and the education provided

25   to youth confined therein.  CJJA and the Education Experts each provided a written report and

26   recommendations to the Parties containing their evaluation of the issues at the Facilities as they

27   relate to the above-captioned matter, along with recommended changes to policies, practices, and

28
_____
[3] CJJA was previously known by the name "Council of Juvenile Correctional Administrators" or "CJCA."

1    procedures at the Facilities.  The Defendants subsequently provided Plaintiffs with initial

2    confidential written responses to the experts' reports to facilitate settlement discussions.

3         After receiving recommendations from CJJA and the Education Experts, the Parties met

4    and conferred jointly and separately by phone and in person more than twenty times between

5    September 2018 and the filing of the Fourth Joint Status Report in July 2019 to negotiate the

6    Settlement Agreements and strategies for implementing and monitoring these recommendations.

7    Both the Probation and Schools Defendants have agreed to incorporate these strategies into their

8    respective Settlement Agreements.

9         As part of the Probation Settlement, the Plaintiffs and Probation Defendants have

10   negotiated and developed a written plan, titled the Kern County Probation Action Plan

11   ("Probation Plan"), which lays out the significant changes that the Probation Defendants will

12   make in the Facilities and the Parties' plans for implementation and monitoring.[4]  The Probation

13   Plan is detailed and provides substantial and meaningful supports for detained youth with

14   disabilities.  The Probation Plan is the result of negotiations with the Plaintiffs and is based on

15   CJJA's recommendations, including the Probation Defendants' site visits to four other juvenile

16   corrections facilities as recommended by CJJA, their further research into the areas of trauma

17   informed care, adolescent development, youth with mental health disabilities, and de-escalation.

18   CJJA has been consulted for input regarding the form and substance of the changes, as well as

19   the monitoring logistics of the Probation Plan.

20        Similarly, as part of the KCSOS Settlement, the Plaintiffs and Schools Defendants have

21   negotiated and developed a detailed written plan, titled the Court Schools Implementation Plan

22   ("Schools Plan"), that lays out the significant changes that the Schools Defendants will adopt in

23   the schools that serve students housed at the Facilities, as well as the Parties' plans for

24   implementation and monitoring.[5]  The Schools Plan is the result of negotiations with the

25

26   [4] A copy of the Probation Settlement and Probation Action Plan was filed with the Parties'
     Preliminary Approval Motion (ECF No. 36-2) and preliminarily approved by this Court in
27   December 2019 (ECF No. 50).

     [5] A copy of the KCSOS Settlement (minus the new Addendum, which is included with the
28   instant Motion for Final Approval (*see* Exh. A to Munson Decl.)) and Schools Plan were filed
     with the Parties' Preliminary Approval Motion (ECF. No. 36-3) and preliminarily approved by
     this Court in December 2019 (ECF No. 50).

1  Plaintiffs and is based on the Education Expert's recommendations and provides substantial and

2  meaningful educational services for detained youth with disabilities.  Dr. Elliott has been

3  actively involved in collaborating on the form, substance, and monitoring logistics of the plan.

4      As discussed above and below, the KCSOS Defendants have encountered two unforeseen

5  issues that have affected the Monitoring Term.  Munson Decl. ¶¶ 26-28.  Accordingly, the

6  Plaintiffs and KCSOS Defendants have executed an Addendum to the KCSOS Settlement to

7  modify Section 6.1.1 and add a new Section 6.5 in order to ensure that meaningful monitoring

8  occurs for the full term contemplated in the agreement.  Addendum ¶¶ 2, 4 at Exh. A to Munson

9  Decl.  By its own terms, the Addendum is incorporated by reference into the KCSOS Settlement.

10 Addendum ¶ 3.

11     As outlined above, the Parties have completed the laborious work of developing the

12 detailed plans for substantive reforms, as well as the implementation and monitoring of these

13 reforms.  These negotiations were time- and resource-intensive for all Parties, but were necessary

14 for the Parties' ultimately successful resolution of this action.  The Parties have agreed that

15 Plaintiffs' Counsel has the right to seek and recover reasonable attorneys' fees, and have further

16 reached an agreement as to the amount to be sought by Plaintiffs.  The Plaintiffs are concurrently

17 filing their motion for an award of attorneys' fees consistent with the terms of the Settlement

18 Agreements.

19 III.  **SUMMARY OF THE SETTLEMENT AGREEMENTS**

20     Through implementation of the following terms[6], the Settlement Agreements will provide

21 relief to the Plaintiffs and Settlement Class, which consists of "all youth with mental health,

22 behavioral, learning, intellectual and/or developmental disabilities as defined by the Americans

23 with Disabilities Act, Section 504 of the Rehabilitation Act, and/or Individuals with Disabilities

24 Education Act who are currently detained, or who will be detained during the Monitoring Term

25

26 [6] This summary of the proposed terms of the Settlement Agreements is qualified in its entirety by
   the references to the terms and provisions in the proposed Settlement Agreements (each of which
27 includes their respective plans which are incorporated into those agreements).  In the event of
   any inconsistencies between the terms and provisions of the Settlement Agreements and the
28 summary set forth herein, the terms and provisions of the Settlement Agreements shall govern.
   In addition, capitalized terms used in this summary shall have the same meanings ascribed to
   them as set forth in the Settlement Agreements.

1  (through August 31, 2022), at the Kern County Juvenile Facilities (Juvenile Hall, Crossroads,

2  and Camp Erwin Owen)."  Preliminary Approval Order at 18.

3      **A.**      **The Probation Settlement.**[7]

4      The Probation Settlement is entered into by Plaintiffs and Probation Defendants.  The

5  Probation Settlement operates in conjunction with the related Probation Plan, attached to the

6  Probation Settlement as Exhibit A, which is fully incorporated into the Settlement.  *See* ECF No.

7  36-2.

8      **1.**      **Modifications to Policies and Procedures.**

9          a.      ***Facility Culture and Environment.***

10     As per the Probation Settlement, Probation Defendants have developed a plan to

11  transition from a corrections model to a treatment model, with new training for staff to reform

12  and to reduce the use of Oleoresin Capsicum ("O.C." or "pepper") spray, restrictive housing, and

13  mechanical restraints, with special attention paid to youth with disabilities.  Probation Plan § 1.

14  Probation will create an Implementation Team to oversee the Probation Plan, conduct listening

15  sessions and open other lines of communication to hear concerns from staff about the transition,

16  provide additional training and continued skill development for staff working with youth with

17  disabilities, and identify existing staff leaders to act as champions and mentors to those staff who

18  are "on the fence" or opposed to the changes.  Probation Plan § 1.

19     Further, Probation Defendants will create new Re-Entry, ADA and Programming

20  ("RAP") Units within each of the Facilities, comprising a total of 26 staff members.  Probation

21  Plan Intro and *passim*.  These specialized staff will be vital in increasing programming,

22  improving staff/youth interactions, reducing use of force incidents and changing facility culture.

23  *Id.*  These staff will be completely separate from existing facility housing unit staffing, allowing

24  them to focus on their specific assigned tasks.  *Id.*  RAP staff will be assigned as coordinators for

25  Re-Entry, Program, Volunteer, School and ADA services.  *Id.*  Additional RAP Unit staff will

26  support these coordinators and provide other duties as needed.  *Id.*  Furthermore, all RAP Unit

27

28

[7] With the exception of the III.A.6, *supra* at 13, this section tracks the summary previously
included in the Parties' Motion for Preliminary Approval.  ECF No. 36.

1  staff will be trained to act as Crisis Awareness Response ("CARE") Team members. *Id*. The

2  CARE team will consist of staff designated to respond to crisis situations within each facility in

3  an attempt to de-escalate situations before they deteriorate further.

4      Probation Defendants will also coordinate this facility culture change by, among other

5  things: (1) reading and learning more about developmentally informed juvenile justice and

6  positive youth strategies; (2) visiting juvenile facilities that have embraced developmentally

7  informed juvenile justice, trauma informed, therapeutic environments and positive youth

8  development; (3) communicating with agency directors who have made a similar transition; (4)

9  incorporating the principles of the above ideas into all training, policies and procedures and

10  providing continuing education for staff; (5) providing strong leadership for the above ideas and

11  reinforcing in all communication with staff; (6) consulting with experts on the above ideas for

12  assistance in incorporating the principles into training, policies and procedures; and (7) ensuring

13  job descriptions and hiring processes reflect the changes in the above ideas. Probation Plan § 8.

14      Probation Defendants will also improve the physical Facilities by creating more artwork,

15  murals, and inspirational sayings throughout the Facilities, as well as offering youth more books,

16  games, and craft supplies, to assist in fostering a homelike environment. Probation Plan § 6. In

17  particular, at the Juvenile Hall and Crossroads Facilities, Probation Defendants will paint units

18  with vibrant colors and decorations that reflect the culture of the youth served, remove outdated

19  or negative signage, and post information on daily activities. Probation Plan § 11.

20                   b.    ***Case Management System.***

21      Probation will acquire a Case Management System that can provide critical measures in

22  monthly reports to track the use of force, including O.C. spray, mutual fights, youth assaults,

23  room confinement, youth grievances and other issues, for ease of monitoring compliance with

24  the Probation Implementation Plan. Probation Plan § 2.

25                   c.    ***Programming.***

26      Probation will (1) develop a full schedule of structured activities for youth in the

27  afternoons, evenings and weekends with the help of local resources; (2) assign a volunteer

28  coordinator to conduct outreach and manage volunteer activities; (3) get input from staff,

1    volunteers, youth and families for ideas on reducing idleness and providing more meaningful and

2    structured activities for youth; and (4) post a daily schedule of activities that is reviewed by

3    leadership and followed closely by staff.  Probation Plan § 3.

4                    d.    ***Training and Coordination with KCSOS.***

5            Probation Defendants will provide training to all staff in the following areas: (1) crisis

6    intervention; (2) trauma informed care; (3) adolescent development and behavior; and (4) mental

7    health disabilities.  Probation Plan § 4.  Probation will further develop detailed policies and

8    procedures to incorporate ideas and philosophies learned from above training.  Probation Plan §

9    4.  Probation Defendants will identify staff with desired skills that use alternatives to O.C. spray

10   and use them as mentors to other staff.  Probation Plan § 4. Probation will also invite KCSOS to

11   their staff trainings, as well as attend trainings provided by KCSOS.  Probation Plan § 18.

12   Probation will consult with KCSOS in, among other things, (1) drafting youth handbooks at an

13   appropriate comprehension level for special education students, (2) making accessible sensory

14   tools for special education students, and (3) increasing the number and variety of reading

15   materials available to youth in their housing units.  Probation Plan § 18.

16                   e.    ***Youth, Family and Staff Input.***

17           Probation Defendants will create and distribute surveys to youth, family and staff to

18   determine strengths, service gaps and perception regarding the facilities, programs, and services.

19   Probation Plan § 5.  Probation Defendants will then incorporate appropriate ideas and

20   suggestions from youth, family and staff surveys into programs, services and practices.

21   Probation Plan § 5.

22                   f.    ***Complaints and Grievances.***

23           Probation Defendants will develop a robust review process for staff and youth grievances

24   to ensure facility leadership is aware of and addresses such concerns.  Probation Plan § 7.

25                   g.    ***Pepper Spray, Isolation, Seclusion, and Confinement.***

26           Probation Defendants will incorporate strategies to mitigate the need for use of force,

27   including reducing the use of O.C. spray.  Probation Plan § 9.  As part of this effort, Probation

28   Defendants will, among other things: (1) only use O.C. spray in accordance to its policy (see

1   Exhibit A of Probation Plan); (2) create Crisis Awareness Response Teams ("CARE teams") of

2   staff dedicated to resolving and de-escalating situations without the need for physical force

3   interventions; (3) refrain from using O.C. spray where mental health treatment is warranted, for

4   example in response to threats of self-harm; and (4) debrief staff after an O.C. incident.

5   Probation Plan § 9.

6       Similarly, Probation Defendants will gradually reduce the length of time youth spend in

7   isolation.  Probation Plan § 10.  For example, Probation Defendants will: (1) eliminate the

8   "program restriction" sanctions that require youth to sit in a chair outside of their rooms; (2)

9   create CARE teams to resolve and de-escalate situations without the use of isolation; (3) limit the

10  amount of time a youth spends in separation following a safety and security incident; (4) change

11  policy and procedures to reduce time youth spend in separation for investigations or pending

12  disciplinary hearings; and (5) consult with youth and staff to develop and implement a more

13  robust behavior management and incentive system.  Probation Plan § 9.

14      Probation Defendants will also: (1) track the number and types of room separations; and

15  (2) require mental health consultation for youth who self-separate for more than four hours

16  and/or for youth who self-separate frequently.  Probation Plan § 16.

17              h.  ***Special Cases Meetings, Individualized Safety and Security***
18                  ***Program, and Suicide Prevention.***

19      Probation's new RAP Units will oversee Special Cases Meetings, where the RAP Unit

20  staff and other staff will discuss youth on the Special Cases List, e.g., youth with security, mental

21  health, ADA, education, behavioral, and/or medical issues.  Probation Plan § 13.

22      Probation will further revise the Individualized Safety and Security Program ("ISSP")

23  manual to ensure that behavioral health professionals have experience with youth with

24  disabilities, trauma informed care, delinquency variables, and have training in leading a team.

25  Probation Plan § 14.  ISSP plans will clearly state: (1) why the plan would not unfairly or

26  disproportionately deprive youth of programs, services or increase his time in custody; (2) how

27  the plan relates to other special education, behavioral, mental health, or medical plans; (3) the

28  youths' progress on the ISSP; (4) why any modifications or revisions are made; and (5) when

1    reviews occur (no less than weekly).  Probation Plan § 14.  Youth and their parents will be

2    informed of the ISSP process, how they can participate in the process, as well as the recourses

3    available if they disagree with the process.  Probation Plan § 14.

4         Probation will also change the language in the suicide prevention policy to: (1) be more

5    in line with the Massachusetts Youth Screening Instrument ("MAYSI") designed to identify the

6    potential mental health needs of adolescents involved in the juvenile justice system; and (2) more

7    accurately reflect risk-level identification and awareness.  Probation Plan § 15.

8                          i.    ***Re-Entry.***

9         Probation Defendants will assign a dedicated RAP staff to act as a re-entry coordinator at

10   each facility.  They will bolster the frequency and scope of re-entry meetings.  These meetings

11   will address both in custody and community needs upon release.  Probation Plan § 17.  The case

12   plan will be revised at least bi monthly by the full team to update goals and plans upon release

13   for housing, education, vocation, medical and mental health services.  Probation Plan § 17.

14                   **2.    Term of Probation Settlement.**

15        The Parties agree that the Probation Settlement, and all of its terms, will expire, and will

16   no longer be enforced or enforceable in any court, upon the completion of the Monitoring Term

17   and issuance of the final monitoring report.  Probation Settlement § 8.  The Monitoring Term

18   expires three (3) years after the Execution Date of the Probation Settlement.  Probation

19   Settlement § 6.1.

20                   **3.    Monitoring.**

21        Plaintiffs and Probation Defendants have selected CJJA to act as the Monitoring Expert

22   to monitor compliance with the Probation Plan for the term of the Probation Settlement.

23   Probation Settlement § 6.  The Monitoring Expert will prepare a written report for review and

24   comment by the Parties on a quarterly basis for the first year of the Monitoring Term and on a

25   semiannual basis thereafter.  *Id.* § 6.22.  At the conclusion of the Monitoring Term, the

26   Monitoring Expert will issue a final report.  *Id*. § 6.2.2.3.  The Monitoring Expert will be given

27   full and reasonable access throughout the Term of the Agreement to any and all information

28   necessary to assist in conducting the review of the Probation Action Plan and monitoring

1    Probation Defendants' progress in its implementation, including access to Probation's personnel,

2    documents, facilities, records, and incarcerated youth.  *Id*. § 6.2.1.  In the event that CJJA is

3    unable to serve as Monitoring Expert for any reason in the future, the Parties have agreed upon a

4    process through which to replace CJJA.  *Id*. § 6.1.4.

5        Plaintiffs' Counsel will review each monitoring report that is issued, and provide

6    feedback, if any, in writing to the Monitoring Expert and copy Probation Defendants' counsel on

7    that feedback.  Plaintiffs' Counsel will also perform at least one monitoring visit during the Term

8    of the Agreement.  *Id*. § 6.3

9        **4.    Dispute Resolution and Reservation of Jurisdiction and Enforcement.**

10        The Parties have agreed to a detailed dispute resolution process that requires the Parties

11   to meet and confer in good faith to attempt to resolve disputes and allows for a mediation before

12   Magistrate Judge Thurston, if necessary.  *Id.* § 7.  If the dispute cannot be resolved through the

13   meet and confer process and/or the mediation process, the Parties agree that remaining disputes

14   will be heard and decided by this Court, and that any relief arising from such disputes is bounded

15   by and subject to the limitations and terms of the Probation Settlement.  *Id.* § 7.2.4.  Enforcement

16   of the proposed Probation Settlement will be subject to the continuing jurisdiction of this Court

17   throughout the Term of the Probation Settlement.  *Id*. § 10.

18        **5.    The Release of Claims and Dismissal of Actions.**

19        In exchange for the injunctive relief proposed in the Probation Settlement Agreement,

20   upon Court approval, Plaintiffs and Plaintiff Class agree to release any and all claims, rights,

21   demands, charges, complaints, actions, suits, and causes of action, for injunctive or declaratory

22   relief, that have been brought in the Lawsuit under the ADA, Rehabilitation Act, IDEA, and/or

23   state laws arising from February 21, 2016, through the Term of the Agreement brought against

24   Probation Defendants.  *Id.* § 11.2.  However, the release does not apply to any claims for

25   compensatory education or individual due process claims arising under the IDEA or Section 504,

26   any claims for reasonable accommodations related to physical access, communication access,

27   and/or accommodations otherwise relating to hearing, vision and/or mobility disabilities arising

28   under the ADA or Section 504, or any monetary claims that may exist under any relevant laws.

1    *Id.* Additionally, the release does not apply to claims relating to enforcement of the Probation

2    Settlement. *Id.*

3                    **6.    Attorneys' Fees, Costs, and Expenses.**

4            Probation Defendants have agreed to pay Plaintiffs' Counsel $900,000 in reasonable

5    attorneys' fees and costs, subject to this Court's approval. *See* Probation Settlement § 12. This

6    amount will fully resolve all claims for attorneys' fees, costs, and expenses against the Probation

7    Defendants, through and including the Monitoring Term[8]. Probation Settlement § 12.3. In their

8    concurrently filed fee motion, Plaintiffs seek Court approval for the award of $900,000 in

9    attorneys' fees and costs incurred in litigating this lawsuit with the Probation Defendants,

10   including $25,000 in projected fees and costs related to future monitoring work. *See id.* The

11   Probation Defendants have agreed not to oppose this fee motion. Probation Settlement § 12.2.

12          **B.    The KCSOS Settlement and Addendum.[9]**

13          The KCSOS Settlement is entered into by Plaintiffs and KCSOS. The KCSOS

14   Settlement operates in conjunction with the related Schools Plan, attached to the KCSOS

15   Settlement as Exhibit A, which is fully incorporated into the Settlement.

16          Since filing for preliminary approval, the KCSOS Defendants have encountered two

17   unforeseen issues that have necessitated an Addendum to the KCSOS Settlement. Munson Decl.

18   ¶¶ 26-28; Ex. A to Munson Decl.

19          First, the KCSOS Defendants experienced an unforeseen delay in retaining the agreed

20   upon monitor, Dr. Elliott. Munson Decl. ¶ 26. Accordingly, Dr. Elliott did not begin the

21   monitoring work required by the KCSOS Settlement until January 1, 2020. *Id.* Because the

22   KCSOS Settlement provides that the Monitoring Term runs from the Execution Date, which was

23   August 30, 2019, this delay would have shortened the period of monitoring by four months. This

24   delay was not intended or contemplated by the Parties in the KCSOS Settlement. *Id.*

25

26   [8] With one exception: pursuant to Probation Settlement Sections 12.3 and 12.4, any future fees
     and costs incurred as a direct result of resolving future disputes or enforcing of the Probation
27   Settlement under Sections 7.2.3, 7.2.4, and 7.3, should any such fees and costs ever be incurred,
     are excluded from this resolution of fees.

28   [9] With the exception of the introductory description of the Addendum and III.B.2 and B.6, *supra*,
     this section tracks the summary previously included in the Parties' Motion for Preliminary
     Approval. ECF No. 36.

1   Accordingly, the Plaintiffs and KCSOS Defendants executed an Addendum to the KCSOS

2   Settlement to revise Section 6.1.1 to adjust the start date for the Monitoring Term to align with

3   the date Dr. Elliott began her monitoring work.  Addendum ¶¶ 2-3, Exh. 1 to Munson Decl.  This

4   ensures that the Monitoring Term is not short-changed.

5          Second, understandably the Parties did not foresee the global pandemic known as

6   COVID-19, which has caused statewide shelter-in-place restrictions and the physical closure of

7   schools throughout California, including the Facility Schools.  Munson Decl. ¶¶ 27-28.  The

8   Facility Schools closed for physical, in-person instruction on March 18, 2020.  *Id*.  Although

9   students at the Facility Schools continue to receive instruction through modified means, such as

10  distance learning, the terms of Schools Plan are not able to be fully and adequately implemented

11  and monitored during the physical closures, due to the lack of in-person instruction, restrictions

12  of visitors, and required social distancing of students from each other and staff.  *Id*.  Accordingly,

13  the Plaintiffs and Schools Defendants have agreed to hold the Monitoring Term in abeyance until

14  regular, in-person instruction can resume.  Addendum ¶ 4.b, Exh. 1 to Munson Decl.  The terms

15  of this abeyance, including plans to resume monitoring, apprise the Court of developments, and

16  address any future resurgence of COVID-19, are detailed in the Addendum and incorporated into

17  the KCSOS Settlement as new Section 6.5.  *Id*.

18         The Addendum to the KCSOS Settlement has been incorporated by reference into the

19  KCSOS Settlement, and is subject to the same force, effect, and enforceability.  Addendum ¶ 3,

20  Exh. 1 to Munson Decl.

21             **1.**    **Modifications to Policies and Procedures.**

22                 a.     ***Access to Adequate Education, Special Education, and Related***
23                        ***Services for Youth with Disabilities.***

24         The Schools Defendants have agreed to take a number of steps to improve their education

25  programs at the Facilities.  KCSOS will develop an intake Classroom at Juvenile Hall to which

26  all youth are assigned during their initial detention, where KCSOS will: (1) assess students'

27  needs, including the need for Education Related Mental Health Services ("ERMHS"); (2)

28  provide basic instruction in literacy, numeracy, and current events; (3) determine students' prior

school history and special education eligibility; (4) identify English learners; and (5) determine

1    students' instructional needs.  Schools Plan §§ 1.1 and 2.10.  Further, KCSOS will place students

2    in classrooms by grade level and, if necessary, group them by ability level, to ensure they are

3    receiving grade appropriate content and coursework.  Schools Plan § 1.2.  KCSOS will also,

4    among other things: (1) provide students who have met graduation requirements with post-

5    secondary college or vocational learning opportunities (e.g., resume building, online enrollment

6    in college courses) (Schools Plan § 1.3); (2) provide professional learning opportunities for

7    education staff to reinforce and further develop the delivery of robust and engaging instruction

8    (Schools Plan § 1.6); (3) implement web-based instructional technology (Schools Plan § 1.7); (4)

9    hire additional school counselors (Schools Plan § 1.10); (5) hire additional librarians to promote

10   literacy (Schools Plan § 1.11); (6) develop and implement an intensive reading instruction

11   support program (Schools Plan § 1.12); and (7) provide push-in services and support for students

12   with disabilities (Schools Plan § 1.15).

13           b.     ***Behavioral Interventions and Supports, Mental Health Care,***
              ***Educationally Related Mental Health Services, and Transition***
14            ***Planning.***

15           KCSOS will provide sensory tools for all students who need breaks during educational

16   programming.  Schools Plan § 2.3.  KCSOS will further create and maintain a formal tracking

17   system of school exclusion that records the daily removal incidents (e.g., by youth, date, reason,

18   number of minutes, personnel requesting removal) for all students, especially for students with

19   disabilities, and ensure that this information is shared with both education and probation staff on

20   a regular basis (e.g., bi-weekly, monthly).  Schools Plan § 2.4.  KCSOS will also, among other

21   things: (1) create a system to ensure all service providers, including ERMHS clinicians, are made

22   aware of pending release dates of students so that planning and transition services can be

23   coordinated (Schools Plan § 2.6); (2) invite designated mental health clinicians, in addition to

24   ERMHS providers, to IEP meetings of youth on their caseloads and participate in the

25   development of the goals and objectives for mental health and related services on youths' IEP's

26   (Schools Plan § 2.8); (3) ensure that ERMHS providers communicate with mental health

27   providers to promote therapeutic delivery of mental health services for youth with IEPs (Schools

28   Plan § 2.13); and (4) provide regular orientation and training for Probation staff on mental health

1    diagnoses and the impact on youth behavior (Schools Plan § 2.12).

2                    c.    ***Reasonable Accommodations.***

3           KCSOS will develop and/or adopt a screening instrument as part of an intake assessment

4    process to identify youth with disabilities who are entitled to accommodations, support, and

5    protection while in custody.  Schools Plan § 3.1.  KCSOS will also develop material and

6    procedures better matched to the literacy and comprehension skills of youth at the Facilities,

7    including ensuring that any materials provided to youth describing school-based behavior

8    management will be available graphically and at their developmental level.  Schools Plan § 3.2.

9    KCSOS will further develop a protocol for use by the ADA coordinators to review policies and

10   practices that might have an adverse impact on youth with disabilities.  Schools Plan § 3.3.

11                   d.    ***Training and Coordination with Probation.***

12          KCSOS will provide training to education staff on the use of data to drive instructional

13   decision making, including training on a suite of data reports that are used by administration and

14   education staff to manage, coordinate services and monitor performance for all students

15   including students with disabilities.  Schools Plan §§ 4.1 and 4.2.  KCSOS will regularly review

16   such data at administrative and staff meetings to monitor youth performance across multiple

17   measures.  Schools Plan § 4.3. KCSOS will further create a comprehensive electronic log that

18   actively documents the process and outcome of youth referred to the Student Support Team.

19   Schools Plan § 4.5.  KCSOS will also develop and deliver professional learning opportunities for

20   Probation and education staff around mental health diagnoses and behavior, identification of

21   youth with disabilities, de-escalation strategies, restorative practices, Behavior Intervention

22   Plans, ADA weekly meetings, Individualized Education Plans ("IEPs"), ERMHS and other

23   related services, and the behavior management system.  Schools Plan §§ 4.10-4.13.  Finally,

24   KCSOS will schedule regular meetings with Probation and education staff to share information

25   from critical incident and ADA protocol reviews, new or revised policies and practices, and to

26   problem solve areas of need.  Schools Plan §§ 4.14-4.17.

27              **2.    Term of KCSOS Settlement.**

28          The Parties agree that the KCSOS Settlement, and all of its terms, will expire, and will no

1    longer be enforced or enforceable in any court, upon the completion of the Monitoring Term and

2    issuance of the final Monitoring Report.  KCSOS Settlement § 8.

3        As discussed above, the Parties have executed an Addendum to the KCSOS Settlement to

4    address an unforeseen delay in retaining the Monitoring Expert and ensure the full Monitoring

5    Term.  Munson Decl. ¶ 30.  Accordingly, Section 6.1.1 of the KCSOS Settlement has been

6    revised so that the Monitoring Term now expires three years after January 1, 2020, subject to any

7    period of abeyance due to the physical closure of the Facility Schools during the COVID-19

8    pandemic.  Addendum ¶ 4.a.

9        In addition, Plaintiffs and KCSOS Defendants have added a new Section 6.5 to address

10   the COVID-19 pandemic and its impact on the Facility Schools.  Addendum ¶ 4.b.  Because: 1)

11   the Facility Schools have had to physically close and resort to distance learning, neither of which

12   was contemplated in the KCSOS Settlement; 2) the Schools Plan is built around improving in-

13   person instruction and interaction between staff and students; and 3) social distancing and

14   shelter-in-place restrictions would prevent the monitor from conducting on-site monitoring while

15   the Facility Schools are closed, the Plaintiffs and KCSOS Defendants have agreed to hold the

16   Monitoring Term in abeyance beginning March 18, 2020 – the first day that the Facility Schools

17   were physically closed.  Addendum ¶ 4.b; Settlement § 6.5.1.  The abeyance will lift and the

18   Monitoring Term will resume once the Facility Schools reopen, pursuant to either Section 6.5.1.4

19   (in the event that in-person instruction resumes by September 1, 2020) or 6.5.1.5 (in the event

20   that COVID-19 requires prolonged physical closures).  The Parties will keep the Court apprised

21   of the lifting of the abeyance by way of a joint status report.  Settlement §§ 6.5.1.4, 6.5.1.5.  The

22   abeyance shall not have the effect of shortening the Monitoring Term.  Settlement § 6.5.4.

23       Based on currently available public health guidance, Plaintiffs and KCSOS Defendants

24   recognize that there may be a resurgence of COVID-19 in the future that requires additional

25   physical school closures for public health reasons.  Accordingly, in an attempt to be proactive,

26   the Parties have included a plan for meeting and conferring within fifteen calendar days in the

27   event the Facility Schools have to close again so that they can determine how to implement and

28   monitor implementation of the Schools Plan during the closure and whether to put the

---

*T.G., et al. v. Kern County, et al.*, Case No 1:18-cv-00257-JLT
**JOINT MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS**                    **17**

1    monitoring into abeyance once more.  Settlement § 6.5.2.  The Parties will file a status report to

2    apprise the Court of any such developments.  *Id*.

3              **3.      Monitoring.**

4        A Monitoring Expert will monitor KCSOS's compliance with the Court Schools

5    Implementation Plan for the Term of the KCSOS Settlement.  KCSOS Settlement § 6.1.  The

6    Monitoring Expert will prepare a written report for review and comment by the Parties on a

7    quarterly basis for the first year of the Monitoring Term and on a semiannual basis thereafter.

8    KCSOS Settlement § 6.2.2.3.  At the conclusion of the Monitoring Term, the Monitoring Expert

9    will issue a final report.  *Id.*  The Monitoring Expert will be given full and reasonable access

10   throughout the Term of the Agreement to any and all information necessary to assist in

11   conducting the review of the Court Schools Implementation Plan and monitoring KCSOS's

12   progress in its implementation, including access to KCSOS personnel, documents, facilities,

13   records, and incarcerated youth.  *Id.* § 6.2.1.  The Parties have agreed that Judy Elliott, Ph.D. will

14   act as Monitoring Expert, and they have agreed upon a process by which to replace Dr. Elliot, if

15   necessary.  *Id.* § 6.1.

16       Plaintiffs' Counsel will review each monitoring report that is issued, and provide

17   feedback, if any, in writing to the Monitoring Expert and copy KCSOS's counsel on that

18   feedback.  Plaintiffs' Counsel will also perform at least one monitoring visit during the term of

19   the agreement.  *Id.* § 6.3.

20              **4.      Dispute Resolution and Reservation of Jurisdiction and Enforcement.**

21       The Parties have agreed to a detailed dispute resolution process that requires the Parties

22   to meet and confer in good faith to attempt to resolve disputes and allows for a mediation before

23   Magistrate Judge Thurston, if necessary.  KCSOS Settlement § 7.  If the dispute cannot be

24   resolved through the meet and confer process and/or the mediation process, the Parties agree that

25   remaining disputes will be heard and decided by this Court, and that any relief arising from such

26   disputes is bounded by and subject to the limitations and terms of the KCSOS Settlement.  *Id*. §

27   7.2.  Enforcement of the proposed KCSOS Settlement will be subject to the continuing

28   jurisdiction of this Court throughout the Term of the KCSOS Settlement.  *Id*. §§ 7.2.4, 10.

**5.**    **The Release of Claims and Dismissal of Actions.**

In exchange for the injunctive relief proposed in the KCSOS Settlement, Plaintiffs have agreed to release any and all claims, rights, demands, charges, complaints, actions, suits, and causes of action, for injunctive or declaratory relief, that have been brought in the Lawsuit under the ADA, Rehabilitation Act, IDEA, and/or state laws arising from February 21, 2016, through the Term of the Agreement brought against KCSOS.  *Id.* § 11.  However, the release does not apply to any claims for compensatory education or individual due process claims arising under the IDEA or Section 504, any claims for reasonable accommodations related to physical access, communication access, and/or accommodations otherwise relating to hearing, vision and/or mobility disabilities arising under the ADA or Section 504, or any monetary claims that may exist under any relevant laws.  *Id.*  Additionally, the release does not apply to claims relating to enforcement of the KCSOS Settlement.  *Id.*

**6.**    **Attorneys' Fees, Costs, and Expenses.**

The KCSOS Defendants have agreed to pay Plaintiffs' Counsel $850,000 in reasonable attorneys' fees and $8,743.43 in reasonable costs, payable in three installments over the course of three years, subject to this Court's approval.  Addendum ¶5.a; *see, generally,* KCSOS Settlement § 13 and Addendum ¶ 5.  This amount will fully resolve all claims for attorneys' fees, costs, and expenses against the KCSOS Defendants, through and including the date of final approval for all work incurred in litigation this lawsuit with the KCSOS Defendants.  KCSOS Section § 13.2, Addendum ¶ 5.a.i.

KCSOS Defendants have also agreed to pay Plaintiff's Counsel for monitoring work incurred on and after July 1, 2020, on a periodic basis and at rates negotiated for the purposes of monitoring only, as specified in paragraph 5.b of the Addendum.  *See also* KCSOS Settlement § 13.3.

In their concurrently filed fee motion, Plaintiffs seek Court approval for the award of $858,743.43 in reasonable attorneys' fees and costs incurred in litigating this lawsuit with the KCSOS Defendants, and approval of the negotiated structure for periodic payment of reasonable fees and costs related to future monitoring work.  The KCSOS Defendants have agreed not to

1  oppose Plaintiffs' fee motion.  KCSOS Settlement § 13.1.2.3.2.

2

3  **IV.    NOTICE HAS BEEN PROVIDED TO THE CLASS AND NO OBJECTIONS HAVE BEEN FILED.**

4          In accordance with the Settlement Agreements, the notice distribution plan in the Parties'

5  Joint Motion for Preliminary Approval, and the Court's December 4, 2019, order directing notice

6  to the class, the Defendants distributed the class notice to at least 279 individual detained youth

7  and their parents or guardians on or around December 20, 2019.  *See* Defendants' Joint Notice of

8  Compliance Re Dissemination of The Notice […], ECF Nos. 56 – 56-8.  The Defendants also

9  posted the notice in Spanish and English throughout the Facilities, including in each classroom at

10  the Facility Schools, in advance of the January 6, 2020, deadline.  *Id.*  The Parties' also posted

11  the class notices and information about the settlements on their websites through at least March

12  16, 2020.[10]  *Id*; *see also* Declaration of Thomas Zito Concerning Provision of Class Notice by

13  Disability Rights Advocates  ("Zito Decl. re Class Notice"), ECF No. 55; Declaration of Carly J.

14  Munson Regarding Provision of Class Notice by Disability Rights California, ECF No. 57.

15          The deadline to file objections was March 16, 2020.  Preliminary Approval Order at 31.

16  To date, no class member has filed an objection to the Settlement with the Court.

17          Plaintiffs' Counsel also provided their phone numbers on the class notice so that class

18  members could inquire about the lawsuit or Settlement Agreements.  Munson Decl. ¶ 34.

19  Between January 6, 2020, and March 16, 2020, DRC received telephone inquiries from the

20  families of two detained youth in response to the class notice.  *Id.*  Neither call was related to

21  concerns about the substance of the Settlement Agreements; rather, each family had a question

22  about understanding the notice and the action.  *Id.*

23  ///

24

25  [10] The Probation Defendants inadvertently posted the Court's Preliminary Approval Order, which describes the substance of the Settlement Agreements, rather than the Settlement Agreements themselves.  However, Plaintiffs' Counsel do not believe the class was prejudiced

26  by this because: 1) the Probation Defendants did post the class notices on their website; 2) the Defendants distributed the class notice directly to individual class members and their parents; 3)

27  the class notice directed anyone looking for more information to Disability Rights Advocates' website, not the Probation Defendants' website; and 4) Disability Rights Advocates established

28  and maintained the website linked on the class notice so that it contained information about the case, the full text of the Settlement Agreements, the class notice, and other case-related documents.  *See* Zito Decl. re: Class Notice ¶ 6.

1    V.    **THE SETTLEMENT AGREEMENTS SHOULD BE APPROVED.**

2          A.    <u>**Legal Standards for Approval of Class Action Settlement.**</u>

3          The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class

4    actions. *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); *Class Plaintiffs v. City*

5    *of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). Courts must give "proper deference to the

6    private consensual decision of the parties." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th

7    Cir. 1998). "[S]ettlement [is] the preferred means of dispute resolution" and that "is especially

8    true in complex class action litigation." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d

9    615, 625 (9th Cir. 1982).

10          The Court may approve a proposed class settlement "after a hearing and on finding that it

11   is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "Although Rule 23 imposes strict

12   procedural requirements on the approval of a class settlement, a district court's only role in

13   reviewing the substance of that settlement is to ensure that it is 'fair, adequate, and free from

14   collusion.'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (citation omitted). In

15   reviewing proposed class-action settlement agreements, there is an initial presumption of fairness

16   when a proposed class settlement was negotiated at arm's length by counsel for the class. *Harris*

17   *v. Vector Mktg. Corp.*, No. C-08–5198 EMC, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29,

18   2011).

19          A district court considers several factors in determining whether a class action settlement

20   is "fair, reasonable, and adequate." *Hanlon*, 150 F.3d at 1026 (citation omitted). The factors

21   include: "[1] the strength of the plaintiffs' case; [2] the risk, expense, complexity, and likely

22   duration of further litigation; [3] the risk of maintaining class action status throughout the trial;

23   [4] the amount offered in settlement; [5] the extent of discovery completed and the stage of the

24   proceedings; [6] the experience and views of counsel; [7] the presence of a governmental

25   participant; and [8] the reaction of the class members to the proposed settlement." *Id.*; see also

26   *In re Oracle Sec. Litig.*, 829 F. Supp.1176, 1179 (N.D. Cal. 1993).

27          The "relative degree of importance to be attached to any particular factor will depend

28   upon and be dictated by the nature of the claim(s) advanced, the type of relief sought, and the

1  unique facts and circumstances presented by each individual case." *Officers for Justice*, 688

2  F.2d at 625.  "Under certain circumstances, one factor alone may prove determinative in finding

3  sufficient grounds for Court approval." *Garner v. State Farm Mutual Automobile Ins. Co.*, 2010

4  WL 1687832 at *7 (N.D. Cal 2010).

5        **B.**    **The Settlement Agreements Are Fair, Adequate, and Reasonable.**

6       The Court should approve the Settlement Agreements because they were achieved after

7  extensive arm's length negotiations and, as set forth below, an analysis of the *Hanlon* factors[11]

8  establishes that the Settlement Agreements are fair, adequate, and reasonable.

9
10         **1.**    **The Strength of Plaintiffs' Case and Risk and Expense of Continued Litigation.**

11       When analyzing the fairness of a settlement, "[t]he Court shall consider the vagaries of

12  litigation and compare the significance of immediate recovery by way of the compromise to the

13  mere possibility of relief in the future, after protracted and expensive litigation." *Nat'l Rural*

14  *Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004).  This factor weighs

15  heavily in favor of approving the Settlement Agreements.

16       Here, the Settlement Agreements provide substantial and lasting benefits to youth with

17  disabilities who are detained in the Facilities.  Under the Settlement Agreements, Defendants

18  will modify their policies, practices, and procedures to ensure that members of the Class are

19  identified and tracked, housed in a safe and supportive homelike environment, provided

20  reasonable accommodations, and given equal access to educational and rehabilitative programs

21  and services.  The Probation Defendants will further create new roles for staff tasked specifically

22  with increasing rehabilitative programming, improving youth interactions with staff, reducing

23  use of force incidents, and generally changing the facility culture from a corrections model to a

24  treatment model.  The Schools Defendants will moreover hire additional staff to enhance the

25  education, special education and related services offered to youth, as well as to train staff around

26

27  _____

28  [11] Although the presence of a governmental participant is a factor under *Hanlon*, this factor does not apply to the case at hand.  No federal agency participated in this lawsuit.  Although KCSOS, Probation, and their respective agency heads did participate in this case, their participation was as defendants only.

1   mental health diagnoses and behavior, de-escalation strategies and restorative practices.  Class

2   Counsel are confident that these measures required by the Settlement Agreements are sufficient

3   to create a juvenile detention facility that provides adequate education services, supports, and

4   accommodations for youth with disabilities.  Declaration of Thomas Zito in Support of Joint

5   Motion for Final Approval of Class Settlement and Plaintiffs' Unopposed Motion for Award of

6   Attorneys' Fees and Costs ("Zito Decl.") ¶¶ 13-15, 18.

7         Thus, the proposed Settlement Agreements will provide injunctive relief that is

8   reasonably calculated to effectuate the modifications necessary to make the Kern County

9   Juvenile Facilities and the Kern County Court Schools operated therein safe and supportive for

10   all youth, including youth with disabilities.  This is an excellent result for the Class, and it is

11   unlikely that this Court would order greater relief.  Moreover, the relief is consistent with that

12   sought in the Complaint.  *See* ECF No. 1.

13         In comparison, courts routinely approve class action settlements in which the value of

14   class relief is much less than what could have been obtained at trial. *See, e.g., In re Heritage*

15   *Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *2 (C.D. Cal. June 10, 2005) (a

16   proposed settlement should not "be judged against a hypothetical or speculative measure of what

17   might have been achieved") (quoting *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of*

18   *San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)); *Nat'l Rural Telecomm's Coop.*, 221 F.R.D. at

19   527 ("[I]t is well-settled law that a proposed settlement may be acceptable even though it

20   amounts to only a fraction of the potential recovery that might be available to the class members

21   at trial.").  Accordingly, the substantial benefits to the proposed Class weigh in favor of

22   preliminary approval of the Settlement Agreements.

23         Moreover, the Parties agree that the litigation risks presented by this case are significant.

24   Zito Decl. ¶ 16.  As noted in the Preliminary Approval Motion, the extensive factual issues and

25   novel legal issues in the case would involve extensive resources at trial, including the use of

26   experts.  Such factual and legal issues include: (1) the constantly changing populations of youth

27   in the Facilities and the resulting probability that current Class members will age out of the

28   Facilities before getting any relief; (2) ongoing policy revisions by Defendants which could

1    create different factual issues; (3) the expense of hiring experts for all Parties; (4) legal resolution

2    of any conflicts between federal and state laws and regulations; and (5) the novelty of Plaintiffs'

3    claims, many of which – like the challenge to pepper spray use – have never been challenged

4    under the ADA in California.

5        Although Plaintiffs maintain that they would ultimately win on issues of liability, and

6    Defendants maintain that they would be successful in their defenses, these Settlement

7    Agreements are in the best interests of the Class as they achieve the broadest relief in the shortest

8    period of time.  Proceeding to trial, along with possible appeals, could delay resolution of this

9    matter by as many as seven years.  By contrast, under the Settlement Agreements, the Class will

10    not have to wait for relief.  Given the importance of the negotiated relief to Class members'

11    lives, the difference between the possibly long delay involved in continued litigation and the

12    immediate improvements promised by the Settlement Agreements is an important consideration.

13    The risks of continued litigation therefore weigh in favor of approval.

14        **2.    The Settlement Agreements are Fair, Adequate, and Reasonable in
             Light of the Discovery Completed and the Stage of the Proceedings.**

15

16        When class counsel "possess a sufficient understanding of the issues involved and the

17    strengths and weaknesses of the case," this factor weighs in favor of settlement approval.  *See*

18    *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010).

19        As set forth in Section II, *supra*, and as noted by the Court in its Order Granting

20    Preliminary Approval, the negotiated Settlement Agreements were preceded by a lengthy

21    investigation that included on-site inspections of the Facilities and Facility Schools by experts,

22    meetings with administrators, staff, and detained youth, and review of more than 10,000 pages of

23    documents including policies, incident reports, logs of pepper spray use and confinement,

24    medical records, and education records.

25        "Due to the extent of the investigation and discovery completed, the parties were able to

26    make informed decisions regarding the claims presented and use of the recommendations of the

27    experts to frame the Probation Action Plan, Court Schools Implementation Plan, and settlement

28    agreements."  (Order Granting Preliminary Approval at 26, ECF No. 50).  Accordingly, this

1    factor supports approval of the Settlement Agreements.

2                    **3.    No Class Member Objected to the Settlement Agreements.**

3            Despite class notice reaching at least 279 class members, no class member has filed an

4    objection to the Settlement Agreements with the Court.  "[T]he absence of a large number of

5    objections to a proposed class action settlement raises a strong presumption that the terms of a

6    proposed class action settlement are favorable to the class members."  *In re Omnivision Techs.,*

7    *Inc.,* 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (quotation omitted).

8                    **4.    The Settlement Agreements Are the Product of Arms-Length
9                            Negotiations by Experienced Class Counsel.**

10           Where a settlement is the product of arms-length negotiations conducted by experienced

11   class counsel, the Court begins with a presumption that the settlement is fair and reasonable.  *See*

12   5 Newberg § 13.45; *Hall v. Cty. of Fresno*, No. 111CV02047LJOBAM, 2015 WL 5916741, at

13   *4 (E.D. Cal. Oct. 7, 2015); *Fernandez v. Victoria Secret Stores, LLC*, No. CV 06-04149 MMM

14   (SHx), 2008 WL 8150856, at *4 (C.D. Cal. July 21, 2008); *Nat'l Rural Telecomm's Coop. v.*

15   *DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D Cal. 2004).  Here, both the Probation and KCSOS

16   Settlement Agreements are fundamentally fair, adequate, reasonable, and free from collusion,

17   and thus should be granted approval.

18           The Settlement Agreements negotiated by the Parties were the result of arms-length

19   negotiations by experienced counsel on both sides, each with a comprehensive understanding of

20   the strengths and weaknesses of each party's respective claims and defenses.  Zito Decl. ¶¶ 2-19.

21   Plaintiffs and Probation Defendants reached the Probation Settlement after more than ten (10) in-

22   person and telephonic negotiations between counsel.  Zito Decl. ¶ 9.  Similarly, Plaintiffs and

23   School Defendants reached the KCSOS Settlement after more than ten (10) in-person and

24   telephonic negotiations between counsel.  *Id.*  Moreover, when unforeseen issues arose with

25   implementing the KCSOS Settlement, Plaintiffs and Schools Defendants executed an Addendum

26   to ensure the full Monitoring Term would be implemented.  Munson Decl. ¶¶ 26-28, 30.  Both

27   Settlement Agreements were negotiated in consultation with the respective experts in order to

28   implement their report findings.  Zito Decl. ¶¶ 4-7, 9, 19.  In the case of the KCSOS Settlement,

1   Dr. Elliot worked closely with KCSOS as a neutral expert to assist in drafting their Schools Plan.

2   Zito Decl. ¶ 9(a).  Additionally, CJJA and Dr. Elliott are the Monitoring Experts for the

3   Probation Plan and Schools Plan, respectively.  Zito Decl. ¶¶ 14-15.

4         Further, as discussed above, Class Counsel collectively have extensive expertise in

5   complex civil litigation, in class action cases, and in litigation regarding the rights of persons

6   with disabilities and conditions of detention.  Munson Decl. ¶¶ 3-10; Zito Decl. ¶¶ 21-22.  They

7   have investigated the factual and legal issues raised in this action and diligently negotiated

8   Plaintiffs' claims for approximately three years.  Munson Decl. ¶¶ 12-31.  Counsel for both the

9   Probation Defendants and the School Defendants also possess substantial experience defending

10  their client against class actions.  Counsel on both sides view the Settlement Agreements as a

11  successful compromise that will resolve Class members' claims in a fair and efficient manner.

12  Zito Decl. ¶¶ 16-19.  Thus, the fact that qualified, well-informed counsel endorse the Settlement

13  Agreements as being fair, reasonable, and adequate weighs in favor of preliminary approval.

14  That the Parties negotiated the Settlement Agreements on the injunctive relief for the benefit of

15  the Class, while leaving determination of Plaintiffs' claims for attorney's fees and costs for later

16  negotiation, further demonstrates the absence of any collusion.  Zito Decl. ¶¶ 11-12.

17  VI.    **CONCLUSION**

18        The Settlement Agreements will benefit hundreds of youth with disabilities who are

19  currently detained at the Facilities or who will be detained at the Facilities in the future.  Given

20  the relief achieved, the risks and costs involved in further litigation, and the absence of class

21  member objections, the negotiated Settlement Agreements represent a fundamentally "fair,

22  adequate, and reasonable" resolution of the disputed issues.  Therefore, the Parties respectfully

23  request that this Court approve the Settlement Agreements.  Pursuant to Local Rule 5-1(i)(3)

24  concurrence in the filing of this document has been obtained from each of the signatories below.

25  DATED:  May 6, 2020                    Respectfully submitted,

26                                         DISABILITY RIGHTS CALIFORNIA

27                                         /s/ Carly J. Munson
                                           Carly J. Munson
28
                                           and

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES

/s/ Thomas P. Zito
Thomas P. Zito
*Attorneys for Plaintiffs*

OFFICE OF KERN COUNTY COUNSEL

/s/ Margo A. Raison (as authorized on May 6, 2020)

_____
Margo A. Raison, County Counsel
*Attorney for Defendants: Kern County, Kern County
Probation Department, and TR Merickel*

ATKINSON, ANDELSON, LOYA, RUUD &
ROMO

/s/ Mark R. Bresee (as authorized on May 6, 2020)

_____
Mark R. Bresee
*Attorney for Defendants: Kern County
Superintendent of Schools and Mary C. Barlow*

1

LIST OF ADDITIONAL ATTORNEYS

2

MARGO A. RAISON (SBN: 133579)
KENDRA L. GRAHAM (SBN: 219760)

3

ANDREW C. THOMSON (SBN: 149057)
ANDREW HAMILTON (SBN: 299877)

4

Office of County Counsel, County of Kern
1115 Truxtun Avenue, Fourth Floor

5

Bakersfield, CA 93301
Phone: (661) 868-3848

6

Facsimile: (661) 868-3643
Email: kgraham@kerncounty.com

7

Attorneys for Defendants: Kern County, Kern County Probation Department, and TR Merickel

8

9

MARK R. BRESEE (SBN: 167346)
Atkinson, Andelson, Loya, Ruud & Romo
16870 West Bernardo Drive, Suite 330

10

San Diego, CA 92127
Phone: (858) 485-9526

11

Facsimile: (562) 653-3658
Email: mbresee@aalrr.com

12

13

Attorneys for Defendants: Kern County Superintendent of Schools and Mary C. Barlow

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28